UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

MELVIN NEWSOME, et al.

Plaintiffs,

v.                                          Civil Action No. S01-2257 (WDQ)

UP-TO-DATE LAUNDRY, INC., et al.

Defendants.

**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

The five named plaintiffs are African Americans who were hourly employees of defendant Up-To-Date Laundry, Inc. (UTD). They have sued UTD and its two top officers under 42 U.S.C. § 1981, claiming that the company has engaged in a pattern or practice of intentional racial discrimination against its black employees. Plaintiffs now move under Rule 23, F.R.Civ.P., to represent a class of all African Americans employed by UTD in hourly positions since August 1998.

UTD is a company in which the defendant Chief Executive Officer, Nancy Stair, admits saying that she paid blacks less than Latinos, because she believed Latinos were better workers [Nancy Stair deposition (hereafter Stair) at 130], and in which the defendant President, Brad Minetree, regularly calls black employees "niggers" and says that his "philosophy" is to "stall and delay rather than address" issues of discrimination [Frank Minniti declaration (hereafter Minniti), ¶ 18]. UTD has engaged in class-wide bias – directed from the top – and a class-wide approach is required to remedy the company's unlawful practices and to make whole those who have suffered from them.

## I. PLAINTIFFS' ALLEGATIONS AND PROOF

A. Background

Plaintiffs do not have to prove the merits of their case to get a class certified under Rule 23. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974) ("nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); see Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999). Still, "it is evident that some inspection of the circumstances of the case is essential to determine whether the prerequisites of Federal Civil Rule 23 have been met." Wagner v. Taylor, 836 F.2d 578, 587 (D.C. Cir. 1987) (footnote omitted). This means that "the court must examine both the claims presented and the showing in support of class certification for their adherence to the requirements of Rule 23." Id.

An "inspection of the circumstances" here reveals that UTD has engaged in a pattern or practice of intentional discrimination based on race that pervades every aspect of the workplace. In particular, the company (1) pays black workers less than Latino employees, (2) gives blacks disproportionately fewer hours than Latinos, including overtime, (3) routinely assigns blacks to the dirtiest and most dangerous jobs in the plant, and (4) subjects black workers to an environment in which crude racial epithets, and other belittling treatment based on race, are the norm. UTD's discriminatory practices have been documented by discovery in this case, as well as by the Maryland Commission on Human Relations, which in 2001 issued a number of "probable cause" determinations finding that the company engages in systemic racial discrimination, including determinations for each of the five named plaintiffs [see Tab 1].

UTD is a family-owned Maryland corporation.  The company owns and operates a large industrial laundering facility in Baltimore that washes, dries, presses and delivers about 28 million pounds of laundry each year, including linens, towels and hospital clothing.  Clients include many of the hospitals in the Baltimore-Washington metropolitan area, as well as other commercial customers.   UTD has been run by members of the same family – Chief Executive Officer Nancy Stair and her sons, Brad and David Minetree, the President and former Vice President, respectively (Stair and Brad Minetree are the two individual defendants; David Minetree was named but not served).  Stair and her sons have been personally involved in UTD's operations and are responsible for much of racial bigotry that is rife at the laundry.

UTD employs several hundred workers at its only plant, which is in Baltimore. The plant was organized when UTD signed a collective bargaining agreement with UNITE in June 2001.  But before then, the vast majority the workforce consisted of unskilled laborers who earned about $5 to $7 per hour.  The hourly jobs at issue, which were located in five departments (100-500), required no experience and little or no training.  See Michael Kennedy declaration (hereafter Kennedy), ¶ 4 ("Workers did not need any special skills and they were trained on the job.  Laundry work is repetitive and it is not brain surgery").  See also Minniti, ¶ 5.

Historically, only a few whites (under five percent) have worked in the hourly positions [John Fitzgerald deposition (hereafter Fitzgerald) at 29].  Until the late 1990's, most of these jobs were filled by African Americans, but at that time UTD also began hiring Latino workers.  Many of plaintiffs' allegations focus on the company's conscious decision to treat black employees worse than Latinos in terms of base pay, overtime and

job assignment.  UTD and its top officials have also created a hostile work environment for the company's African-American employees.

