# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MELVIN NEWSOME, et al. | * |
| Plaintiffs, | * |
| v. | *   Civil Action No:  01-2257 (WDQ) |
| UP-TO-DATE LAUNDRY, INC., et al. | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*         \*   \*   \*   \*   \*

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This suit was filed by Plaintiffs Melvin Newsome, Joseph Lloyd, Veronica Johnson, Herbert Datcher and Rudolph Curtis on August 1, 2001.[1]  Plaintiffs are five former employees of Defendant Up-To-Date Laundry, Inc. ("UTDL").  They claim, under 42 U.S.C. §1981, that they were discriminated against on the basis of race in their employment with UTDL with respect to various employment decisions, including pay, job assignments, opportunity for overtime work, availability of work hours, assignment to weekend shifts and maintenance of a hostile work environment.

Defendants UTDL, Nancy Stair and Bradley Minetree have moved for summary judgment with respect to:

- Plaintiff Newsome's complaints that he was denied overtime hours, assigned to the sorting area, or "soil room", and suffered a reduction of work hours because of his race

---

[1]   This complaint asserts that this is a class action, but Plaintiffs did not move at any time during the discovery period to have the case certified as a class action.  It is Defendants' understanding that Plaintiffs intend to file a motion for certification on the motions deadline.

and his complaint of a hostile work environment;

- Plaintiff Datcher's complaints that he was denied overtime hours, assigned to the soil room, and suffered a reduction of work hours because of his race;

- Plaintiff Curtis' claims that he was denied overtime hours, assigned to the soil room and suffered a reduction of work hours because of his race;

- Plaintiff Lloyd's complaints that he was denied overtime hours and assigned to the soil room because of his race; and

- Plaintiff Johnson's complaints that she was denied overtime hours, assigned weekend shifts and suffered a reduction of work hours because of her race and her complaint of a hostile work environment.

This Memorandum is submitted in support of that Motion.

## STATEMENT OF FACTS[2]

UTDL is family-owned corporation engaged in the business of laundering linens, towels, gowns and clothing for health systems and hospitals in the Baltimore-Washington metropolitan area. *Exhibit 1 at p.1*. Defendant Nancy Stair is UTDL's Chief Executive Officer, and Defendant Bradley Minetree is its President.

Until early 1999, UTDL operated in a facility located at 2204 Frederick Avenue in Baltimore. In the late 1990's, the Frederick Road plant was operating at maximum capacity, making it difficult for the company to complete work from existing customers in a timely fashion and impossible to seek new customers. In late 1997, UTDL decided to move to another location

---

[2] UTDL is aware that, for the purpose of this motion, the Court must view the evidence available in the light most favorable to the Plaintiffs. The following statement of facts is drafted with this principal in mind and quotes largely from the Plaintiffs' deposition testimony and affidavits. UTDL would disagree with various portions of this testimony, but these disagreements are not material with respect to this summary judgment motion and many are not mentioned or discussed in this Memorandum.

that would permit expansion. A site at 1221 DeSoto Road, also in Baltimore, was identified. *Id. at pp.1-2*.

In December of 1998 and January of 1999, UTDL started moving equipment to the DeSoto Road plant and phasing in operations there. From January though March of 1999, operations were split between the old Frederick Avenue plant and the new DeSoto Road plant. By the end of March, 1999, all of the equipment, operations, and those of the employees who were willing to transfer, had moved to the DeSoto Road plant. *Id. at p.2*.

For most of the period at issue, UTDL operated two shifts – a day shift from 6:00 – 2:30 and a second shift from 2:30 until the work was completed. During the January – March transition period in 1999, UTDL operated a single shift at DeSoto Road, from 7 a.m. until approximately 7 p.m. *Newsome at 46*.[3] After the bulk of the equipment and employees had moved to DeSoto Road, UTDL resumed the two-shift operation. *Id. at 47*.

**A.    UTDL'S BUSINESS**

UTDL picks up soiled linen from its customers, delivers it to the plant to be processed (*i.e.*, sorted, washed, dried, folded and packed), then returns the clean laundry to the customer. *Ex. 1 at p.2*. The Plaintiffs were employed in the various areas involved in the processing of the laundry at the UTDL plant, and a basic understanding of how laundry is processed is necessary background for evaluation the claims at issue in this Motion.

