UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

MELVIN NEWSOME, et al.

    Plaintiffs,

    v.                        Civil Action No. S01-2257 (WDQ)

UP-TO-DATE LAUNDRY, INC., et al.

    Defendants.

## PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Up-To-Date Laundry, Inc. (UTD) is a large commercial laundry in Baltimore that is owned and operated by racists. Defendant Nancy Stair, Chief Executive Officer of UTD, admits saying that she paid black employees less than Latinos, because she believed Latinos were better workers and that blacks ("niggers" as she calls them) did not want to do any work [Nancy Stair deposition (hereafter Stair) at 130]. President Brad Minetree, also a defendant, regularly calls black employees "niggers," describes them as "lazy" and says that his "philosophy" is to "stall and delay rather than address" issues of discrimination [Frank Minniti declaration (hereafter Minniti), ¶ 18; Maria Espinosa declaration (hereafter Espinosa) at 2]. Those racist admissions, combined with other degrading racist slurs cited below, are typical of a company in which discrimination based on race permeates every aspect of the workplace.

The five named plaintiffs in this case -- Melvin Newsome, Joseph Lloyd, Veronica Johnson, Herbert Datcher and Rudolph Curtis -- are African Americans who were hourly employees of UTD. They have filed a class action against UTD and its two top officers under 42 U.S.C. § 1981, claiming that the company has engaged in a pattern or practice of intentional racial discrimination against its black employees. Plaintiffs filed a motion for class certification

on June 26, 2003.  At the same time, defendants moved for **partial** summary judgment on some

of the plaintiffs' <u>individual</u> claims, entirely ignoring the shocking direct evidence of racism and

discriminatory practices uncovered during discovery which, standing alone, preclude summary

judgment.  Defendants also ignore the 2001 Maryland Commission on Human Relations

(MCHR) "probable cause" determinations finding that UTD engages in systemic racial

discrimination, including determinations for each of the five named plaintiffs [see Tab 1].

Plaintiffs have set forth overwhelming facts for a jury to find that their race was what

motivated defendants to (1) pay blacks less than Latinos, (2) give blacks disproportionately fewer

work hours than Latinos, including overtime, (3) routinely assign blacks to the dirtiest and most

dangerous jobs in the plant, and (4) subject black workers to an environment in which crude

racial epithets, and other belittling treatment based on race, are the norm.  These claims are

inextricably intertwined as part of a pattern or practice of intentional racial discrimination.  As

shown below, the plaintiffs all were underpaid at the same time and at the same location – and

the same officers who were responsible for the underpayment were simultaneously engaging in

other unlawful acts, including harassment and denial of overtime and job assignments.

Relying on an incomplete view of the record, defendants' motion walks a very fine line,

seeking to segregate several of these claims.  It moves to dismiss the reduced hours and overtime

claims for all five plaintiffs, the job assignment claims for four plaintiffs, the hostile environment

claim for two plaintiffs and Veronica Johnson's scheduling claim.  They concede, however, that

all plaintiffs have triable wage discrimination claims.  Also, in light of the devastating and

pervasive evidence of racism detailed here, defendants do not contest that three plaintiffs

endured a hostile environment and they should be allowed to present that evidence to a jury.  The

hostile work environment includes explicit racism (e.g., officers regularly calling employees

"niggers") and other hostility based on race, such as threats to employees for complaining about harassment.  See Section I.B.1, below.  Thus, it must be assumed for purposes of this motion that defendants' conduct involving **all** of the plaintiffs' claims for wage discrimination and **three** of the plaintiffs' claims for hostile work environment were unlawful.

On this record, there is overwhelming evidence to warrant trial on all of plaintiffs' claims.  A jury could conclude – based on the undisputed fact that UTD paid blacks, including plaintiffs, less because of their race – that race was also a factor in job assignment and scheduling (including overtime) for all plaintiffs.  Defendants' motion should be denied.

## I.  FACTUAL BACKGROUND

A. The UTD Owners and Employees

UTD is a family-owned Maryland corporation.  It operates a large industrial laundering facility in Baltimore that washes, dries, presses and delivers about 28 million pounds of laundry each year, including linens, towels and hospital clothing.  Clients include many of the hospitals in the Baltimore-Washington metropolitan area, as well as other commercial customers.

UTD has been run by members of the same family – Chief Executive Officer Nancy Stair and her sons, Brad and David Minetree, the President and former Vice President, respectively, all of whom are white.  [Tab 2; Tab 1, Finding re Melvin Newsome, ¶ 2].  (Stair and Brad Minetree are the two individual defendants; David Minetree was named but not served.)  Stair and her sons have been personally involved in UTD's operations [Stair at 14-17; Espinosa at 1-2; Minniti, ¶ 4], and are responsible for much of racial bigotry that is rife at the laundry.

UTD employs several hundred workers at its only plant, which is in Baltimore.  UTD's new plant was organized when UTD signed a collective bargaining agreement with UNITE in June 2001.  Before then, the vast majority the workforce consisted of unskilled laborers who

earned about $5 to $7 per hour.  The hourly jobs at issue, which were located in five departments (100-500), required no experience and little or no training.  See Michael Kennedy declaration (hereafter Kennedy), ¶ 4 ("Workers did not need any special skills and they were trained on the job.  Laundry work is repetitive and it is not brain surgery"); Minniti, ¶ 5 ("employees who worked at Up-To-Date could be trained on the job").

Historically, only a few whites (under five percent) have worked in the hourly positions [John Fitzgerald deposition (hereafter Fitzgerald) at 29].  Until the late 1990's, most of these jobs were filled by African Americans, but at that time UTD also began hiring Latino workers.  During 1999, the company shifted from a majority black workforce to a majority Latino workforce [Tab 1, Finding Re Melvin Newsome, ¶ 3].

B.  <u>Defendants Have Engaged in a Pattern or Practice of Racial Discrimination</u>

Much of the evidence set forth below is based on admissions from the two individual defendants themselves (Nancy Stair and Brad Minetree), the other family member who helped to run the company (Vice President David Minetree), and from present or former managers who reported to defendants, including Plant Managers John Fitzgerald, Michael Kennedy and Tom Hendrickson; Linda Marr, the former Human Resources official; and managers Frank Minniti and Maria Espinosa.  Of these managers, all but Espinosa are white; she is Latina.

