1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                      (Northern Division)


 4

 5     MELVIN NEWSOME, et al.,           )

 6                            Plaintiffs, )

 7          vs.                    ) Civil Action

 8     UP-TO-DATE LAUNDRY, INC., et al., ) No. S01-2257

 9                            Defendants. )

10              _     _     _     _     _

11

12              DEPOSITION OF BRAD MINETREE

13                         Baltimore, Maryland

14                         Thursday, February 13, 2003

15

16     The videotaped deposition of BRAD MINETREE was

17     convened on Thursday, February 13, 2003,

18     commencing at 10:08 a.m., at the offices of

19     Whiteford, Taylor & Preston, 7 St. Paul Street,

20     Suite 1300, Baltimore, Maryland, before Sal

21     Napolitano, Notary Public in and for the State of

22     Maryland.
```

BRYNTESON REPORTING, INC.   (703) 768-8122

12

```
 1        A.   Out of frustration I could say the word

 2   not meaning it to any one individually or a race.

 3        Q.   So you just -- do you use it as a swear

 4   word, is that what you're saying, out of

 5   frustration?

 6        A.   Not a common one, no.  But yes, I've used

 7   it occasionally.  I've said it.  But not directed

 8   to the race.  Not directed to a person

 9   specifically.

10        Q.   So you never use the word nigger to refer

11   to blacks, is that what you're saying?

12        A.   That's what I'm saying.  I use the word,

13   but not directed to a single person.

14        Q.   And do you -- when you say the word

15   nigger, to you does it mean that you're referring

16   to or discussing a black person?

17        A.   No.

18        Q.   Give me an example of how you'd use the

19   word nigger in a sentence then.

20        A.   I don't use the word in a sentence.

21        Q.   Give me an example of how you'd use it

22   period.
```

14

```
1          Q.   Have you heard him use it in any other

2     sense or --

3          A.   Only time I heard him say anything is

4     toward me directly.

5          Q.   Now, do you ever use the term nigger at

6     the workplace, Up-To-Date Laundry?

7          A.   What do you mean use the word nigger at

8     the workplace?

9          Q.   Okay.  You're the president of Up-To-Date

10    Laundry, right?

11         A.   Yes, I am.

12         Q.   Okay.  How long have you been president

13    of Up-To-Date Laundry?

14         A.   Since 1993-94.

15         Q.   And you've worked there continuously

16    since the 1993-94 time frame, right?

17         A.   Yes.

18         Q.   Okay.  During that time frame have you

19    used the word nigger at the Up-To-Date Laundry

20    plant?

21         A.   Yes.

22         Q.   And have you used that word in front of
```

15

1    black employees?

2        A.    Describe in front.

3        Q.    In their hearing.  Within their hearing,

4    sir.

5        A.    It's possible.

6        Q.    Have you ever used -- do you know the

7    word coon, have you ever heard that word?

8        A.    I've heard it in my lifetime, yes.

9        Q.    And do you ever use the word coon?

10        A.    No.

11        Q.    Ever heard the word Kunte Kinte?

12        A.    Only time I heard that was that movie.

13        Q.    What does Kunte Kinte mean to you?

14        A.    It was the name of the gentleman in the

15    movie.

16        Q.    You ever refer to any employee at

17    Up-To-Date Laundry at Kunte Kinte?

18        A.    No.

19        Q.    You ever called Joseph Lloyd Kunte Kinte?

20        A.    No.

21        Q.    Can you give me -- you gave one example

22    of using the word nigger-rig-it.  Can you give me

BRYNTESON REPORTING, INC.    (703) 768-8122

16

1     any other example of how you would use the word

2     nigger during your speech?

3          A.    Not off the top of my head.

4          Q.    Do you think -- strike that.

5               I'm not familiar with this term

6     nigger-rig-it and is it fair to say that

7     nigger-rig-it is defined as not correctly fixing

8     something but instead using old or other used

9     parts to fix something?

10         A.    Yeah.

11         Q.    Well, if you think of any other way in

12    which you use the word nigger during your -- at

13    Up-To-Date Laundry or just as a matter of speech

14    during the course of this deposition, you can let

15    me know, okay?

16         A.    Okay.

17         Q.    Is it fair to say you've only thought of

18    one way you use it right now and that's

19    nigger-rig-it?

20         A.    It's not a thing that I say a lot.

21         Q.    Well, I'm asking when you use it --

22         A.    What's --

110

```
 1        A.   I don't recall a conversation.