A.  UTD Has Engaged in a Pattern or Practice of Racial Discrimination

Much of the evidence set forth below is based on admissions from the two individual defendants themselves (Nancy Stair and Brad Minetree), the other family member who helped to run the company (David Minetree), or from present or former managers who reported to defendants, including Plant Managers John Fitzgerald, Michael Kennedy and Tom Hendrickson; Linda Marr, a Human Resources official; and managers Frank Minniti and Maria Espinosa.  These admissions, which are set forth in the attached deposition excerpts and declarations, are admissible under F.R.Evid. 801(d)(2)(D).  Of these managers, all but Espinosa are white; she is Latina.

1.  The Disparity in Base Pay

Plaintiffs allege that UTD pays blacks less than similarly situated Latinos.  First Amended Complaint, ¶¶ 31-32.  The findings of the Maryland Commission on Human Rights corroborate this allegation [see Tab 1].  More important, plaintiffs have retained an expert statistician, Dr. Charles Mann, who analyzed a data base comprising all hourly employees in five departments (100-500) who worked for the laundry in 1999, assembled from personnel records produced by UTD.  Dr. Mann's task was to see, first, whether there were any differences between black and Latino workers in terms of base pay, overtime and job assignment.  Then, if differences were found, Dr. Mann employed recognized statistical techniques to determine whether the differences were statistically significant, i.e., whether they were gross enough to raise an inference of discrimination. Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977) ( "[w]here

gross statistical disparities can be shown, they alone in a proper case constitute prima facie proof of a pattern or practice of discrimination").

Statistical significance is a term of art in both law and science. Not every difference is meaningful, and some apparent differences may arise purely by chance. The job of the statistician (in this case, Dr. Mann) is to advise on the likelihood that any particular difference arose by chance. If that likelihood is sufficiently low, statistical significance is achieved, which means that it can confidently be assumed that something other than chance – e.g., racial discrimination – caused the difference in question.

Courts generally agree that .05 is a statistically significant level of confidence, which means that there is a probability of only five in 100 (or one in 20) that the disparity under consideration arose purely by chance. In statistical terms, a .05 level of confidence translates into two standard deviations, and courts sometimes use this terminology. Hazelwood, 433 U.S. at 309 n.14; see Adams v. Ameritech Services, Inc., 231 F.3d 414, 424 (7th Cir. 2000) ("[t]wo standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral"); Ottaviani v. State University of New York, 875 F.2d 365, 371-72 (2d Cir. 1989); Segar v. Smith, 738 F.2d 1249, 1282-83 (D.C. Cir. 1984). See also Ferguson v. City of Charleston, 186 F.3d 469, 481 (4th Cir. 1999); Anderson v. Zubieta, 180 F.3d 329, 339-40 (D.C. Cir. 1999); Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 362-63 (7th Cir. 2001). The importance of the .05 standard is that statistical evidence that is probative at this level will **alone** be sufficient to raise an inference of unlawful discrimination. Palmer v. Shultz, 815 F.2d 84, 96 (D.C. Cir. 1987).

Dr. Mann prepared a report in January 2003 [Tab 2].  The data base he analyzed contained payroll and other information on 957 individuals who worked for UTD in 1999 – including 541 African Americans and 371 Latinos (and 45 others who were excluded from consideration, e.g., white, Asian, unknown) [id. at 1].  Focusing first on base pay rate, Dr. Mann looked first at employees hired before 1999 and compared three aspects of pay – (1) initial pay rate (i.e., as of January 1, 1999), (2) the highest pay rate in 1999, and (3) the mean (average) pay rate in 1999.

Dr. Mann found that, within this group of employees hired before 1999, the initial pay rate for blacks, on average, was $5.27 per hour, compared to $6.20 for Latinos; the highest 1999 pay rate for blacks, on average, was $5.52, compared to $6.50 for Latinos; and the average 1999 pay rate for blacks was $5.39, compared to $6.44 for Latinos. These differences were all statistically significant, which means that they did not arise by chance [Tab 2 at 2-3].