Throughout the processing, it is critical that the laundry from each hospital be kept separate. Each customer's soiled laundry arrives at the plant in bags which have been piled into

---

[3]    Deposition testimony taken in this case is identified by name of deponent and page number.

3

large wheeled carts.[4] In an area known as the "soil room" or "sort room," the bags of laundry, each of which may weigh more than 100 pounds, are removed from the carts. The bags are opened, and the laundry is sorted by type (*e.g.*, sheets, blankets, towels, gowns, clothing). *Id. at p.2.*

After sorting, loads of like items are fed into an industrial tunnel washer by the tunnel operator.[5] The tunnel operator is responsible for loading the proper amount and type of laundry onto the loading conveyor, operating a computer panel that controls the wash settings for each load, and monitoring the smooth operation of the machine. The loads of laundry advance through the tunnel on a continuous basis.[6] When the laundry emerges from the tunnel washer, it proceeds to a large press that compresses the load to eliminate as much water as possible. The press is monitored by a press operator. The tunnel is located in the same room as the sorting area. *Id. at pp.2-3.*

Dryer operators transport the pressed laundry from the soil room area to the dryer area on the main floor, then load it into commercial dryers. The dryer operator is responsible for ensuring that the dryer has been set with the proper heat level and drying time for each item for each customer. *Id. at p.3.*

Most of the items emerge damp from the dryers and are transported in bins for pressing,

---

[4]  Given that the laundry is arriving from hospitals, much it arrives soiled with blood, fecal matter, and other body fluids. Workers who handled the soiled laundry were provided with gloves and masks if they wished to use them. *Newsome at 108-110.*

[5]  At the old plant and for a short period at the new plant, certain delicate items were washed in "side loaders" -- commercial sized washing machines. Shortly after the move to DeSoto Road, the tunnel and press were adjusted to permit these items to be laundered in the tunnel washers, and, when the side loaders broke down, they were abandoned. *Datcher at 78, 110-111.*

[6]  Plaintiff Lloyd testified that the tunnel must be fed a 120 lb. load of laundry each 90 seconds. *Lloyd at 90.*

folding and packing on the main floor. These tasks are partially automated by pressing and folding machines that are operated by teams of employees (generally "feeders" who feed the items into the machine and "catchers" who catch and stack the items coming out of the machines). Where large items (such as sheets and blankets) are being folded, "box pullers" untangle the items and pull them from a cart, then hand them to the feeders. At the conclusion of the process, the items are packaged by packers and weighed by the scale operator, then stacked in a large wheeled cart and transferred to the dock area for delivery to the customer. *Id.*

**B.    THE UNION ORGANIZING CAMPAIGN**

Many of Plaintiffs' allegations focus on events that occurred in 1999. This year was significant not only because of the move from Frederick Avenue to DeSoto Road, but also because UTDL became the target of an intensive union organizing campaign in 1999. At the time of move, UTDL was a non-union operation. During the transition period, the labor union UNITE! (the Union of Needletrades, Industrial and Textile Employees) began a campaign to organize UTDL's production workers. *Ex. 1 at p.3.*

Two of the Plaintiffs -- Newsome and Datcher -- were among the earliest supporters of the union and its most outspoken advocates. *Datcher at 128-129, Newsome at 48-49, 104-105; Exhibit 2 at p.2.* Other Plaintiffs – Joseph and Lloyd -- became involved in the union later. *Lloyd at 109-110; Datcher at 126-123; Johnson at 74-75, 47-48.* Plaintiff Curtis denied any involvement in the union organizing activities. *Curtis at, 46-48.*

The Union filed a petition with the National Labor Relations Board ("NLRB") in April 1999 seeking to be recognized as the collective bargaining representative of UTDL's production employees. *Ex. 1 at p.3.* The NLRB scheduled a hearing to be held on May 11, 1999, to determine what categories of employees would defined as an appropriate bargaining unit and

would vote in the union election. *Id*. Defendants Minetree and Stair appeared at the NLRB for the hearing, as well as various employees, including Plaintiffs Newsome and Datcher. *Datcher at 121; Exhibit 2 at p. 3*. Counsel for UTDL and UNITE! were able to negotiate a stipulation regarding the appropriate bargaining unit prior to the start of the hearing; thus, no testimony was taken at the hearing. *Datcher at 122-23; Ex. 2 at p.3.*.