1. <u>The Racially Hostile Environment</u>

Black employees at UTD, including all of the plaintiffs, have experienced hostility, discriminatory treatment and harassment attributable to their race.  Examples, all of which must be treated as true for the purposes of this motion, include:

a.  All three Plant Managers – John Fitzgerald, Michael Kennedy and Tom Hendrickson – heard Nancy Stair and the Minetree brothers repeatedly use the term "nigger" at the workplace, including on the plant floor [Fitzgerald at 94; Kennedy, ¶7; Tom Hendrickson deposition (hereafter Hendrickson) at 88].

b.   Brad Minetree admitted that David Minetree used the epithet at work [Minetree at 448].

c.   Brad conceded that he himself used the phrase "nigger-rig-it" to indicate a problem, including on the plant floor in front of black employees [id. at 14-16].

d.   David Minetree admitted using the same phrase when something had been "screwed up" [Tab 1, Finding re Melvin Newsome, ¶ 10].

e.   Linda Marr heard Brad Minetree refer to black employees as "niggers," "dumb niggers," "stupid niggers" and "fucking niggers" [Linda Marr deposition (hereafter Marr) at 42].

f.   Brad Minetree frequently stated, including at UTD weekly staff meetings, that blacks do not work as hard as Hispanics.  According to Brad, there was a hierarchy: "whites were better than Hispanics were better than blacks."  [Marr at 30-31, 78].

g.   Frank Minniti heard David Minetree angrily referring to "niggers" and "fucking niggers" on the plant floor [Minniti, ¶ 16].  When he objected to Stair and Brad Minetree about David Minetree's conduct, "they brushed off [his] concerns" [Id.].

h.   Maria Espinosa heard both Minetrees refer to black employees as "niggers," as well as using other racist terms [Espinosa at 3].

i.   David Minetree admitted that he did not confine himself to a single epithet to abuse black workers; for example, he regularly told African Americans to "get your black ass" over here or over there [Tab 1, Finding re Melvin Newsome, ¶ 10; Fitzgerald at 86-87].

j.   Nancy Stair, UTD's Chief Executive Officer, admitted referring to African Americans as "niggers."  But she said that she only did that in West Virginia – "It's thought of nothing there.  It's just a word" [Stair at 25-26].  She must have forgotten crossing the state line, though, because others heard her use the term in Maryland – at the UTD plant [Kennedy, ¶ 7; Hendrickson at 99].

k.   When Frank Minniti tried to discuss complaints of discrimination with Brad Minetree, Minetree told him that "his philosophy was to stall and delay rather than address these issues" [Minniti, ¶ 18].  And Minetree dismissed and "laughed off" Linda Marr's counseling about his ongoing discriminatory comments at the workplace [Marr at 44, 82].

All five plaintiffs were subjected to a steady stream of racial epithets and other demeaning treatment by company officials, in particular Nancy Stair and Brad and David Minetree.

l.   When a fire broke out and employees discovered that the fire extinguishers did not work, Brad Minetree said, "Don't you dumb niggers know how to work a fire extinguisher?" [Melvin Newsome deposition (hereafter Newsome) at 131-32].

5

m.  Newsome heard Nancy Stair say, "All those people like to do is get drunk and use drugs" [id. at 138].

n.  Stair told Newsome in 1999, around the time of the transfer and reduction in hours, that Latinos are better workers [id. at 145-46].

o.  Newsome saw David Minetree acting as if he was having sex from the rear with black employees, both female and male, including plaintiff Joseph Lloyd [id. at 143-44].  Lloyd verified this incident [Joseph Lloyd deposition at 69-70]. (Defendants fail to mention this evidence of harassment in their motion.)

p.  Lloyd recounted the names that Brad Minetree had called him – "black stupid motherfucker" [id.], "dumb ass nigger" [id. at 71], "Kunta Kinte" [id. at 70].

q.  Lloyd described an incident in late 1998 in which Brad Minetree became irate with him after a Latino worker caused a problem with the laundry tunnel: "Brad start calling me motherfucker, dumb ass, why did I let Santos stop the tunnel up" [id. at 127].  Lloyd asked why Minetree was yelling at him, since Santos was responsible, and then "Brad called me black ass, motherfucker, dumb ass, bitch" [id.].

r.  Lloyd also witnessed Brad Minetree abusing other African-American workers – berating William White, "dumb black motherfucker, why are you taking so long" [id. at 129], and screaming at a number of blacks, "assholes, dumb motherfuckers, niggers" [id. at 142-43].

s.  Lloyd heard Nancy Stair say that she would rather pay Latinos more than blacks, because blacks only want to get high and don't want to work [id. at 70].

t.  Veronica Johnson recounted the time when Nancy Stair literally broadcast racial abuse. Stair went on the public address system, during work hours, and said, "all blacks want to do is get high and Latinos they want something out of life" [Veronica Johnson deposition at 71].

u.  Johnson also heard Brad Minetree lash out profanely, "cussing at the blacks" [id. at 68-69, 98].  (Defendants do not cite this evidence of harassment in their motion).

v.  Herbert Datcher heard Brad Minetree curse people and call them "niggers" [Herbert Datcher deposition (hereafter Datcher) at 142].

w.  On one occasion, Brad Minetree told the workers in the Soil Room, "you mother fucking niggers, you are working too damn slow, I should fire the lot of you" [id. at 144-45].

x.  Datcher also heard David Minetree use racial epithets, including "nigger," "spearchucker" and "boy" [id. at 154].  David would say to Datcher, "What's up nigger?" [id. at 157].  David told Datcher that he had a gun at work [id. at 222-23] (Joseph Lloyd saw the firearm [Lloyd at 122], and Michael Kennedy confirmed that David Minetree kept a gun in his credenza [Kennedy, ¶ 9]).

6

y. Nancy Stair used racial epithets, too, and Datcher heard her say that Latinos worked better than blacks. He asked her, "Ms. Nancy, how can you say that?" Then Brad Minetree came up to Datcher and said that he better never talk to his mother like that again, or he would lose his "fucking job" [Datcher at 161].

z. Rudolph Curtis, who initially began working for UTD in 1995, also suffered racial abuse. When Curtis told Nancy Stair that blacks and Latinos should be paid equally, she told him that Hispanics "do more work than the blacks" [Rudolph Curtis deposition at 88-89].

aa. Curtis also recalled Stair's racial slur over the public address system [id. at 85], as well as the time that Stair became irate because some of the black workers did not share their pizza with her dog [id. at 82-83].

bb. Curtis heard Brad Minetree regularly use the term "nigger," "just about" daily [id. at 78].

cc. Once, in the Soil Room, Brad told Curtis "to get my monkey ass up there" [id. at 74].

dd. On another occasion Brad Minetree said, "if we don't hurry our lazy black asses up and hurry and get this work out, we will all be out of a job" [id. at 79].

ee. Brad once said of a Latino employee, "Santos works harder than five blacks put together" [id. at 113].

ff. Brad Minetree said, "If you guys hurry up and do this, I'll buy you some chicken because I know you black guys love chicken" [id. at 77].

gg. Brad made vulgar comments about black women's supposed sexual proclivities "throughout my history" at UTD [id. at 80].

hh. Curtis once told Brad that he did not want to hear any more of that kind of talk, and Brad barked back, "I don't care what you want to hear, this is my fucking company. I can say what I want to say" [id. at 81].

ii. David Minetree referred to Curtis as "Kunta," called him a "little black mother fucker" and told him to "kiss the head of my dick" [Curtis at 97-98]. He would say to Curtis, "get your black ass over here nigger" [id.].

jj. David Minetree made racial comments on a daily basis -- "Nigger this, nigger that. Or motherfucker, aunt Jemima. Kiss my ass bitch. Suck my dick. Fuck you and your mama. If you don't like what I'm saying, I'll have my mom fire you. We don't need you fucking nigger" [id. at 94].

kk. When David was driving a truck at the plant, he would yell, "get your black ass out of the way" [id. at 96].