 2        Q.   Did you tell Frank Minniti that you're

 3   not going to worry about whether blacks are paid

 4   less than Hispanics?

 5        A.   I don't recall the conversation.

 6        Q.   Did you tell Frank Minniti that blacks

 7   are looking for handouts?

 8        A.   No.

 9        Q.   You didn't tell him that?

10        A.   No.

11        Q.   Did you tell him that Hispanic workers at

12   Up-To-Date Laundry make more money in general than

13   African Americans?

14        A.   No.

15        Q.   Did you ever talk to him about the EEOC

16   complaints?

17        A.   No.

18        Q.   Did you tell him that your response to

19   the EEOC complaints would be to stall?

20        A.   No.

21        Q.   Did you tell him that your response to

22   the -- not the EEOC complaints but the Maryland
```

111

```
 1        Commission on Human Relations complaints would be

 2        to stall?

 3            A.   No.

 4            Q.   Did you tell him that your response to

 5        these administrative complaints would be to delay?

 6            A.   No.

 7            Q.   You said that you have a doubt about

 8        Mr. Minniti's credibility because he paid

 9        employees to do work.  What do you mean by that?

10            A.   If an employee wasn't doing his designed

11        job assignment, he would give them money above and

12        beyond the hourly rate that he was paid.

13            Q.   Was that authorized by you?

14            A.   No, it was not.

15            Q.   Was it authorized by any person?

16            A.   No, it was not.

17            Q.   How do you know that practice took place?

18            A.   He told me.

19                 THE VIDEOGRAPHER:  This ends videotape

20        number one, we're going off the record at 12:20.

21                 (A recess was taken.)

22                 THE VIDEOGRAPHER:  This begins videotape
```

BRYNTESON REPORTING, INC.   (703) 768-8122

146

1       Q.   So should he have been fired or

2    disciplined for saying why in the hell hasn't it

3    been done yet?

4       A.   I told him to stop yelling at the

5    employees.

6       Q.   Did anyone ever tell you to stop yelling

7    at employees?

8       A.   I never yelled to employees so no one

9    told me to stop yelling at the employees.

10      Q.    You ever use the word nigger at the

11   Up-To-Date Laundry facility --

12      A.   I think I answered that question.

13          MS. PHELAN:  We have been up and down

14   that road.

15          BY MR. SIMON:

16      Q.   -- when Mike Kennedy was in your

17   presence?

18      A.   No.

19          MR. SIMON:  All right, it's one o'clock,

20   I propose we take a lunch break.

21          MS. PHELAN:  Fine with me.

22          THE VIDEOGRAPHER: Going off the record at

208

```
 1        Q.   Now, I want to know what impact prior

 2   experience in a laundry had on an employee's wage

 3   rate when they started at Up-To-Date Laundry,

 4   that's what I'm trying to figure out, how much of

 5   an impact, if any, that had.

 6        A.   How much of an impact on how much I

 7   offered them?

 8        Q.   Yes, sir.

 9        A.   Impact to?

10        Q.   Their wage.  Their starting salary.

11        A.   Well, they'd say I won't come for less

12   than this, how many years they've been there, how

13   bad of a need we needed somebody, because the

14   turnover was pretty bad, absenteeism was real

15   bad --

16        Q.   So if someone -- you're saying there was

17   a constant need for employees during this period

18   '98-99, right?