After looking at the employees hired before 1999, Dr. Mann also analyzed the workers hired in 1999.  Again, he found statistically significant differences between blacks and Latinos in all three aspects of pay -- $5.20 (black) and $5.87 (Latino) for initial pay rate; $5.28 (black) and $5.93 (Latino) for highest pay rate in 1999; and $5.23 (black) and $5.91 (Latino) for average 1999 pay rate [Tab 2 at 4].

These pay disparities were not due to chance.  In fact, the pay differences analyzed by Dr. Mann were statistically significant at confidence levels far beyond the .05 (one in 20) accepted by courts.  Many were significant at the .0001 level of confidence, which means that there was only one possibility in 10,000 that a particular difference between blacks and Latinos arose by chance [e.g., Tab 2 at 4].

Dr. Mann's analysis rules out the chance factor, and the record conclusively demonstrates that raw bigotry produced the pay differences.  Indeed, Nancy Stair, the company's CEO, admitted that she told an investigator from the Maryland Human Relations Commission that UTD paid African Americans less than Latinos, because she believed Latinos were better workers; that Latinos deserved better pay; and that blacks did not want to do any work [Stair at 130].  Stair also told UTD's HR official Linda Marr that Latinos deserved better pay than blacks because they were better workers [Linda Marr deposition (hereafter Marr) at 103-04].  And when Frank Minniti raised the pay disparity with Brad Minetree, UTD's President,  after a black worker complained, Minetree acknowledged that "Hispanics were making more money than blacks" [Minniti, ¶ 9].

Maria Espinosa, who was a first level manager with hiring responsibility, said:

I knew that Up-To-Date was paying black employees less money than
Hispanic workers.  I told Brad Minetree that he should pay Hispanics and
blacks equally.  Brad said no and that blacks are lazy.

[Maria Espinosa declaration (hereafter Espinosa) at 2.]

This case would warrant class treatment on the pay disparities alone.  But there is much more.

2.  The Disparity in Overtime

Plaintiffs allege that black workers are denied the opportunity to work as many hours as Latinos, including overtime.  First Amended Complaint, ¶ 39.  Dr. Mann analyzed overtime data for 1999 and found that the average black worker got 19.43 overtime hours, compared to 67.81 for the average Latino – over three times as much.  Of course, some employees worked no overtime at all, so Dr. Mann also analyzed the data

for employees who actually had overtime in 1999. Of those, the blacks averaged 51.43 hours, and the Latinos averaged over twice as many – 105.19 [Tab 2 at 6-8].

Once again, these differences were statistically significant, often at the .0001 level of confidence (meaning that there was only one possibility in 10,000 that the differences in overtime were due to chance) [Tab 2 at 7-8]. These disparities are so dramatic as to, by themselves, raise an inference of racial bias in overtime. Hazelwood, 433 U.S. at 309 n.14; Ferguson v. City of Charleston, 186 F.3d at 481.

 3. Assignment to the Dirtiest, Most Dangerous Jobs

Plaintiffs allege that African-American employees are discriminatorily assigned to the dirtiest, most dangerous jobs. First Amended Complaint, ¶ 36. There is no dispute that these positions are found in the Soil Room in Department 300, because of the presence of bio-hazardous waste on laundry from hospitals, such as blood, blood-borne pathogens and fecal matter. Frank Minniti called the Soil Room "an especially brutal and disgusting job," noting that a black employee working there discovered half a human arm, and that other employees encountered fingers and other body parts [Minniti, ¶ 6].

Dr. Mann examined assignment to the Soil Room, and again his findings confirmed plaintiffs' allegations. Of the 245 employees who worked in the Soil Room in 1999, 225 were black (91.8 percent), and only 20 were Latino (8.2 percent). In the remaining departments, in contrast, representation was roughly equal – 47.2 percent black and 52.8 percent Latino. The sharp disparity here was also statistically significant at the .0001 level of confidence [Tab 2 at 6], thereby raising an inference of discrimination in assignment to the Soil Room.

 4. The Racially Hostile Environment

Plaintiffs allege that UTD and its officials, especially Nancy Stair and Brad and David Minetree, subject black workers to a hostile work environment – a torrent of racial epithets and other demeaning treatment. First Amended Complaint, ¶¶ 23-30. The Maryland Human Relations Commission verified this allegation [see Tab 1], and discovery in this case has uncovered a pattern of harassment that is at once racist and crude.