The union election was scheduled for June 17, 1999. *Ex. 1 at p.4*. At the election, the eligible employees voted in favor of UTDL. After the votes had been counted and it was clear that the union had lost, one of the union representatives told Minetree that "It's not over; you're gonna get your checkbook out." *Id*. Thereafter, representatives of UNITE! took various actions attempt to reverse the results of the election and to pressure UTDL into recognizing UNITE! as the representative of the unit employees. UNITE! filed unfair labor practice charges at the NLRB, alleging that UTDL took various actions, including a significant number of the actions now alleged to been taken because of race, because of the plaintiff's union activities. *Id.*; *Datcher at 167-169; Newsome at 91-92*. Other actions included encouraging union supporters to file charges of discrimination, directing the Plaintiffs herein to their current counsel, adverse publicity, picketing and other actions directed at UTDL's customers and a strike by workers who supported UNITE! *Ex. 1 at pp.4-5; Lloyd at 162-63; Johnson at 76; Datcher at 174, 210-212; Newsome at 91-93*.

In February 2001, the unfair labor practice charges were settled. The settlement included a payment of back pay to various employees, including Plaintiffs Newsome and Lloyd, and an agreement to hold a second election. *Ex. 1 at p. 5*. Before the second election was held, however, UTDL found the pressure imposed by the union campaign financially draining and so disruptive to operations that it voluntarily recognized the union. In June of 2001, UTDL and

UNITE! signed a collective bargaining agreement that since has controlled the terms and conditions of employment for UTDL's production employees. *Id.*

**C.     PLAINTIFF NEWSOME**

Plaintiff Newsome states that he started work at UTDL in September 1998 and that he was assigned to work on the main floor as a box puller. *First Amended Complaint ("Complaint"), ¶41; Newsome at 5-7*. The Complaint alleges that Newsome was subjected to a racially hostile work environment, through comments made by Minetree in November and December of 1998. *Id. at ¶42*. It also claims that, in 1999, the Defendants refused to provide Newsome with an "opportunity to work adequate overtime" (¶45), assigned him to the soil room (¶46) and began to assign him fewer hours per week to work (¶47).[7] The Complaint alleges that this conduct was discrimination based on race. *Complaint, ¶47*.

Newsome testified, both in an Affidavit he gave to the NLRB on July 12, 1999 and in his deposition in this case, that he received overtime work until was seen by Minetree and Stair at the hearing for the union, and that his hours were reduced after the hearing. *Exhibit 2 at p. 1; Newsome at 33*. His affidavit states that "I averaged at least 40 hours with a high of about 63. The least number would be 40 or 42 hours a week. I worked 5 days a week with weekends off. … I worked the same number of hours until I was seen at the hearing for the union on May 11, 1999." *Exhibit 2 at p. 1*.

Newsome stated that his supervisor, Sonny, came to him on a Saturday in May and told him to report to the soil room. *Newsome at 36*. He states that he also worked the following day in the soil room, then at the end of the shift, refused Sonny's request that he stay longer and do

---

[7]     Newsome and other Plaintiffs made claims other than those described in this section of the Memorandum. Defendants have not moved for summary judgment with respect to these claims and they are omitted from the discussion from this point forward.

7

flat work on the main floor. *Id. at 38-39, 41*. Newsome reports that he told Sonny "I was working in the soil room and that was it." Id. at 39. According to Newsome, this transfer occurred after the NLRB hearing and after Stair had spoken to him about being "misinformed about the Union." *Id. at 56-60; Ex. 2 at Pg. 4*. Newsome worked intermittently in the soil room and the main floor (which he described at the "clean floor") after the transfer. *Newsome at 105-106*.

With respect to the harassment allegations, Newsome testified regarding statements he claimed were made by Minetree and Stair. He alleged that, at the old plant, when a dryer caught fire, Minetree said: "don't you dumb niggers know how to work a fire extinguisher?" *Id. at 131-132*. Newsome does not recall the date of this statement. *Id. at 132*. Newsome also alleged that Minetree called an employee a "dumb fucker." *Id. at 133*. Newsome states that he believes that this was racial in nature because the employee was Black. *Id. at 134-135*. Newsome also claims that Minetree stated "you dumb fucker, you fucked up my machine." *Id. at 135-136*. Newsome claimed that Minetree made this comment at the new plant when a sheet caught jammed in the folder. Most of the crew working on the folder were Latino. *Id. at 137*.