7

ll.  Curtis heard David Minetree say to one of the few white employees, "how can you stand working back there with all that blood and all them niggers" [id. at 95].

mm.  Immediately after Rudolph Curtis filed an complaint of discrimination in late 1999, Nancy Stair demanded a meeting with him to ask why he filed the complaint of discrimination and to tell him he should not have filed it [Stair at 254, 257; Curtis at 35-36].  Stair said that "blacks are drunks and drug addicts and Latinos do not ask for anything.  And they do all the work.  Blacks don't do anything." [Curtis at 35-36].  Curtis was fired days later.  [Tab 1, Finding re Rudolph Curtis, ¶ 1].

nn.  Curtis described how this abuse affected him: "That stuff hurts.  I'm not ashamed to say that. . . .  I mean it hurts your pride. . . .  You are supposed to accept it and stuff like that.  But I like my job, so I was doing my job" [Curtis at 98].  He explained why he left UTD: "Being called nigger, assholes, motherfuckers, or you can kiss my ass, or that bitch here, that bitch there.  Respect don't cost you anything.  I think they were very unprofessional in a company" [id. at 73].

It is well established that harassment does not have to be explicitly racial, as long as it is aimed at blacks, and the harassment suffered by other blacks can be part of plaintiffs' own hostile work environment.  See, e.g., Smith v. First Union National Bank, 202 F.3d 234, 242 (4th Cir. 2000); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69, 71 (2d Cir. 2000).

    2.  The 1999 Union Organizing Campaign Resulted From And Was Based On Race Discrimination.

As a result of the ongoing racism, described above in Section I.B, black employees at UTD began to seek redress in a union [Newsome at 13, 15, 43; Datcher at 113, 123; Johnson at 87].  In early 1999, the Union of Needletrades, Industrial and Textile Employees (UNITE) began an organizing campaign that focused on ending the rampant race discrimination at UTD.  Defendants' Motion (hereafter "Def."), Ex. 2 at 1.  In a September 16, 1999 letter to the National Labor Relations Board (NRLB), UTD complained that the union "tried to inject racial considerations into the campaign" (emphasis added) and that it played "'the race card' accusing the Employer of treating its employees like slaves" [Tab 3 at 12, 25].

As part of the organizing effort, black employees discussed their concerns about fairness at UTD.  In particular, Melvin Newsome talked to other employees at UTD "who felt that they were being discriminated against" [Newsome at 43].  He learned that other blacks:

> had some of the same concerns that I did about low pay, verbal abuse, being called niggers at certain times, sexual harassment, job scheduling, [working] in the Soil Room rather than the flat [work area] where the clean laundry was [and] where most of the . . . Latinos worked.

[Id. at 13].  Veronica Johnson also attended meetings at which UTD employees raised concerns about how the company treated blacks, including harassment, schedule changes, and no raises [Johnson at 48-49].  She also talked to Herbert Datcher, Melvin Newsome, Rudolph Curtis and other black employees about their concerns regarding discrimination at UTD [id. at 88-90].

After a May 1999 meeting, more than two dozen black employees, including Newsome, Datcher, Lloyd and Johnson, signed a letter demanding equal pay for blacks and an end to harassment, including "crude and abusive remarks" [Def., Ex. 3].  The "Open Letter" was signed after the May 11, 1999 NLRB hearing and before the end of May [Newsome at 50, 54; Johnson at 46-47; Datcher at 232].  CEO Stair and President Minetree read the letter and understood that it was from black employees complaining about harassment and asking for better pay [Minetree at 308; Stair at 184, 187].[1]  Stair discounted the concerns because she believes black employees are not "capable of making up their own minds about issues like better pay" [Stair at 186].

---

[1] Portions of Brad Minetree's affidavit about the campaign also must be disregarded because it contains inadmissible hearsay.  Affidavits supporting motions for summary judgment must contain admissible evidence and be made on personal knowledge.  Fed. R. Civ. P. 56(e); Evans v. Technology Applications & Serv. Co., 80 F.2d 954, 962 (4th Cir. 1996); Metropolitan Life Ins. Co. v. Hall, 9 F.Supp.2d 560, 561 n.2 (D. Md. 1998).  The testimony set forth in ¶¶ 15 (alleged unidentified hearsay by officers and managers), 17 (alleged unidentified union representative hearsay), 19 (alleged unidentified "reports"), 20 (alleged unidentified customer hearsay), and 21 (alleged third party hearsay) would not be admissible at trial and should not be credited here.

UTD continued its campaign of harassment against blacks. After the letter was distributed, David Minetree told Newsome that he should stop causing trouble if he wanted to keep his job [Newsome at 23]. After Joseph Lloyd signed the letter, Nancy Stair told him, in a private meeting, that he had hurt her feelings by signing it and that his signature on the letter might cost him a lot of money [Lloyd at 97-98, 102]. Veronica Johnson learned that Brad Minetree was going to harass the employees who signed the letter [Johnson at 46].

    3. <u>The Disparity in Base Pay</u>

Defendants do not challenge plaintiffs' allegation that UTD pays blacks less than similarly situated Latinos. First Amended Complaint, ¶¶ 31-32. Evidence of a pay disparity is demonstrated by defendants' own damaging admissions and the findings of plaintiff's expert statistician as well as the Maryland Commission on Human Rights [see Tab 1].

Plaintiffs have retained an expert statistician, Dr. Charles Mann, who analyzed a data base comprising all hourly employees in five departments (100-500) who worked for the laundry in 1999, assembled from personnel records produced by UTD. Dr. Mann's task was to see, first, whether there were any differences between black and Latino workers in terms of base pay, overtime and job assignment. Then, if differences were found, Dr. Mann employed recognized statistical techniques to determine whether the differences were statistically significant, i.e., whether they were gross enough to raise an inference of discrimination. Courts generally agree that .05 is a statistically significant level of confidence, which means that there is a probability of only five in 100 (or one in 20) that the disparity under consideration arose purely by chance. See Plaintiffs' Motion for Class Certification at 4-5 and the cases cited therein.

Dr. Mann prepared a report in January 2003 [Plaintiff's Motion for Class Certification, Tab 3 (hereafter Mann Report)]. The data base he analyzed contained payroll and other

information on 957 persons who worked for UTD in 1999 – including 541 African Americans and 371 Latinos (and 45 others who were excluded from consideration, e.g., white, Asian, unknown) [id. at 1]. Focusing first on base pay rate, Dr. Mann looked at employees hired before 1999 and employees hired in 1999 and compared three aspects of pay – (1) initial pay rate (i.e., as of January 1, 1999), (2) the highest pay rate in 1999, and (3) the mean (average) pay rate in 1999. He found statistically significant differences between blacks and Latinos in all three aspects of pay [id. at 3-6]. In fact, the pay differences analyzed by Dr. Mann were statistically significant at confidence levels far beyond the .05 (one in 20) accepted by courts. Many were significant at the .0001 level of confidence, which means that there was only one possibility in 10,000 that a particular difference between blacks and Latinos arose by chance [e.g., id. at 4].