19        A.   Oh, yes.

20        Q.   Did you turn down applicants to

21   Up-To-Date Laundry?

22        A.   Not many.  That I can remember.
```

234

1        A.   How long ago they were fired from another

2   facility, how much time between the jobs they had,

3   see how eager they were.

4        Q.   Would you check references for applicants

5   at Up-To-Date Laundry?

6        A.   No, we'd go by the application.

7        Q.   Was part time or full time a factor in

8   setting a wage rate at Up-To-Date Laundry?

9        A.   Not to my knowledge.

10       Q.   Was shift, different shift subject to any

11   difference in wage rate, that is, you know, day

12   shift, morning shift, a night shift?

13       A.   No.

14       Q.   What about different types of laundry

15   experience, I mean were you differentiating

16   between commercial laundry experience and for

17   instance hotel laundry experience or was it -- or

18   is that all comparable?

19       A.   It would to be -- excuse me.  It would

20   depend on what position we were hiring for.

21       Q.   Well, if you're hiring for a position

22   such as department 100 or 300, how would that

244

1    hour, I told them to get experienced people up

2    here, she told me they won't work for less than

3    $6, we had a need for employees --

4        Q.    So you --

5        A.    -- we hired almost everybody that walked

6    in the door --

7        Q.    So you gave her then the authorization to

8    bring those people on board at $6 an hour, right?

9        A.    Yeah, I told her make sure you interview

10   and they have experience.

11       Q.    Even if they did not have experience you

12   authorized her to hire --

13       A.    No, I didn't say that.

14       Q.    So you're saying you told --

15       A.    I wasn't there every time she

16   interviewed.  I didn't look at every application.

17   So how can I tell her to hire someone that I

18   didn't look at the application?

19       Q.    Did you give her authorization to hire

20   employees from the Washington, D.C. area --

21       A.    I told you I told --

22       Q.    Let me just finish.

BRYNTESON REPORTING, INC.    (703) 768-8122

245

1              -- who did not have any prior laundry

2      experience at a rate of $6 an hour?

3          A.   No, I did not tell her that.

4          Q.   Did you tell her that she could not hire

5      employees from the Washington, D.C. area at the

6      rate of $6 an hour if they didn't have any prior

7      laundry experience?

8          A.   I don't remember I said that.

9          Q.   Isn't it true, sir, that Up-To-Date

10     Laundry, that Up-To-Date Laundry was hiring these

11     workers from the Washington, D.C. area and that

12     they were all Hispanics?

13         A.   We didn't look at it as a race factor.

14         Q.   Weren't they all Hispanics?

15         A.   I would say most of them were, but that's

16     not what we were looking at.

17         Q.   Did you know in fact, sir, whether there

18     was any black hired from the Washington, D.C.

19     area?

20         A.   Yes.

21         Q.   Who was that?

22         A.   I can't remember her name.  She used to

1    right?

2        A.    Yeah, I read it.

3        Q.    And isn't it fair to say that the workers

4    who signed this letter are black?

5        A.    Yes.

6        Q.    And these workers were raising concerns,

7    these black workers were raising concerns that

8    were -- and requesting better pay and an end to

9    harassment, right?

10       A.    We were in a campaign with the union.

11   The union was recruiting people, getting everybody

12   riled up, you have some followers and you don't

13   have some followers.

14       Q.    Did you understand this to be a letter

15   from black employees complaining about harassment

16   and asking for better pay?

17       A.    I've read the letter.

18       Q.    And is that what you understood it to

19   mean, sir?

20       A.    That's what it says.

21       Q.    What it says is the black employees are

22   asking for better pay and an end to harassment,

316

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3                    (NORTHERN DIVISION)

 4

 5   MELVIN NEWSOME, et al.,              )

 6                     Plaintiffs,       ) Civil Action

 7        vs.                            ) No. S01-2257

 8   UP-TO-DATE LAUNDRY, INC., et al.,   )

 9                     Defendants.       )

10

11                              Wednesday, May 21, 2003

12                              Towson, Maryland

13

14          DEPOSITION OF BRAD MINETREE (VOLUME II)

15

16          The videotaped deposition of BRAD MINETREE

17   was resumed on Wednesday, May 21, 2003, at 10:15

18   a.m., taken at 15 East Chesapeake Avenue, Towson,

19   Maryland, before Raymond G. Brynteson, RDR-CRR and

20   Notary Public.

21

22
```

BRYNTESON REPORTING, INC.    (703) 768-8122

345

```
 1      Q.   Did either Amy Mattis or Linda Marr ever

 2   counsel or talk to you about comments you made in

 3   the workplace regarding racial issues or race?

 4      A.   No.

 5      Q.   Do you know Noe Torillo?

 6      A.   Yes.

 7      Q.   Who is he?

 8      A.   First shift supervisor.

 9      Q.   Was there ever an issue or an incident

10   that you are aware of, sir, where he was involved

11   with a mistake that led to some linens from Church

12   Home being burned?

13      A.   I don't remember the incident.

14      Q.   Do you remember anything about Church Home

15   pads being burned or otherwise destroyed or ruined?

16      A.   Not at the present time, no.

17      Q.   Do you know Santos Hernandez?

18      A.   If that's the one I am thinking of.

19      Q.   He used to work in the tunnel area.

20      A.   In the old building?

21      Q.   Yes, sir, and in the new building.

22      A.   Never in the new building.
```

427

1    Q.   Did you ever tell her, did anyone ever

2    tell her that her work was slow?