All three Plant Managers – John Fitzgerald, Michael Kennedy and Tom Hendrickson – heard Nancy Stair and the Minetree brothers repeatedly use the term "nigger" at the workplace, including on the plant floor [Fitzgerald at 94; Kennedy, ¶7; Tom Hendrickson deposition (hereafter Hendrickson) at 88]. Brad Minetree admitted that David Minetree used the epithet at work [Brad Minetree deposition at 448]. And Brad conceded that he himself used the phrase "nigger-rig-it" to indicate a problem, including on the plant floor in front of black employees [id. at 14-16]. David Minetree admitted using the same phrase when something had been "screwed up" [Tab 1, Finding re Melvin Newsome, ¶ 10].

Linda Marr heard Brad Minetree refer to black employees as "niggers," "dumb niggers," "stupid niggers" and "fucking niggers" [Marr at 42]. Frank Minniti heard David Minetree angrily referring to "niggers" and "fucking niggers" on the plant floor [Minniti, ¶ 16]. Maria Espinosa heard both Minetrees refer to black employees as "niggers," as well as using other racist terms [Espinosa at 3]. Indeed, David Minetree admitted that he did not confine himself to a single epithet to abuse black workers; for example, he regularly told African Americans to "get your black ass" over here or over there [Tab 1, Finding re Melvin Newsome, ¶ 10; see Fitzgerald at 86-87].

Nancy Stair, UTD's Chief Executive Officer, admitted referring to African Americans as "niggers."  But she said that she only did that in West Virginia – "It's thought of nothing there.  It's just a word" [Stair at 25-26].  She must have forgotten crossing the state line, though, because others heard her use the term in Maryland – at the UTD plant [Kennedy, ¶ 7; Hendrickson at 99].

It is rare today to see senior managers of a company engaging in such open and vile racial harassment.  The Fourth Circuit has recognized that,

> [f]ar more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans.  "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (citation omitted).

UTD's top officials have created an "abusive working environment" that must be addressed on a class-wide basis.

## II.  THE CLASS PROPOSED BY PLAINTIFFS SHOULD BE CERTIFIED

The statute of limitations for claims brought in Maryland under 42 U.S.C. § 1981 is three years.  Grattan v. Burnett, 710 F.2d 160, 161-63 (4th Cir. 1993).  The original complaint in this case was filed on August 1, 2001, so any claims arising on or after August 1, 1998 would be timely.  In light of the statute of limitations, as well as the organization of most of the hourly workers in the laundry into five departments (100-500), plaintiffs propose certification of this class:

> All African Americans employed by defendant Up-To-Date Laundry, Inc. as hourly workers in Departments 100 through 500 at any time from August 1, 1998 through the present.

As proponents of class certification, plaintiffs must show, first, that the proposed class meets the four criteria set forth in Rule 23(a) – numerosity, commonality, typicality and adequacy of representation.  See, e.g., Hewlett v. Premier Salons International, Inc., 185 F.R.D. 211, 215 (D. Md. 1997).  Second, they must show that the proposed class fits into one of the three categories in Rule 23(b).  Id.  In this connection, the Supreme Court has observed that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of the type of class envisioned by Rule 23(b)(2). Anchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997).

Plaintiffs likewise rely on Rule 23(b)(2) in the present case.  In particular, they propose a bifurcation in which "the issues of liability and class-wide relief would be tried first, with the individual relief, if any, to be determined later."  Hewlett, 185 F.R.D. at 219.  The issues of liability and class-wide relief, including "declaratory and injunctive relief and, possibly, punitive damages," would be certified for class treatment under Rule 23(b)(2).  Id. at 222.  The Court need not now determine the best means for deciding remedies peculiar to individuals.  Id.  Instead, "[i]f liability is established, the Court [can] then determine the most appropriate mechanism for determining [individual] remedies." McReynolds v. Sodexho Marriott Services, Inc., 208 F.R.D. 428, 449 (D.D.C. 2002).

First, though, plaintiffs must address the criteria in Rule 23(a), which are easily satisfied in this case.