Newsome alleged that Stair said, in a conversation with a Black employee at the old plant, that "all these people like to do is get drunk and use drugs." *Id. at 139-140*. Newsome interpreted this statement as racial in nature because the work force at the old plant was "basically all Black." *Id. at 140-141*. He also claimed that Stair told him, around the time of the transfer and reduction in hours, that Latinos are better workers. *Id. at 145-146*.

D.   **PLAINTIFF LLOYD**

Plaintiff Lloyd states that he began working for UTDL in May 1997. *Complaint, ¶52*. The Complaint alleges that he was assigned to the soil room because of his race. *Id. at ¶57*. It

8

also alleges that, in 1999, Defendants refused to provide Lloyd with an "opportunity to work adequate overtime." *Id. at ¶56*.

At his deposition, however, Lloyd denied that he had been denied overtime hours because of his race. *Lloyd at 66-67, 72*. He stated that he received overtime hours and that there were no occasions when he wanted to work overtime but was not permitted to do so. *Id. at 39-40, 79-80*.

Lloyd's deposition testimony regarding job assignments also contradicted the allegations set forth in the Complaint regarding assignment to the soil room. Lloyd testified that he had asked to work a wide variety of jobs in all areas of the plant, and that, on each occasion, his request was granted and he was provided training necessary to learn the jobs. *Id. at 38, 41-63*.

After UTDL moved to DeSoto Road in 1999, Lloyd worked the dryers and in the soil room area, primarily operating the tunnel washer and the side loaders. *Id. at 73-76*. He testified that there was nothing wrong with him being assigned to this area. *Id. at 77-78*.

E.  **PLAINTIFF JOHNSON**

Plaintiff Johnson states that she worked at UTDL from October of 1994 until August of 1999. *Complaint, ¶62*. The Complaint alleges that she was subjected to a racially hostile work environment through a comment made by Stair over the Company's public address system and that she was discriminatorily required to work weekend shifts. *Id. at ¶¶63, 64*. The Complaint also asserts that, starting in 1999, Defendants refused to provide Johnson with "an adequate opportunity to work overtime" and reduced her weekly work hours, leading to her resignation. *Id. at ¶¶65, 66*.

During her tenure at UTDL, Johnson worked in a variety of positions on the main floor at UTDL. *Johnson at 9-12*. She worked on the day shift. *Id. at 13*. Her usual work schedule included Monday, Tuesday, Wednesday and Friday, plus either Thursday or Saturday on an

9

alternating basis. *Id. at 13-14.*

Johnson testified that she and other black co-workers worked overtime regularly. *Id. at 14-17.* She stated that employees who wanted overtime worked it and those who didn't want to work overtime did not. *Id. at 15-16.*

In 1999, Johnson was working on the pad machine. *Id. at 11-12.* Johnson alleged that her work schedule was changed after the 4th of July in 1999, and that the plant manager Fitzgerald told her at that time that there would be no more overtime. *Id. at 17-19, 45-46.* She testified that the schedule was changed to add Sunday as a scheduled workday and that Sunday was a difficult day for her to work because of reduced transit bus service on Sundays. *Id. at 21-22.*

For two weeks, Johnson worked the new schedule, but did not report for work on Sundays, which resulted in her working only four days those weeks. She spoke to John Fitzgerald regarding her dissatisfaction with that schedule and he told her that it would be changed to give her five workdays, not including Sunday, and it was. *Id. at 73.*

Johnson asserted that he schedule change occurred because she signed a document, known at the "open letter," that was circulated by various supporters at the plant prior to the June 1999 election. *Id. at 46-48, Ex. 3.* She states that co-worker Desiree Rodman told her that Minetree said he was going to change the schedules of employee who signed the letter. Id. at 46.