In this case, plaintiffs all were paid less than similarly situated Latino employees during their employment. [Tab 1; Mann Report]. In particular, Newsome was hired at the rate of $5.15 per hour in 1998 and received a raise to $5.50 per hour in May 1999. [Tab 1, Finding re Melvin Newsome, ¶ 5]. Johnson earned $5.50 per hour as of May 1998 and $5.75 effective April 1999. [Tab 1, Finding re Veronica Johnson, ¶ 5].

Dr. Mann's analysis rules out the chance factor, and the record conclusively demonstrates that raw bigotry produced the pay differences. Indeed, Nancy Stair, the company's CEO, admitted that she told an investigator from the Maryland Human Relations Commission that UTD paid African Americans less than Latinos, because she believed Latinos were better workers; that Latinos deserved better pay; and that blacks did not want to do any work [Stair at 130; see also Tab 1, Finding re Melvin Newsome, ¶ 9]. Stair also told UTD's HR official Linda Marr that Latinos deserved better pay than blacks because they were better workers [Marr at 103-04]. And when Frank Minniti raised the pay disparity with Brad Minetree, UTD's

President, after a black worker complained, Minetree acknowledged that "Hispanics were making more money than blacks" [Minniti, ¶ 9].

Maria Espinosa, who was a first level manager with hiring responsibility confirmed that defendants made a conscious decision to pay blacks less than Hispanics:

> I knew that Up-To-Date was paying black employees less money than Hispanic workers. I told Brad Minetree that he should pay Hispanics and blacks equally. Brad said no and that blacks are lazy.

[Espinosa at 2.] As noted above, UTD's motion concedes this discriminatory wage policy.

4.  The Disparity in Overtime

While defendants do not even deny paying black employees less because of their race in this partial motion, they do dispute plaintiffs' claim that black workers are denied the opportunity to work as many hours as Latinos, including overtime. UTD did not have any written overtime policy. Instead, overtime was assigned on a "volunteer basis only" [Stair at 279-80]. UTD told the MCHR that "in most cases, when overtime was offered, all volunteers were permitted to work" [Tab 1, Finding re Melvin Newsome, at 3]. UTD needed overtime help in 1998 and 1999 because it had a "constant need" for employees [Brad Minetree at 208; Tab 1, Finding Re Melvin Newsome, ¶ 8].

But Dr. Mann's analysis revealed that the blacks were being hurt by defendants' discretionary policy. He analyzed overtime data for 1999 and found that the average black worker got 19.43 overtime hours, compared to 67.81 for the average Latino – over three times as much. Of course, some employees worked no overtime at all, so Dr. Mann also analyzed the data for employees who actually had overtime in 1999. Of those, the blacks averaged 51.43 hours, and the Latinos averaged over twice as many – 105.19 [Mann Report at 6-8].

Once again, these differences were statistically significant, often at the .0001 level of confidence (meaning that there was only one possibility in 10,000 that the differences in overtime were due to chance) [id. at 7-8]. These disparities are so dramatic as to, by themselves, raise an inference of racial bias in overtime. Ferguson v. City of Charleston, 186 F.3d 469, 481 (4th Cir. 1999).

Contrary to defendants' suggestion, all five of the plaintiffs have stated that they were denied the opportunity, despite their requests, to work as many hours as Latinos, including overtime, because of race discrimination [Newsome at 13, 27, 62-64; Def. Ex. 2 at 5; Datcher at 115, 188-89, 200; Johnson at 32-33, 46-47; Lloyd 112, 115, 117; Curtis at 16, 18; Tab 4 (plaintiffs' payroll records)].

5.  Assignment to the Dirtiest, Most Dangerous Jobs

Defendants further deny that plaintiffs' allegation that African-American employees are discriminatorily assigned to the dirtiest, most dangerous jobs. First Amended Complaint, ¶ 36. There is no dispute that these positions are found in the Soil Room in Department 300, because of the presence of bio-hazardous waste on laundry from hospitals, such as blood, blood-borne pathogens and fecal matter. Frank Minniti called the Soil Room "an especially brutal and disgusting job," noting that a black employee working there discovered half a human arm, and that other employees encountered fingers and other body parts [Minniti, ¶ 6]. Even Brad Minetree agreed that work in Soil Room is the dirtiest job in the plant [Brad Minetree at 427]. David Minetree concurred: "how can you stand working back there with all that blood and all them niggers." Section I.B.1, ¶ ll.

Dr. Mann examined assignment to the Soil Room, and again his findings confirmed plaintiffs' allegations. Of the 245 employees who worked in the Soil Room in 1999, 225 were

black (91.8 percent), and only 20 were Latino (8.2 percent). In the remaining departments, in contrast, representation was roughly equal – 47.2 percent black and 52.8 percent Latino. The sharp disparity here was also statistically significant at the .0001 level of confidence [Mann Report at 6], thereby raising an inference of discrimination in assignment to the Soil Room.

Defendants did not have any written job assignment policy [Tab 5 at 3 (Response to Request No. 5)]. Linda Marr, former human resources director, observed defendants' disproportionate assignment of blacks to the Soil Room and buttresses Mann's findings. She believed that UTD's assignment of blacks to the Soil Room was discriminatory [Marr at 125-26].

On this motion, it is undisputed that four of the plaintiffs – Melvin Newsome, Herbert Datcher, Joseph Lloyd, and Rudolph Curtis -- worked in the Soil Room, where conditions were wretched: "When soil came across there, such as fecal matter, and the diapers and blood[y] clothes coming across there, they were basically using their hands" [Newsome at 108].

In particular, Lloyd believed that his assignment to the Soil Room in 2001, after he returned to work at UTD, was discriminatory [Lloyd at 112, 116-117]. As for Rudolph Curtis, Brad Minetree assigned him to the Soil Room in 1999 and denied his requests to transfer to another job at the laundry. Brad told him: "No, you're going to work in the Soil Room" [Curtis at 13, 15]. Once when Curtis was helping out on the truck, Brad saw him and told him to "get my ass in the Soil Room where I belonged" [id. at 68]. In its response to the MCHR, UTD denied that Curtis requested a transfer. [Tab 1, June 26, 2001 Finding re Rudolph Curtis at 2-3].

The facts outlined in Section I all show that UTD maintains a policy of discriminating against African-Americans in the terms and conditions of employment. Defendants treat black employees worse than Latinos in terms of base pay, overtime, scheduling and job assignment. UTD and its top officials created a raw hostile work environment for the company's African-

American employees.  On these facts, a jury could readily find that race was a motivating factor in defendants' conduct harming each of the plaintiffs.  Summary judgment should be denied.