3    A.   I believe so.

4    Q.   I am not asking if you believe so.  I am

5    asking if it ever happened?

6    A.   I don't know.

7    Q.   Sir, you are familiar with the work in the

8    soil room, we have already talked about that a

9    little bit, but that's the department where the

10   dirty linens are brought into the plant, right, the

11   soil room?

12   A.   Yes, the soil room, yes.

13   Q.   And would you say that that is probably

14   the dirtiest job in the plant, as far as dealing

15   with the soiled linens from hospitals and other

16   clients?

17   A.   Yes.

18   Q.   How do you account for the fact that

19   during 1999, of the roughly 245 employees assigned

20   to that department, 225 of them were black?

21   A.   As I stated before, Mr. Ashley not only

22   tried to recruit people he knew or associated with,

448

1    was.

2        Q.    Did it have anything to do with race and

3    race characteristics at the company?

4        A.    I can't sit here and say exactly what that

5    report was.  My main concentration was customers

6    and production.

7        Q.    Did you ever hear Dave Minetree use the

8    word nigger at the workplace?

9        A.    In the office.

10       Q.    You did hear him use it in the office?

11       A.    Yes.

12       Q.    Is that appropriate, sir?

13       A.    He said it to me, and no.

14       Q.    Was he ever disciplined for using the word

15   nigger in the workplace?

16       A.    I could not discipline David.

17       Q.    Did you ever propose that David Minetree

18   be disciplined for using the word nigger in the

19   workplace?

20       A.    Well, yes.

21       Q.    Is that in writing?

22       A.    No.

462

        1            She got complaining about her boyfriend

        2    that lived there, that never gave any money, so,

        3    yes, that's how that comment came up.  I mean, if

        4    you are going to let the boyfriend live there, or

        5    your fiance live there, then he needs to help pay

        6    for the children.

        7       Q.   Did you ever ask any employees for sex at

        8    Up-to-Date Laundry other than the employees that we

        9    have already discussed here today?

       10       A.   No.

       11       Q.   Did you ever tell Celeste Ireland not to

       12    complain about harassment to Nancy Stair?

       13       A.   No.

       14       Q.   Did you ever call black employees at

       15    Up-to-Date Laundry black motherfuckers?

       16       A.   No.

       17       Q.   Do you know if your brother was having

       18    sexual relationships with employees at Up-to-Date

       19    Laundry?

       20       A.   I have no idea what my brother was doing.

       21    Can I take a break for the restroom?

       22       Q.   Sure.


        BRYNTESON REPORTING, INC.    (703) 768-8122

464

1    A.    No.

2    Q.    Joseph Lloyd raised an allegation that you

3  approached him and grabbed his chest at one point

4  in time.  Is that true?

5    A.    No.

6    Q.    That never happened?

7    A.    No.

8    Q.    Did you ever tweak his nipples and say,

9  other guys have titties, where are yours?

10    A.    No.  The only thing I done was with my

11  flat hand, just like that on his chest.  That's the

12  only thing.

13    Q.    Why did you do that?

14    A.    I was congratulating him on something and

15  we were just talking.  We had good communication

16  between the two.

17    Q.    Can you recall what you were

18  congratulating him about?

19    A.    No.

20    Q.    Do you know an employee by the name of

21  Shumara Harrera, a former employee?

22    A.    I think I know who you are talking about.


BRYNTESON REPORTING, INC.    (703) 768-8122

511

1    something nice for the customers to come and see.

2        Q.    Mr. Minetree, just shifting gears for a

3    second, did you ever call Rudolph Curtis, who is a

4    former employee, one of the Plaintiffs in this

5    case, did you ever refer to him as a monkey or

6    Bubba?

7        A.    No.

8        Q.    Did you ever refer, to black employees, to

9    their liking for chicken or watermelon?

10       A.    We asked them, if you are referring to

11   when we were in the old building, we asked them

12   what they would like to have, and they said either

13   chicken or watermelon, and that's what we got.

14       Q.    Did you ever make comments like blacks

15   love chicken and watermelon?

16       A.    I love chicken and watermelon.

17       Q.    I am talking about blacks.

18       A.    No.

19       Q.    Did Nancy Stair ever get on the PA at any

20   point in time and make a comment about blacks as

21   far as drug use or use of alcoholic beverages, that

22   you are aware of?


              BRYNTESON REPORTING, INC.    (703) 768-8122