A.  <u>Plaintiffs Meet the Standards in Rule 23(a)</u>

1.  <u>Numerosity</u>

Plaintiffs must show that "the class is so numerous that the joinder of all members

is impracticable."  Rule 23(a)(1).  In this regard, plaintiffs' data base, which was created

using personnel records produced by UTD, shows that 541 African Americans worked

for the company in 1999 alone [Tab 2 at 1]; many more blacks have been employed

before and since.  Plaintiffs are "not required to demonstrate that every member of the

proposed class ha[s] been a victim of discrimination; it [is] sufficient that they could have

been victims of an alleged pattern and practice of discrimination."  <u>Bullock v. Board of

Education of Montgomery County</u>, 210 F.R.D. 556, 559 (D. Md. 2002), explaining <u>Lilly

v. Harris-Teeter Supermarket</u>, 720 F.2d 326 (4th Cir. 1983).

In <u>Lilly</u>, where the focus was on a pattern of discriminatory terminations,

plaintiffs showed that "229 black employees were involuntarily terminated . . . easily

enough to demonstrate the existence of a class" for numerosity purposes.  720 F.2d at

333.  It follows that plaintiffs here, who can point to over twice the number of class

members as in <u>Lilly</u>, meet the numerosity standard in Rule 23(a)(1).

2.  <u>Commonality</u>

Rule 23(a)(2) requires "questions of law or fact common to the class."  In the

present case, the focus is on **one** plant providing **one** service -- commercial laundering --

run by **one** family.  The class members all have similar hourly jobs, and they have been

subjected to pervasive racism.

In this setting, there are a host of common questions having both legal and factual

aspects, including (1) whether UTD pays black employees less than similarly situated

Latinos, (2) whether the company discriminates against black workers with respect to overtime assignments, (3) Whether UTD regularly assigns blacks to the dirtiest, most dangerous jobs in the plant, and (4) whether company officials, including UTD's most senior officers, subject black workers to a hostile work environment replete with the crudest of racial epithets.

As we have shown, the evidence is in, and the answer to each of these questions is a resounding yes.  In any event, class "[c]ertification is only concerned with the commonality (not the apparent merit) of the claims."  <u>Lilly</u>, 720 F.2d at 332-33.  Here, as in <u>Lilly</u>, "the complaint plainly alleged a practice of disparate treatment in the exercise of unbridled discretion," and that is enough to raise common questions of law and fact.  <u>Id</u>. at 333.  And here, although not required to do so, plaintiffs have at a minimum shown substantial merit in their allegations.  The commonality criterion in Rule 23(a)(2) is satisfied.

3.  <u>Typicality</u>

The "claims . . . of the representative parties [must be] typical of the claims . . . of the class."  Rule 23(a)(3).  The Supreme Court has noted that

> [t]he **commonality and typicality requirements of Rule 23(a) tend to merge.**  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

<u>General Telephone Co. of the Southwest v. Falcon</u>, 457 U.S. 147, 158 n.13 (1982) (emphasis added).

In the present case, the named plaintiffs themselves have suffered the same kinds of injuries that they allege are common to the class. All five plaintiffs -- Melvin Newsome, Joseph Lloyd, Veronica Johnson, Herbert Datcher and Rudolph Curtis -- were paid less than similarly situated Latino workers, denied overtime, and subjected to a steady stream of racial epithets and other demeaning treatment by company officials, in particular Nancy Stair and Brad and David Minetree. And all except Ms. Johnson were assigned to the dirty and dangerous Soil Room. First Amended Complaint, ¶¶ 41-47 (Newsome), 52-57 (Lloyd), 62-66 (Johnson), 71-77 (Datcher), 82-87 (Curtis). See McReynolds, 208 F.R.D. at 431 ("the allegations in the complaint are presumed true for purposes of a motion for class certification"); In re Kirschner Medical Corporation Securities Litigation, 139 F.R.D. 74, 81 (D. Md. 1991) ("in a [class] certification motion the Court must accept as true the substantive allegations of the Complaint").