Johnson opined that she should have continued to receive overtime hours because there were more pads to be done when her shift ended. *Id. at 34.* There were, however, other employees assigned to the pad machine on the second shift. *Id. at 34-35.* Johnson stated that she did not know the names of these employees, but they were Black. *Id. at 35.*

When questioned about harassment, Johnson testified that she never heard Minetree or

his brother David make racial statements. *Johnson at 70-71*. The only racial statement she identified was one she claimed was made by Stair, in 1997 or 1998. *Id. at 71-72*. She testified that Stair announced over the intercom at the Frederick Avenue plant that "All blacks want to do is get high, and Latinos, they want something out of life." *Id. at 71*. Johnson further testified that other employees went to Stair and talked to her regarding the statement, and that Stair went back on the intercom and apologized for the statement. *Id. at 72*. Johnson stated that Stair never did anything like that again. *Id.*

F.   **PLAINTIFF DATCHER**

Plaintiff Datcher states that he was hired by UTDL in October 1997, was initially assigned as a box puller (an assignment on the main floor), then requested and received a transfer to the dryer area some three to four months later. *Complaint, ¶¶71, 72; Datcher at 66*. The Complaint alleges that, in 1999, Defendants refused to provide him with an "opportunity to work adequate overtime" (¶75), assigned him to the soil room (¶76), and began to assign him fewer hours per week to work (¶77). The Complaint alleges that this conduct was discrimination based on race. *Complaint, ¶77*.

Datcher testified that he was assigned by Minetree to work on the main floor as the Box Puller, then he worked on the blanket folder. *Datcher at 63-65, 71*. After three or four months, Datcher requested to be transferred to the dryer area. *Id. at 66, 77*. Minetree and Elijah Sewell trained him to operate the dryers. *Id. at 77, 94-95*. Datcher testified that the work hours for the dryer operators on his shift -- the second shift -- were from 2:30 p.m. until the work was done at 2:30 or 3:30 a.m. *Id. at 79, 86*. Newsome testified that Datcher would brag about getting a lot of overtime hours. *Newsome at 20-21*.

Datcher later requested to work on the press end of the tunnel. This request was also

granted and he was trained by Minetree and Sewell to performed this job. *Id. at 77, 95-97*.

Datcher was working as a dryer operator when UTDL moved to the new plant. *Id. at 80*. Datcher testified that he was transferred to the soil room because he showed up at the May 11 NLRB hearing. *Id. at 105-108, 117-118*. Datcher worked sorting laundry in the soil room for some period, then was assigned to operate the tunnel, then, after a dispute with his supervisor (who was also Black) regarding who was responsible for a tunnel jam, was sent back to sorting, then later worked on the side loaders. *Datcher 98-102, 104-105, 109-110*.

Datcher also testified that the reduction in his work hours was a result of his appearance at the NLRB hearing. *Id. at 117-18, 187-188, 196*. In his words, "When I went to the hearing to get the Union in, that's when everything started going downhill for me." *Id. at 118*.

G. **PLAINTIFF CURTIS**

Plaintiff Curtis was employed intermittently by UTDL since 1995. Complaint, ¶82. The only period of this employment falling within the limitations period was from June 1999 until December 1999. Id. The Complaint alleges that, in 1999, Defendants refused to provide Curtis with an "opportunity to work adequate overtime" (¶85), assigned him to the soil room (¶86) and began to assign him fewer hours per week to work (¶87). The Complaint alleges that this conduct was discrimination based on race. *Complaint, ¶87*.

Curtis worked in the soil room for much of his employment at UTDL. He testified that he had initially been assigned to work as a box puller on the main floor during the first period he worked for UTDL, but that he had been transferred to the soil room about three months later because of an incident with a female employee whom he described as "having a special arrangement with Brad [Minetree]." *Curtis at 57-59, 63-65*. Based upon Curtis's initial date of employment, this would have been in 1995 or early 1996. Thereafter, he worked in the soil room

each time he returned to UTDL. *Id. at 67.*

While Curtis worked at UTDL, he also held a part-time position at Mary E. Rodman Elementary School. *Id. at 4-6.* During the period Curtis worked at UTDL in 1999, he was employed full-time as a tutor at the elementary school, working 7:30 a.m. to 3:00 p.m., Monday through Friday. *Id. at 5.* This schedule precluded his working on the first shift at UTDL and caused him to arrive late for the second shift at UTDL, which started at 2:30 p.m. *Id. at 10.* Curtis testified that UTDL permitted him to show up after the start of the shift, whenever his school job permitted, which he stated was generally between 4 and 5 p.m. *Id. at 9-10.* He then worked until the sorting work in the soil room had been completed.