## II. ARGUMENT

### A.  The Appropriate Rule 56 Standard

In assessing defendants' partial motion for summary judgment, the evidence must be viewed in the light most favorable to plaintiffs, with all reasonable inferences drawn in their favor.  In particular, as the Supreme Court emphasized in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), a trial court considering a motion for summary judgment (or for judgment as a matter of law) "should review all of the evidence in the record" and "must draw all reasonable inferences in favor of the nonmoving party."  Id. at 150.  In addition, the court "may not make credibility determinations or weigh the evidence" and "must disregard all evidence favorable to the moving party that the jury is not required to believe."  Id.  See EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001)(citing Reeves); Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995) ("[t]he court's function . . . is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

### B.  UTD Denied Plaintiffs Opportunities For Additional Work And Assigned Them To The Soil Room Because Of Their Race

1.  UTD's Policy of Discrimination and Admissions of Racial Animus

Plaintiffs have alleged that UTD followed a "pattern or practice" of racial discrimination concerning all aspects of employment.  Proof of such a policy can be compelling evidence of discrimination.  See, e.g., Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (4th Cir. 1998) ("[e]vidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a prima facie case, that the individual's adverse employment action

occurred under circumstances giving rise to an inference of unlawful discrimination * * * or that

the employer's articulated reasons for the adverse action was merely pretext * * * or to establish

the plaintiff's ultimate burden").

Plaintiffs have amassed evidence showing that UTD has engaged in a pattern or practice

of bald racial discrimination that has harmed them by costing them money and other lost

opportunities at work.  Defendants' own admissions, detailed in Section I.B.1, above, reveal a

racist policy that guided the company:

- CEO Stair admits that UTD paid black employees less than Latinos because of
  her belief that Latinos were better workers and that blacks did not want to do any
  work.  Stair announced on the public address system at work that "all blacks want
  to do is get high and Latinos they want something out of life."  Sections I.B.1, ¶ t,
  I.B.3.  (She also believes that "blacks have their own language" [Stair at 33].)

- President Brad Minetree frequently stated, including at weekly staff meetings, that
  blacks do not work as hard as Hispanics.  Brad Minetree had a hierarchy: "whites
  were better than Hispanics were better than blacks."  Section I.B.1, ¶ f.

- Vice President David Minetree chided a white employee about why he worked in
  the Soil Room "with all that blood and all them niggers."  Section I.B.1, ¶ ll.

In addition, defendants explicitly and repeatedly referred to black employees with crude

epithets such as "niggers," "dumb niggers," "stupid niggers," "fucking niggers," "black ass" and

"lazy black ass," "monkey," "Kunta Kinte," "Aunt Jemima," "black stupid motherfucker," "little

black motherfucker," "spearchucker," "boy," and "bitch."  Section I.B.1.  See Mullen v. Princess

Anne Volunteer Fire Co., Inc., 853 F.2d 1130 (4th Cir. 1988) ("[u]se of racial aspersions

obviously provides an indication that the speaker might be more likely to take race into account

in making a hiring or membership decision.  The probative value of this evidence is apparent

from the nature of the words involved."); Forman v. Small, 271 F.3d 285, 293 (D.C. Cir. 2001)

(when decision makers express discriminatory feelings around the relevant time in regard to the

adverse employment action complained of, then it may be possible to infer that the decision makers were influenced by those feelings in making their decisions).

There is no ambiguity here about racism. Defendants believe that blacks are an inferior race and incompetent employees; their policy is to treat Latinos better than blacks. Their own admissions highlight that the policy of discrimination was founded on invidious stereotypes about blacks (e.g., lazy, drug abusers, alcoholics, who have their own language and are incapable of independent thought). Brad Minetree ranks blacks at the bottom in his racial hierarchy; they "belong" in the soil room. For Nancy Stair, blacks are not even as worthy as her own dog. For David Minetree, no one except "niggers" should work in the Soil Room. The list of derogatory racist slurs about the plaintiffs, about black employees at UTD and about blacks in general only buttresses this conclusion. For these reasons, defendants admittedly paid blacks workers less than Latinos. The same reasons also led them to put blacks in the dirtiest and most dangerous part of the plant and to limit their opportunities for hours and overtime. This is classic direct evidence of discrimination and as a result, the case "simply does not fit the mold of the McDonnell Douglas formula, and the plaintiff has no need to prove independently that the defendant's articulated reasons for a discharge were pretextual." Wilhelm v. Blue Bell, 773 F.2d 1429, 1432 (4th Cir. 1985).

Even aside from the direct evidence of racial bias, plaintiffs also have amassed statistical data that is relevant evidence for the purposes of summary judgment. Defendants do not even deny for the purposes of summary judgment that they paid blacks less than Latinos. Moreover, Dr. Mann found that blacks were adversely affected (at a level of significance less than 0.05) when compared to Latinos with regard to department assignment and overtime opportunity. Sections I.B.4-5, above.

In addition, the MCHR concluded that statistically significant evidence established a casual link between race and scheduling weekend work [Tab 1, Finding re Veronica Johnson, ¶ 18]. Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977) ("[w]here gross statistical disparities can be shown, they alone in a proper case constitute prima facie proof of a pattern or practice of discrimination").

The evidence of defendants' racism, when combined with the undisputed findings of statistical significance, provides overwhelming relevant evidence of pattern and practice discrimination. In sum, a jury could fairly conclude based on this evidence alone that the defendants did not give any plaintiff a fair chance to work additional work hours, scheduled blacks on weekends and disproportionally assigned blacks to the Soil Room.

## 2. **Defendants' Proffered Reasons For Its Conduct Are Pretextual**

As noted above, plaintiffs here are not required to prove pretext under Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), because a jury could directly conclude that race was a motivating factor in plaintiffs' treatment, given the open racism at UTD. Wilhelm, supra. Still, it is worthwhile to consider the novelty, if not absurdity, of defendants' primary argument: they did not violate § 1981 because they instead retaliated against three of the plaintiffs -- Newsome, Datcher and Johnson -- because of their union activity. In fact, defendants previously denied that this very argument was true. This argument also ignores the fact that the plaintiffs' union activity was driven by the ongoing race discrimination and harassing work environment at UTD and that defendants previously have admitted to this fact.

Defendants also advance several pretextual claims regarding Curtis and Lloyd. For Curtis, they argue – in only two sentences – that his assignment to the Soil Room was based on a non-race related issue and also that he was not assigned extra hours because he was a part-time

worker.  Defendants also generally argue that, for all the plaintiffs, the fact that other blacks

worked overtime and worked outside of the Soil Room should be dispositive.  For Lloyd,

defendants briefly allege – in two sentences – that he conceded both claims.

In a disparate treatment case of discrimination such as this one, the plaintiff must first

establish a prima facie case of bias, at which point the employer must articulate a legitimate

nondiscriminatory reason for the challenged personnel action.  Burdine, 450 U.S. at 252-53.  The

burden of establishing a prima facie case is "not onerous," id. at 253, and in this case defendants

do not even contest that plaintiffs have established a prima facie case of discrimination.[2]

Assuming both parties meet their respective burdens, "the factual inquiry proceeds to a

new level of specificity," Burdine, 450 U.S. at 255, in which the plaintiff may prevail "either

directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id.

at 256.  In short, a plaintiff who makes out a prima facie case of discrimination will ordinarily

survive summary judgment by presenting evidence discrediting the employer's rationale for its

conduct, and "[n]o additional proof of discrimination [or retaliation] is required."  Hicks, 509

U.S. at 511 (emphasis in original); see Reeves, 530 U.S. at 146-47.