Beyond the complaint, the named plaintiffs have testified about their mistreatment at UTD. In May 1999, Melvin Newsome signed and helped distribute an open letter demanding equal pay for black employees and an end to harassment [Melvin Newsome deposition at 50-51]. Shortly after that, David Minetree told Newsome that he should stop causing trouble if he wanted to keep his job [id. at 23]. Newsome worked in the Soil Room, where conditions were wretched: "When soil came across there, such as fecal matter, and the diapers and blood[y] clothes coming across there, they were basically using their hands" [id. at 108]. When a fire broke out and employees discovered that the fire extinguishers did not work, Brad Minetree said, "Don't you dumb niggers know how to work a fire extinguisher?" [id. at 131-32]. Newsome heard Nancy Stair say, "All those people like to do is get drunk and use drugs" [id. at 138]. And Newsome saw David

Minetree acting as if he was having sex from the rear with black employees, both female and male, including plaintiff Joseph Lloyd [id. at 143-44].

Lloyd verified this incident [Joseph Lloyd deposition at 69-70], and he recounted the names that Brad Minetree had called him – "black stupid motherfucker" [id.], "dumb ass nigger" [id. at 71], "Kunta Kinte" [id. at 70]. He described an incident in late 1998 in which Brad Minetree became irate with him after a Latino worker caused a problem with the laundry tunnel: "Brad start calling me motherfucker, dumb ass, why did I let Santos stop the tunnel up" [id. at 127 ]. Lloyd asked why Minetree was yelling at him, since Santos was responsible, and then "Brad called me black ass, motherfucker, dumb ass, bitch" [id.]. Lloyd also witnessed Brad Minetree abusing other African-American workers – berating William White, "dumb black motherfucker, why are you taking so long" [id. at 129], and screaming at a number of blacks, "assholes, dumb motherfuckers, niggers" [id. at 142-43]. In addition, Lloyd heard Nancy Stair say that she would rather pay Latinos more than blacks, because blacks only want to get high and don't want to work [id. at 70].

Veronica Johnson recounted the time when Nancy Stair literally broadcast racial abuse. Stair went on the public address system, during work hours, and said, "all blacks want to do is get high and Latinos they want something out of life" [Veronica Johnson deposition at 71]. Johnson also heard Brad Minetree lash out profanely, "cussing at the blacks" [id. at 68-69].

Herbert Datcher heard Brad Minetree curse people and call them "niggers" [Herbert Datcher deposition at 142]. On one occasion, Brad told the workers in the Soil Room, "you mother fucking niggers, you are working too damn slow, I should fire the lot

of you" [id. at 144-45].  Datcher also heard David Minetree use racial epithets, including "nigger," "spearchucker" and "boy" [id. at 154].  David would say to Datcher, "What's up nigger?" [id. at 157].  And David told Datcher that he had a gun at work [id. at 222-23] (Joseph Lloyd saw the firearm [Lloyd at 122], and Michael Kennedy confirmed that David Minetree kept a gun in his credenza [Kennedy, ¶ 9]).  Nancy Stair used racial epithets, too, and Datcher heard her say that Latinos worked better than blacks.  He asked her, "Ms. Nancy, how can you say that?"  Then Brad Minetree came up to Datcher and said that he better never talk to his mother like that again, or he would lose his "fucking job" [Datcher at 161].

If anything, Rudolph Curtis, who initially began working for UTD in 1995, suffered even more racial abuse than the other named plaintiffs.  When Curtis told Nancy Stair that blacks and Latinos should be paid equally, she told him that Hispanics "do more work than the blacks" [Rudolph Curtis deposition at 88-89].  He also recalled Stair's racial slur over the public address system [id. at 85], as well as the time that Stair became irate because some of the black workers did not share their pizza with her dog [id. at 82-83].

Curtis heard Brad Minetree regularly use the term "nigger," "just about" daily [Curtis at 78].  Once, in the Soil Room, Brad told Curtis "to get my monkey ass up there" [id. at 74].  On another occasion he said, "if we don't hurry our lazy black asses up and hurry and get this work out, we will all be out of a job" [id. at 79].  He once said of a Latino employee, "Santos works harder than five blacks put together" [id. at 113].  Still another time, Brad Minetree said, "If you guys hurry up and do this, I'll buy you some chicken because I know you black guys love chicken" [id. at 77].  And Brad made vulgar

16

comments about black women's supposed sexual proclivities "throughout my history" at UTD [id. at 80]. Curtis once told Brad that he did not want to hear any more of that kind of talk, and Brad barked back, "I don't care what you want to hear, this is my fucking company. I can say what I want to say" [id. at 81].