Curtis alleges that the workers on the main floor worked later than the sorters in the soil room and that he should have been permitted to work on the main floor once the work of the sorters was finished. *Id. at 16-17.* Minetree believed that, if there were extra hours to be given to employees, that they should be given first to employees who had worked the entire shift, rather than to Curtis. *Ex.1 at p.5; see Curtis at 18-19.* Curtis admitted that both Black and Latino workers from the soil room were permitted to work overtime on the main floor. *Id. at 16-17.* He also acknowledged that he was the only employee he knew of who was permitted to come in when convenient to him, rather than the start of the shift. *Id. at 19-20.* Curtis's time cards for the last 3 months of his employment demonstrate that he arrived for work most days after 5:00 p.m., and sometimes as late as 6:45. *Exhibit 4.*

## ARGUMENT

Summary judgment is appropriate where the pleadings, deposition testimony, affidavits and other discovery materials "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), F.R.Civ.P.; see *Celotex*

13

*Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In order to show a "genuine" issue of material fact, the non-moving party "must produce 'specific facts showing that there is a genuine issue for trial,' rather than resting upon the bald assertions of his pleadings.'" *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985).

In this case, Plaintiffs' sworn testimony demonstrates that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law with respect to the claims that are the subject of this motion.

**A.   THE DISPARATE TREATMENT CLAIMS**

Section 1981 outlaws race discrimination in the making and enforcement of private contracts. It provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). Section 1981 proscribes only purposeful discrimination. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Courts have applied the standards applicable to proving a case of disparate treatment under Title VII to claims under 42 U.S.C. §1981. See, *Skipper v. Giant Food, Inc*., 2003 U.S. App. LEXIS 11562, *16-17 (4th Cir. June 11, 2003). Under those standards, a plaintiff bears "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 533, 543 (2000).

14

1.     **Plaintiff Lloyd's Claims Related to Overtime Hours and Transfer**

Plaintiff Lloyd conceded that he had been granted overtime hours whenever he wanted them and that there was nothing wrong with his transfer to work in the soil room area, where he worked primarily on the tunnel and side loaders. See p.9 *supra*. This testimony establishes that Defendants are entitled to summary judgment with respect to these claims.

2.     **Plaintiffs Newsome and Datcher's Claims Related to Overtime Hours, Reduction of Work Hours and Transfer**

The testimony of Plaintiffs Newsome and Datcher demonstrates the absence of evidence from which a reasonable fact finder could conclude that the reduction of work hours and overtime hours alleged by Newsome and Datcher and their assignments to the soil room were based upon their races. Newsome, in a sworn statement prepared within a month or two of the alleged events, clearly avers that these actions took place after he was seen at the NLRB hearing. Datcher candidly testified in his deposition that these actions took place immediately after and because of his attendance at the same hearing. Both also testified that other Black employees received more favorable treatment in these areas than they did during the same time period.

Under these circumstances, no reasonable fact finder could conclude that these actions were based upon race, rather than the Plaintiffs' participation in union activities. Defendants are entitled to summary judgment with respect to these claims.

3.     **Plaintiff Johnson's Claims Related to Overtime Hours, Change of Schedule and Reduction of Work Hours**

Plaintiff Johnson's claims are similarly defective. She testified that she was provided a schedule to her liking and overtime hours until she was identified as a signer of the "open letter" circulated by union supporters to encourage other employees to join the unionization drive. See p.9-10 *supra*. She testified that the change occurred on July 4 – after the Union election – and

15

after she had had a conversation with the Plant Manager in which he informed her that he knew who supported the union and voted for the union. *Id.* To the extent that there was work to do on her machine after her shift ended, the work was performed by other Black employees. *Id.*

Even crediting Johnson's testimony, there is no evidence from which a fact finder could conclude that the schedule changes were based upon race, rather than union activity. Accordingly, Defendants are entitled to summary judgment with respect to these claims.

    **4.**      **Plaintiffs Curtis's Claims Related to Work Hours and Assignment to the Soil Room**

Plaintiff Curtis has presented no evidence from which a reasonable fact finder could conclude that his assignment to the soil room was based on race. He testified that the assignment was made long ago because of an incident where a woman who had a close relationship with Minetree thought he was getting fresh. See p.12 *supra*.

There is also ample evidence in the record to establish that the relatively low number of hours Curtis worked was not related to his race. Curtis was able to work only an abbreviated portion of the shift because he held a full-time job that conflicted with his potential work hours at UTDL, and even in that case, the gap between the times he punched in UTDL and the end of his shift at his other employer (3:00) calls into question the degree of interest he had in maximizing his hours at UTDL. Curtis alleged that he was denied extra hours when the work in his area had been completed because UTDL showed preference for employees who had worked the entire shift. Given that the preferred employees included Black employees, there can be no inference that this reason based on Curtis' race. Accordingly, Defendants are entitled to summary judgment with respect to these claims.