Plaintiffs have amassed abundant evidence undermining all of defendants' explanations

for their actions.  On this record, a jury could find that these explanations are irrelevant and

unsupported by the record and that defendants were adhering to their racist and subjective

policies; that the explanations have shifted over time; and that defendants have lied about

---

[2] Defendants do not challenge the fact that all five plaintiffs were denied the opportunity for
additional hours or overtime and that four of the plaintiffs were transferred to work in the Soil
Room.  Out of an abundance of caution, plaintiffs have attached their pay records to this
opposition, all of which demonstrate that plaintiffs suffered a reduction in hours worked.

pertinent matters.  A finding favorable to plaintiffs on any of these issues would preclude summary judgment, and the evidence supports all of them.

a.  <u>Melvin Newsome, Herbert Datcher and Veronica Johnson</u>.  Defendants argue that their so-called <u>legitimate</u> non-discriminatory reason and the only reasonable explanation for plaintiffs' assignment to the Soil Room and reduction in hours (and also weekend work in Johnson's case) was because of "the Plaintiffs' participation in union activities."  That claim is pretext pure and simple.

First, the Union campaign was overtly based on and tied to defendants' discriminatory conduct, as even defendants admitted in 1999 and try to ignore now.  Both Stair and Brad Minetree knew in May 1999 that more than twenty black employees, including plaintiffs, had signed a letter complaining about race discrimination and harassment.  Section I.B.2.  And UTD itself told the NLRB in 1999 that the union "tried to inject racial considerations into the campaign."  In any event, the evidence set forth in Sections I.B.2, I.B.4 and I.B.5, including statements by Newsome, Datcher and Johnson, demonstrates that the disparity in hours and job assignments was the product of racism.  It is irrelevant for the purposes of this motion that their concerns were raised in the context of the union organizing campaign.  The evidence reveals that defendants have a documented history of racism that both preceded, continued during, and then followed, the 1999 union organizing drive.

Second, UTD is offering different justifications at different times for its conduct, and that also is probative of pretext.  In 1999, UTD claimed that its conduct was not motivated by union activity, which is just the opposite of what it asserts now.  In the September 16, 1999 letter to the NLRB, UTD emphatically stated that no employee, including Herbert Datcher, "<u>ever had his/her hours reduced because of their Union activities or for any other reason</u>" (emphasis in original)

[Tab 3 at 2].  UTD took the same unwavering stance with respect to assignment to the Soil

Room:  "Under no circumstances were alleged Union supporters assigned to the sorting area as

punishment for or in retaliation for alleged Union activity" [Tab 3 at 4].  By the same token,

when UTD responded to the MCHR, it never offered union participation as the basis for its

conduct [Tab 1].  Now UTD argues that no reasonable factfinder could conclude that the changes

were based on anything other than union activity.  It is evident that UTD has shifted from one

explanation in 1999 to another in 2003, and "the fact that [Defendants have] offered different

justifications at different times for its [adverse actions] is probative of pretext."  EEOC v. Sears

Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001).

    Third, in light of UTD's previous filing with the NLRB, defendants' current claim that

plaintiffs' union participation is now the only explanation for the adverse actions at issue could

well be viewed as dissembling.  One way for plaintiffs to prevail is to show that the employer is

not telling the truth, because "the factfinder is entitled to consider a party's dishonesty about a

material fact as 'affirmative evidence of guilt.'"  Reeves, 530 U.S. at 147.  In 1999, when UTD

was facing liability for unlawful conduct, it told the NLRB that its conduct was not based on

union participation and there was no violation of the law.  Now, in 2003, when UTD has settled

the NLRB claims but is still facing liability for unlawful race discrimination, defendants are

arguing to this Court that their conduct in 1999 was based on union participation.  Defendants

cannot have it both ways, and their attempt to openly manipulate the legal system should be

viewed as a deceitful dodge to avoid liability.

    In this regard, there is other evidence that defendants have displayed a callous disregard

for candor, especially when it comes to adhering to anti-discrimination laws.  For instance, Brad

Minetree stated his "philosophy" is to "stall and delay rather than address" issues of

discrimination.  Nancy Stair urged supervisor Maria Espinosa prior to her interview by the

MCHR "to say that I did not hear Brad and David calling people niggers" [Espinosa at 4].

Likewise, Brad Minetree dismissed and "laughed off" Linda Marr's legitimate concerns about

his discriminatory comments and then Minetree denied under oath that he had done that [Marr at

44, 78; Minetree at 345].  (Marr concluded that efforts to enforce the company's anti-harassment

policies were futile [Marr at 82].)  Brad Minetree's credibility is a central issue in this case,

especially since he has categorically denied making the racist statements and conduct set forth in

Section I.B.1, ¶¶ a, e, k, l, o, p, r, w, bb, cc, and ff [Minetree at 12, 15, 110, 111, 146, 244, 245,

345, 462, 464, 511].  Viewed in the light most favorable to plaintiffs, a jury could find Stair's

bold attempt to suborn perjury, Minetree's dishonesty about the fact that the HR official had

counseled him about harassment, and his failure to own up to his severe and pervasive racist

remarks, are all further evidence of pretext.

      Fourth, the fact that UTD's overtime and job assignment practices are undocumented,

discretionary and subjective also constitutes evidence that a jury could rely on to reject

defendants' proffered rationale.  Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 445-46, (4th

Cir.), cert. denied, 531 U.S. 822 (2000) (finding that defendant's subjective and unstructured

promotional system, "coupled with the fact that the . . . executive responsible for the system

harbors racial animus towards African- Americans" is probative of defendant's "effort to mask

. . . a corporate policy" of discrimination).  The evidence is undisputed that defendants had no

written overtime or job assignment policy (or wage policy either).  Lacking any policy,

defendants assigned 225 blacks, out of a total of 245 employees, to the Soil Room in 1999.  Also

Stair admitted that in 1999 overtime was assigned on a "volunteer basis" and "volunteers were

permitted to work" (to the extent they were Latino), because UTD desperately needed overtime

help then.  See Section I.B.4, above.  Given this record of subjective decisionmaking guided by explicit racial animus and buttressed by statistical findings, a jury could easily find that plaintiffs' requests for overtime and job assignments would have been granted, but for their race.

Finally, defendants advance another non-discriminatory motive -- that they treated blacks other than the plaintiffs favorably.  But that claim is not helpful as a matter of law and must be rejected.  The claim that some blacks may have received more favorable treatment by defendants, for instance by being allowed to work overtime or not to work in the Soil Room, is unpersuasive for the purposes of summary judgment in light of the evidence of discriminatory animus coupled with Dr. Mann's statistical analysis demonstrating that blacks generally were treated less favorably than Latinos.  EEOC v. Sears Roebuck & Co., 243 F.3d at 855 ("simply because [defendant] hired other Hispanic individuals in other departments does not mean that its failure to hire [plaintiff] was free from discriminatory intent.  See Connecticut v. Teal, 457 U.S. 440, 453-55 (1982) * * * This is not to say that a trier of fact might not ultimately rely on this evidence in returning a verdict for [defendant].  But this evidence does not compel the grant of summary judgment to [defendant]").

b.  Rudolph Curtis.  Defendants proffer two reasons here, both of which are pretext for discrimination.  First, defendants try to confuse the timing of Curtis' complaint about his assignment to the Soil Room.  Their motion is based solely on the fact that Curtis was assigned to the Soil Room in 1995.  But defendants agree that Curtis was employed at UTD after that date and that all of his subsequent assignments were to the Soil Room, including his most recent period of employment in 1999 when Brad Minetree assigned him there.  Defendants do not offer a shred of evidence about why Curtis was repeatedly assigned to the Soil Room after 1995,

especially given the facts that he had work experience elsewhere in the plant and also that defendants denied his requests to transfer out of the Soil Room (a fact that UTD now denies).