David Minetree was equally abusive. David referred to Curtis as "Kunta," called him a "little black mother fucker" and told him to "kiss the head of my dick" [Curtis at 97-98]. He would say to Curtis, "get your black ass over here nigger" [id.]. David made racial comments on a daily basis -- "Nigger this, nigger that. Or motherfucker, aunt Jemima. Kiss my ass bitch. Suck my dick. Fuck you and your mama. If you don't like what I'm saying, I'll have my mom fire you. We don't need you fucking nigger" [id. at 94]. When David was driving a truck at the plant, he would yell, "get your black ass out of the way" [id. at 96]. Once, Curtis heard David Minetree say to one of the few white employees, "how can you stand working back there with all that blood and all them niggers" [id. at 95].

Curtis described how this abuse affected him: "That stuff hurts. I'm not ashamed to say that. . . . I mean it hurts your pride. . . . You are supposed to accept it and stuff like that. But I like my job, so I was doing my job" [Curtis at 98]. He explained why he left UTD: "Being called nigger, assholes, motherfuckers, or you can kiss my ass, or that bitch here, that bitch there. Respect don't cost you anything. I think they were very unprofessional in a company" [id. at 73].

That was an understatement. There is no question that UTD was "unprofessional." Nor is there any question here that the claims of the named plaintiffs are typical of the claims of the class. Given the close congruence between commonality

and typicality, "[s]o long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied." Hewlett, 185 F.R.D. at 217. A shared "interest in prevailing in similar legal claims" certainly exists here, and plaintiffs meet the typicality standard in Rule 23(a)(3).

　　4. Adequacy of Representation

The "representative parties [must] fairly and adequately protect the interests of the class." Rule 23(a)(4). As the Supreme Court noted in Falcon, 457 U.S. at 158 n.13, this criterion overlaps with commonality and typicality in contemplating that the claims of the named plaintiffs and the class are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." As has been shown, there is no question here that the claims of the named plaintiffs and the class are sufficiently "interrelated." Indeed, this class is more homogeneous than most, because the jobs at issue are all relatively low wage positions requiring no particular expertise. In part for that reason, there are no conflicts of interest between the named plaintiffs and the class, which is another element addressed under the adequacy-of-representation standard. Falcon, id. Both the class and the named plaintiffs seek to prove exactly the same thing – the existence of a pattern or practice of racial bias at UTD.

Finally, adequacy of representation means that plaintiffs' counsel are competent to handle class litigation. Falcon, id. That condition is also met here. See Tab 3 (Declaration of Douglas B. Huron). The named plaintiffs will "fairly and adequately protect the interests of the class," as required by Rule 23(a)(4).

　　B. The Proposed Class Should be Certified under Rule 23(b)(2)

Plaintiffs easily satisfy the four criteria in Rule 23(a), but they also must show that the proposed class fits into one of the three types of classes enumerated in Rule 23(b).  The class proposed by the plaintiffs should be certified under 23(b)(2), and plaintiffs seek (b)(2) certification.  In the alternative, certification under 23(b)(3) would also be appropriate.  But "[w]here a class is capable of certification under both (b)(2) and (b)(3), the preferred method is to certify under (b)(2)."  Hewlett, 185 F.R.D. at 219.

    1.  Rule 23(b)(2)

Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  As noted above, the Supreme Court has said that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of 23(b)(2) class actions.  Anchem Products, 521 U.S. at 614.  This is just such a case.

Indeed, it is difficult to imagine a case more suited for (b)(2) certification, since "the party opposing the class [UTD] has acted . . . on grounds generally applicable to the class," by discriminating against African Americans **as a class** in terms of base pay, hours worked (including overtime), job assignment, and hostile comments and treatment. In these circumstances, both "final injunctive relief [and] corresponding declaratory relief" are appropriate.