**B.**    **THE HOSTILE ENVIRONMENT CLAIMS**

In order to maintain a cause of action for a racially hostile environment under 42 U.S.C.

16

§1981, a plaintiff must produce sufficient evidence to permit a reasonable fact finder to conclude that (1) he was subjected to unwelcome harassment;  (2) that the harassment was based upon race;  and (3) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a abusive atmosphere.  *Skipper v. Giant Food, Inc.*, 2003 U.S. App. LEXIS 11562 at *11; *see Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

For a hostile work environment claim to lie there must be evidence of conduct severe or pervasive enough to create "an environment that a reasonable person would find hostile or abusive." *Id.*, *citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  The plaintiff's burden of proof in this regard is twofold:  he must show that his workplace was both subjectively and objectively hostile. *Id.*   In determining whether an actionable hostile environment exists, the Court must examine "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" ); *Hopkins v. Baltimore Gas and Electric Co.,* 77 F.3d 745, 753 (4th Cir. 1996), *cert. denied,* 519 U.S. 818 (1996) (*quoting Harris,* 114 S.Ct. at 371).

    1.    **Plaintiff Johnson's Claim**

Plaintiff Johnson's hostile work environment claim fails on two grounds.  First, it clearly fails to meet the "severe or pervasive" standard.  She alleges that she experienced a single incident:  the comment by Stair occurring in 1997 or 1998 – a comment for which Stair made an almost instant public apology.  *See pp. 10-11 supra*.  There is no evidence that the comment was threatening or humiliating, especially in light of Stair's apology, or that it interfered with Johnson's work performance.

Further, Johnson's testimony suggests that the comment occurred prior to the limitations

period applicable to this case. A three-year statute of limitations is applicable to claims under 42 U.S.C. §1981. *See Grattan v. Burnett*, 710 F.2d 160, 162 (4th Cir. 1983); *Skipper v. Giant Food, Inc.*, 2003 U.S. App. LEXIS 11562 at *14 n.5. Thus, the alleged comment is time barred if it occurred prior to August 1, 1998. Given these infirmities, Defendants are entitled to summary judgment with respect to this claim.

### 2.     Plaintiff Newsome's Claim

While Plaintiff Newsome alleges several more comments that Johnson, his allegations likewise fail to make the showing required by *Harris*. With respect to several of the comments – the two "dumb fucker" comments attributed to Minetree (*see p. 8 supra*) and the "drugs and drinking" comment attributed to Stair – Newsome has not presented evidence from which a reasonable fact finder could conclude that the comments were based on race. A party opposing summary judgment "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). In the case of the first comment, it is mere speculation that the comment was made because of the employee's race, especially in light of the plaintiffs' testimony that Minetree had a temper and tended to become very upset when the work was not getting done. *Lloyd at 122; Datcher at 142*. The alleged Stair comment is built upon a similar speculative inference. In the case of the second Minetree comment, any inference of racial motivation is refuted by Newsome's testimony that the group to whom the comment was directed included Latinos as well as Blacks.

The remaining allegations – an allegation of a single use of the word "nigger" by Minetree and an allegation that Stair told Newsome that she thought Hispanics are better workers – occurring over the course of a nine month period do not show harassment was sufficiently severe or pervasive to alter the conditions of Newsome's employment or to create a abusive

atmosphere. Accordingly, Defendants are entitled to summary judgment with respect to this claim.

## CONCLUSION

Defendants' Motion, Supporting Memorandum, and supporting affidavits, exhibits and testimony demonstrate that no genuine issues of material fact exist with respect to the claims identified in the Motion and on pp. 1-2 of this Memorandum and that Defedants are entitled to judgment as a matter of law. Accordingly, Defendants requests the Court to grant their Motion and to enter judgment in their favor with respect to these claims.

        Respectfully submitted,

        /s/
        _____
        Jeanne M. Phelan
        Whiteford, Taylor & Preston L.L.P.
        Seven Saint Paul Street
        Suite 1300
        Baltimore, Maryland  21202
        (410) 347-8738

        Counsel for Defendants

1499879