On this record, a jury could find that Brad Minetree's decision to keep Curtis' "ass in the Soil Room where [he (i.e., a black)] belonged," was a race-based decision.  It was Brad himself who warned Curtis in response to his complaint of discrimination that "I don't care what you want to hear, this is my fucking company.  I can say what I want to say."  See Section I.B.1, ¶¶ hh and ll, above.  That type of animus corroborates Minetree's own admission, Def., Ex. 1, ¶ 24, that he gave Curtis' requests for overtime "the lowest priority."  Given the copious evidence of racism described in Section I.B, defendants' claim that Curtis was assigned to the Soil Room for a non-race based reason is unavailing on summary judgment, where the court must view the evidence in the light most favorable to plaintiffs.

Second, defendants now claim that they gave Curtis' requests for overtime the "lowest priority" compared to other employees because he worked part-time.  This claim is unconvincing, devoid of all merit and is merely a post hoc justification without any basis in fact.  The focus must be on the motivation of the decision-makers "at the time of the decision" under challenge.  McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360 (1995) ("'proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made'").

The evidence is undisputed that defendants had no written overtime policy and there are no contemporaneous documents that exist to support defendants' newly-hatched explanation.  Instead, Stair admitted that in 1999 overtime was assigned on a "volunteer basis" and in most cases, "all volunteers were permitted to work."  See Section I.B.4, above.  Brad Minetree further admitted that UTD does not treat workers differently because of their part-time status [Brad

Minetree at 234], and it is undisputed that Curtis was a part-time employee.  The undisputed evidence also shows that UTD desperately needed overtime help in 1998 and 1999 and, on this record of racial animus, a jury could easily find that Curtis' legitimate requests for overtime would have been granted, but for his race.

Here, looking at the totality of the circumstances, there is ample evidence from which a factfinder could conclude that defendants' explanation is false and a pretext for discrimination.  It is evident that defendants' explanation for Curtis' denial of overtime hours has shifted.  Initially, defendants, including Nancy Stair, said overtime volunteers were accepted.  Then Brad Minetree told Curtis that "other people want to make time and money, so I said punch out.  This is my company" [Curtis at 19].  Now defendants contend that Curtis' offers to volunteer were rejected.  "[T]he fact that [defendant] has offered different justifications at different times for its [adverse action] is probative of pretext."  Sears Roebuck & Co., 243 F.3d at 853 (citing cases).

A jury also could conclude based on a reasonable reading of the evidence that Minetree manipulated the overtime selection process in favor of Latinos and then later lied in his affidavit to conceal this fact.  He never told Curtis that the reason he could not work overtime was because he started work late.  Instead, he told Curtis that: "This is my company."  In addition, in 1999, Nancy Stair and David Minetree repeatedly asked Curtis to return to work at UTD.  Thus, at the time he was hired Brad Minetree was well aware that Curtis worked at an elementary school and would be a part time employee [Curtis at 12-13].  Defendants were the ones who approved this schedule!  Minetree's dishonesty about "material facts" in this case could cause the jury to find for plaintiffs.  Reeves, 530 U.S. at 147.

c.  Joseph Lloyd.  Defendants also deliberately misconstrue the time frame of Joseph Lloyd's testimony on the issue of disparity in hours and assignment to the Soil Room.

Defendants concede in their motion that Lloyd was a talented worker who was qualified to work in all areas of the plant, including the highest paying jobs located in the tunnel and dryers. Contrary to defendants' assertion, Lloyd testified that he was denied overtime because of his race in 2001 – not 1999 as they contend – and that he complained about that fact to management. See Section I.B.4 and I.B.5, above. Given his skills and the abundant evidence of defendants' racial animus, a jury could easily find that, but for his race, Lloyd would have been allowed to work outside of the Soil Room and would have been given additional work hours. For this reason alone, defendants' motion should be denied.

## C. **Hostile Environment**

Defendants' contention that Newsome's and Johnson's hostile environment claims should be dismissed is frivolous, especially given that both were subjected to repeated incidents of egregious racial harassment over many months and UTD did nothing about it, even though both plaintiffs complained. In crafting its motion, defendants, like the proverbial ostrich, simply chose to ignore the mountain of corroborating evidence of severe and pervasive race-based harassment, including but not limited to sworn declarations and testimony from many high-level UTD managers, the plaintiffs themselves, as well as the Maryland Human Relations Commission's independent finding of racial harassment [see Tab 1]. On this record, it is beyond dispute that plaintiffs can demonstrate that UTD and its officials, especially Nancy Stair and Brad and David Minetree, subjected black workers, including both Newsome and Johnson, to a hostile work environment – a torrent of racial epithets and other demeaning treatment. This aspect of defendants' motion should also be denied.

1.  The Legal Standard

Section 1981 forbids discrimination in employment on the basis of race, including the

creation of a hostile work environment.  It is an understatement to say that it is rare today to see

the senior officers of a company engaging in the open and vile racial harassment witnessed here,

including repeatedly calling black employees "niggers."  The Fourth Circuit has recognized that:

> [f]ar more than a "mere offensive utterance," the word "nigger" is pure anathema
> to African-Americans.  "Perhaps no single act can more quickly alter the
> conditions of employment and create an abusive working environment than the
> use of an unambiguously racial epithet such as 'nigger' by a supervisor in the
> presence of his subordinates."

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (citation omitted) (also

finding that calling black employees "monkey" was "degrading and humiliating in the extreme").

Even aside from the overwhelming direct evidence of racism, a hostile environment also

may include, as is the case here, conduct that is not overtly racist in nature.  In this connection,

the Fourth Circuit has explained in the context of hostile work environment based on sex that:

> a woman's work environment can be hostile even if she is not subjected to sexual
> advances or propositions. * * * Instead, an employer violates Title VII "[w]hen
> the workplace is permeated with 'discriminatory intimidation, ridicule and insult,'
> that is 'sufficiently severe or pervasive to alter the conditions of the victim's
> employment and create an abusive working environment. . . .'" Harris [v. Forklift
> Systems, Inc.], 510 U.S. [17] at 21 [(1993)] * * * A work environment consumed
> by remarks that intimidate, ridicule and maliciously demean the status of women
> can create an environment that is as hostile as an environment that contains
> unwanted sexual advances.

Smith, 202 F.3d at 242 (some citations omitted).  See Williams v. General Motors Corp., 187

F.3d 553, 563-64 (6th Cir. 1999)(finding a hostile environment based on the "constellation of

surrounding circumstances," citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82

(1998), including the threatening language and sexually aggressive innuendo from a supervisor,

that could be viewed as work-sabotaging behavior that creates a hostile work environment).