Plaintiffs seek back pay and compensatory and punitive damages, in additional to non-monetary declaratory and injunctive relief.  See First Amended Complaint at pp. 21-22.  Rule 23(b)(2) is silent as to whether monetary remedies may be sought in a (b)(2) action, but the Advisory Committee Notes on Rule 23 say that class certification under

(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or **predominantly** to money damages" (emphasis added). This indicates that the drafters of Rule 23 contemplated that some form of monetary relief would be permissible in a (b)(2) action, but that issues concerning money damages could not predominate.

In order to insure that the class members' individual claims for back pay and nonpecuniary compensatory damages do not predominate over the claims for class-wide relief, plaintiffs propose a bifurcation in which "the issues of liability and class-wide relief would be tried first, with the individual relief, if any, to be determined later." Hewlett, 185 F.R.D. at 219. Given this bifurcation, (b)(2) certification would be limited to the issues of liability and class-wide relief, including declaratory and injunctive relief and punitive damages. This was exactly what Judge Chasanow ordered in Hewlett, 185 F.R.D. at 222.

Punitive damages are available under 42 U.S.C. § 1981. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975). It is possible, of course, that the plaintiffs could prevail on the issue of class-wide liability, with consequent entitlement to declaratory and injunctive relief, and still be denied punitive damages. And as in any case, the Court would decide in the first instance whether an instruction on punitives was warranted. But if the evidence plays out at trial as plaintiffs expect – and as outlined above – this case, which smacks of the worst bigotry of an earlier era, is a prime candidate for an assessment of punitive damages on a class-wide basis.

In any event, bifurcation in the manner suggested by plaintiffs is appropriate, and the proposed class is suitable for certification under Rule 23(b)(2). Hewlett, 185 F.R.D. at 222.

2. <u>Rule 23(b)(3)</u>

The proposed class could also be certified under 23(b)(3), which permits class treatment where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other methods for a fair and efficient adjudication of the controversy." Bifurcation would insure that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," since only the issues relating to the class as a whole would be tried first (i.e., class-wide liability and entitlement to class-wide declaratory and injunctive relief, as well as punitive damages). In addition, one trial on these class-wide issues would plainly be "superior to other methods for a fair and efficient adjudication of the controversy."

Certification under Rule 23(b)(3) is possible. As noted above, though, "[w]here a class is capable of certification under both (b)(2) and (b)(3), the preferred method is to certify under (b)(2)." <u>Hewlett</u>, 185 F.R.D. at 219. For this reason, courts that certify a class under 23(b)(2) may either refuse to certify under (b)(3), as in <u>Hewlett</u>, <u>id</u>. at 222, or simply decline to decide the issue, as in <u>McReynolds</u>, 208 F.R.D. at 448 n.33.

Class certification under Rule 23(b)(2) is the preferable approach in this case, but plaintiffs would press for (b)(3) certification if the Court for any reason believes that (b)(2) is not appropriate.

**CONCLUSION**

A district court has "broad discretion in deciding whether to permit a case to proceed as a class action." <u>Hartman v. Duffey</u>, 19 F.3d 1459, 1471 (D.C. Cir. 1994). If ever a case cried out for class-wide treatment, this is it. Defendants UTD and its highest

level officials have subjected the company's African-American workers to the kind of virulent, open racism that this nation hoped had ended.  UTD will not reform on its own. On the contrary, when Frank Minniti tried to discuss complaints of discrimination with Brad Minetree, Minetree told him that "his philosophy was to stall and delay rather than address these issues" [FM ¶ 18].  And Minetree dismissed and "laughed off" Linda Marr's counseling about his ongoing discriminatory comments at the workplace [Marr at 44, 82].

The proposed class has hundreds of members.  If it is not certified, the result will be scores of individual lawsuits, which would not be efficient for either the parties or the Court.

Plaintiffs easily pass muster under Rule 23(a), and the class they propose -- together with the bifurcation they suggest -- satisfies the criteria for certification under Rule 23(b)(2).  The motion for class certification should be granted.

<div style="margin-left:40%;">

_____/s/_____

Philip J. Simon 12893
Richard A. Salzman
Douglas B. Huron
Betty Grdina 15647
HELLER, HURON, CHERTKOF
LERNER, SIMON & SALZMAN
1730 M Street, NW
Suite 412
Washington, DC  20036
(202) 293-8090

Attorneys for plaintiffs

</div>