The analysis adopted by the Fourth Circuit in <u>Smith</u> in a sexual harassment context applies with equal force to claims of race-based harassment.

2. <u>The Hostile Environment at UTD</u>

Any hostile environment case is heavily fact specific: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. at 23. The hostility must be both severe and pervasive, and "[t]he severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'" <u>Beardsley v. Webb</u>, 30 F.3d 524, 530 (4th Cir. 1994). In this case, as outlined in detail above, Newsome and Johnson both endured harassment that intimidated, ridiculed and maliciously demeaned blacks, including reduced pay, lost opportunities for additional work, dangerous job assignments and weekend work.

Defendants' effort to disaggregate and minimize the ongoing harassment suffered by Newsome and Johnson should not be countenanced. "All the circumstances" must be assessed, rather than isolating incidents deliberately handpicked by defendants. See <u>Conner v. Schrader-Bridgeport Int'l, Inc.</u> 227 F.3d 179, 194 (4th Cir. 2000) (citing <u>Reeves</u> and criticizing the trial court for "disaggregating . . . from the whole" a number of hostile environment sexual harassment incidents in setting aside a jury verdict for the plaintiff).

Contrary to the restricted "environment" proposed by defendants, the demeaning treatment of other blacks contributes to the hostile environment faced by Newsome and Johnson themselves. That is especially the case here, where both Newsome and Johnson were well aware of the harassment suffered by black co-workers at UTD and both signed a letter complaining about the ongoing harassment and were then threatened for doing so. See, e.g., <u>Spriggs</u>, 242 F.3d 184 n.5 (court may consider the "lexicon of obscenity that pervaded the environment of the

workplace both before and after the plaintiff's introduction into its environs")(citation omitted);

Whidbee, 223 F.3d at 69, 71 ("a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim. * * * [E]ven if plaintiff were not present when some comments were made, 'a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment' which 'exacerbated the effect of the harassment [plaintiff] experienced individually' ") (citations omitted); Heyne v. Caruso, 69 F.3d 1475, 1480 (9th Cir. 1995) ("[t]he sexual harassment of others . . . is relevant and probative of [the supervisor's] general attitude of disrespect toward his female employees, and his sexual objectification of them").

In the present case, the circumstances of harassment -- which are outlined in Section I.B above -- include a deluge of racist comments [see Section I.B.1, ¶¶ a-j, l-n, p-t, and v-nn and Section I.B.3], threats and intimidation against plaintiffs and other blacks [id., ¶¶ g, q, w-y, dd, hh-kk, mm and Section I.B.2], physical mistreatment [id., ¶ o, ll and Section I.B.5], abuse and ridicule [id., ¶¶ e, g, l-n, p-w, z, aa, dd, ee, ii, mm, and nn], indifference to or rebuffing of concerns about bias [id., ¶¶ g, k, y, hh, ll and Section I.B.2], assignment of blacks to more dirty and dangerous work [id., ¶ ll and Section I.B.5], disparity in compensation, including but not limited to paying blacks lower wages than Latinos [Section I.B.3], disparity in giving blacks disproportionately fewer hours than Latinos, including overtime, [Section I.B.4] and disparity in scheduling blacks for weekend work [Tab 1, Finding re Veronica Johnson, ¶ 18].  It is also significant for the purposes of summary judgment that, after a lengthy investigation, the MCHR found probable cause to believe UTD racially harassed its black employees [Tab 1, Finding Re Melvin Newsome at 8].

Given this extensive list of evidence, perhaps the most preposterous argument advanced by defendants is their unsupported claim that Nancy Stair's racist diatribe over the public address system was neither threatening nor humiliating to Johnson or to other black employees, apparently because Stair later professed to apologize.  Viewing the facts in plaintiffs' favor on summary judgment, there is an enormous amount of evidence to the contrary.  First, Johnson herself complained about harassment at UTD in general.  Section I.B.2.  In any event, on the day in question blacks, including Johnson, immediately "talked among ourselves," expressing concern about how Stair "said something like that" and workers complained to Stair about her racist remarks.  Second, Johnson's statement was corroborated by Curtis who explained that Stair "did not have the right" to make such racist statements and that a number of black employees immediately walked out of the plant [Curtis at 85-86].  Third, there is no doubt that a CEO's broadcast during work to all employees, most of whom were black, telling them that "all blacks want to do is get high and Latinos they want something out of life" in and of itself is offensive.  See Anderson v. G.D.C., Inc., 281 F.3d 452, 460 (4th Cir. 2002) ("one simply does not refer to black employees as did [plaintiff's] two supervisors without knowing that such language would offend a reasonable person in [plaintiff's] position") (citation omitted).  Fourth, a jury could, without any difficulty, find that Stair's so-called "apology" was insincere given her admissions during her deposition [Stair at 130] and to the MCHR [Tab 1] as well as her continued racist comments and slurs to plaintiffs and other employees (e.g., Linda Marr).  See, Section I.B.1, ¶¶ a, j, m, n, s, y, z, aa, and mm.  This was the type of incident that – alone – might constitute a hostile work environment.  But it was not alone.  Johnson also heard about and witnessed the abuse suffered by other black employees.  See, e.g., Whidbee, supra.

Defendants' further assertion that Stair's racist speech did not interfere with Johnson's work performance is also meritless based on the facts set forth above.  In any event, the proper inquiry "is not whether work has been impaired, but whether working conditions have been discriminatorily altered."  EEOC v. R&R Ventures, 244 F.3d 334, 340 (4th Cir. 2001)(citation omitted).[3]  There is no doubt that was the case here.

Viewing the evidence on this point in Newsome's and Johnson's favor, a jury could easily find that their "workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult' . . . that [was] 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris, 510 U.S. at 21.  The partial motion for summary judgment on plaintiffs' hostile environment claim should be denied.[4]

---

[3] There is no merit to defendants' claim that Nancy Stair's public address system comment is time-barred.  That issue was settled in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 119 (2002), when the Supreme Court held that: "the statute in no way bars a plaintiff from recovering damages for that portion of the hostile environment that falls outside the period for filing a timely charge."  Beall v. Abbott Laboratories, 130 F.3d 614, 620 (4th Cir.1997) (incidents outside of statutory window are not time-barred if continuing).

[4] While the harassment suffered by plaintiffs resulted in tangible employment actions (e.g., loss of pay), that distinction is moot here because defendants apparently concede in their motion that they do not have any affirmative defense to avoid vicarious liability in a hostile environment case.  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

## CONCLUSION

Section 1981 is a civil rights statute that was intended to end precisely the racial bigotry in employment at issue here.  Defendants' startling race-based admissions and epithets alone are sufficient to defeat summary judgment, but the record contains additional overwhelming evidence demonstrating that defendants discriminated against plaintiffs because of their race. The motion for partial summary judgment should be denied in its entirety.

_____/s/_____

Philip J. Simon 12893
Richard A. Salzman
Douglas B. Huron
Betty Grdina 15647
HELLER, HURON, CHERTKOF
LERNER, SIMON & SALZMAN
1730 M Street, NW, Suite 412
Washington, DC  20036
(202) 293-8090
(202) 293-7110 (facsimile)

Attorneys for plaintiffs
