BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

| | |
|---|---|
| **IN THE MATTER OF:**     * | **Respondent's representative:** |
| Rudolph Curtis           * | Jeanne M. Phelan |
| 2111 Booth Street | Attorney at Law |
| Baltimore, Maryland 21223 | Whiteford, Taylor & Preston, L.L.P. |
|     **COMPLAINANT**     * | 7 St. Paul Street |
| | Baltimore, Maryland  21202-1626 |
|       vs. | |
|                 * | |
| Up-To-Date Laundry, Inc. | Case No.: 9911-0386 |
| 1221 DeSoto Road | EEOC No.: 12FA00115 |
| Baltimore, Maryland 21223     * | |
|     **RESPONDENT** | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## WRITTEN FINDING

The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure. COMAR 14.03.01.06(A). All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

The Complainant alleged that the Respondent discriminated against him on the basis of his race, African-American, by paying him at a lower wage than it paid Latino workers doing the same work, in violation of Article 49B of the Annotated Code of Maryland. He also alleged that Respondent further discriminated on the basis of race in its assignment of African-American employees to work in the soil room. He claimed that only African-Americans are pressured to work in the soil room. Work in the soil room involves physically handling dirty linens which often contain blood, blood-borne pathogens, fecal matter, and other potentially infectious material. The soil room employees wear face masks and gloves. It is the least desirable location, with the greatest exposure to risk of injury and contracting disease.

The Complainant stated that he was hired by the Respondent on May 14, 1995 with no

1

The Complainant stated that he was hired by the Respondent on May 14, 1995 with no experience. His starting wage was $4.50/hour and he was assigned to the soil room. At the time he signed his complaint, he stated that he made $5.25/hour.

## SUMMARY OF THE RESPONDENT'S POSITION

### Wages

Respondent records indicate that Complainant was hired in May 1995, left in April 1997, rehired in June 1997, left in February 1998 and rehired again in June 1999. In June 1999, Complainant made $5.15/hour which increased to $5.50/hour in July 1999. He was terminated in December 1999.

Respondent denies that it discriminated on the basis of race with respect to wage rates. However, Respondent acknowledged that wage rates varied to some degree but did so in response to external wage pressures and difficulties Respondent had recruiting reliable employees. Their operations expanded in 1999 calling for more jobs. One of Respondent supervisors, who is Latino, pointed out that there was a large pool of available labor in the Maryland suburbs of Washington, D.C. Once she located available applicants, many of them were unwilling to travel to Baltimore for starting wage rate of $5.15/hour and they demanded more money. In order to make the job attractive to these applicants, Respondent offered and paid them a starting wage of $6.00/hour. Brad Minetree said that he could not attract a higher caliber employee at $5.15/hour so he raised the starting wage to $6.00/hour. Many of the applicants had acquaintances and relatives who were also available and they demanded the same starting wage.

Brad Minetree and Nancy Stair both asserted that work experience upon hiring and the department to which an employee was assigned, influenced employees' starting wages. They concurred that in 1999, prior work experience affected laborers' wages in departments 100, 200 and 300 as much as $.35/hour. Work on the dryers (department 500) and in the wash room, a.k.a. wash alley, a.k.a. the tunnel(department 400) required greater skill and ability. Assignments in these areas call for inputting data and carrying heavy blocks of wet laundry from one place to another.

### Assignments

Respondent denied that it discriminated against the Complainant in assigning him to the soil room. Respondent's representative stated that Respondent's practice was to fill vacancies wherever they occurred and then to make further assignments upon observation of the employees' abilities, aptitude and desires. Respondent representative also questioned

2

that if the assignment was so offensive, why the Complainant did not request a transfer. She stated that Respondent did not recall having received many requests to transfer out of the soil room.

## SUMMARY OF THE INVESTIGATION

1.    Up-To-Date Laundry, Inc. ("Up-To-Date") is a corporation located in Baltimore, Maryland that contracts with various businesses, including Johns Hopkins Hospital, St. Joseph's Hospital, , Bayview Hospital, Union Memorial Hospital, Washington Hospital Center, Georgetown University, Franklin Square Hospital, George Washington, and hospitals located in Harford County, Arlington, Va., and Fallston, Md. to wash, dry and press customers' laundry, including lab coats, hospital gowns, scrubs, towels, sheets and other linens, toweling and clothing items used in hospitals.

2.    Up-To-Date Laundry is a family business in operation since 1946 and owned, since 1994 by Nancy Stair, the secretary and chief executive officer. Stair's sons, Brad and David Minetree are the president and vice president of the Company, respectively. David Minetree is also the company's trucking supervisor.

3.    The Respondent's workforce is composed predominantly of African-Americans and employees of Spanish-speaking, Central American origin (hereinafter, "Latino"). During the 15 month period beginning January 1, 1999 and ending March 31, 2000, the Respondent employed approximately 1,179 persons as laborers, of whom 52.9% were African American, 43.2% were (non-black) Latino, 3.5% were White, and .4% were of other race or ethnic origins. (*See* Attachment 1, Figure 1). At the beginning of 1999, a substantial majority of persons employed as laborers were African-American. (Figure 2). During the year the number of Latino employees steadily increased to the point that by the fourth quarter they held a majority of the positions.

4.    During the investigation, data were collected from personnel, payroll and scheduling records obtained from the Respondent on the race, sex, and ethnic origin of employees, their home addresses, prior work experience, dates of employment, departmental assignments, schedules, hours worked, and compensation. The data were analyzed using the Statistical Package for the Social Sciences ("SPSS"), a leading computer software designed for descriptive and inferential statistical analysis.

3

**Wages**

5.     The Complainant was hired in 1995.

6.     In January 1997, he made $5.00/hour, received an increase in September 1997 to $5.15/hour and left the Respondent 's employ in February 1998. Upon rehire in June 1999, Complainant resumed his former rate of pay at $5.15/hour. His last increase occurred in July 1999 to $5.50/hour where it remained to the point of separation in December 1999.

7.     The dryer and tunnel assignments are paid a higher salary because the work is heavy and calls for gauging computerized settings. A worker assigned to this position must also push cakes of wet laundry, each weighing @ 110 lbs. from the tunnel to the dryers.

8.     Maria "Lulu" Espinosa, one of the Respondent's supervisors who had hiring and firing authority, admitted that most of the Latino people hired by the Respondent did not have relevant prior experience. Ms. Espinosa is the Latino supervisor to whom Latino workers were referred when in search of work. She was a conduit for a large labor pool, of predominantly Central American immigrants, living in the Washington, D.C. suburbs. She participated in hiring for her own shift by giving out job applications and reading them to in Spanish, when necessary, to the applicants.

9.     As the plant experienced rapid growth in 1999, Brad Minetree told Ms. Espinosa that he needed employees.

10.     Nancy Stair stated to this investigator and to another employee of the Commission, that "Latinos are better workers than blacks"and that "Latinos deserve better pay". Stair admitted that she said this to other employers in the industry. Several former employees heard Nancy or Brad say this at work.

11.     At the plant, Brad Minetree referred to the black workers as "niggers" when they were not present. Brad and Dave Minetree were heard at the work site calling the African-American employees "dumb niggers," "stupid niggers," "fucking niggers," "black niggers" and used racially derogatory phrases like " get your black ass over here"and "get your black ass away from there." Dave Minetree admitted that he used the term "nigger-rig-it" publicly when he meant something had been "screwed up". The term "nigger" was commonly used by the Minetrees in front of and behind the backs of its African-American employees.

12.     Brad Minetree did not publicly direct racial or ethnic epithets at or about the Latino employees.

4

13.    With respect to wages, the data showed a consistent disparity between the hourly wages paid to African-American employees and those paid to both Latino and White employees. (Figure 8). The median wage rate for African-Americans who worked at any time during 1999 was $5.15 per hour. For Latinos who worked during the same period the rate was $6.00 and for Whites it was $5.25. For African-Americans, the mean (average) wage rate was $5.29 per hour, while for Latinos and Whites, the means were $5.91 and $5.42, respectively. These wage disparities were evident in each quarter and for both incumbent and newly hired employees. (Figures 6-7). On a month-by-month basis, newly hired African-Americans as a group were consistently paid at a lower hourly rate than their Latino counterparts throughout 1999. (Due to their much smaller numbers, Whites' wages could not be reliably considered on a monthly basis). The overall disparity did not lessen until the first quarter of 2000.

14.    Cross-tabulation procedures were performed on the wage data. The results show that African-Americans as a group were paid at a lower hourly rate than Latinos regardless of prior laundry work experience (Figure 9), rehire status (Figure 10), departmental assignment (Figure 13), distance from home to work (in miles) (Figure 14), and length of service. (Figures 11 and 12).

15.    Multiple regression procedures were performed to determine whether any or all of the above variables, including employee race, were statistically significant predictors of hourly wage. The race variable was "dummy coded" to capture the effect of a change in employee race from (a) non-African-American to African-American (Race1), (b) Latino to African-American (Race2), and (c) White to African-American (Race3). The results are summarized in Tables 1-4 of Attachment 2.

16.    The results show that regardless of which coding scheme is used, employee race was a strong, statistically significant predictor of the Respondent's hourly wage rates, including the starting wage rates of employees hired in 1999 (Table 1), the average wage rates for all employees during 1999 (Table 2), and the average wage rates for employees who worked during both 1999 and the first quarter of 2000 (Table 3). Race1 and Race2 were also significant predictors of the average wage rates by quarter. The results were almost always significant at less than .001, meaning that the probability of such a result occurring by chance alone was less than 1 in 1,000. The direction of the race co-efficient was consistently negative, indicating that the effect was a net *decrease* in wages for African-American employees. In terms of dollars and cents, for a newly hired employee, a change in race from non-African-American to African-American meant a loss of 64 cents per hour, or $26 per 40 hour week; from Latino to African-American, a loss of 67 cents per hour, or $27 per week, and from White to African-American, a loss of 17 cents per hour, or $7 per week. (Table 1).

5

17.    The results show that with one exception, non-racial variables were either statistically insignificant alone or became insignificant when included in the same equation with employee race. The only variable that remained a statistically significant predictor of wage rates *after* the effects of employee race were accounted for was the distance from the employee's home to work. (*See* Tables 1-4). However, Race1 and Race2 were both stronger predictors than distance from home to work and largely negated its effect, reducing the standardized beta coefficient (a measure of the strength of the relationship) of distance from home to work to less than half of its original size. Controlling for the effects of distance, a newly hired African-American employee would still be paid, per hour, 44 cents less than a non-African-American, 57 cents less than a Latino employee, and 11 cents less than a White employee. (Table 1). An incumbent African-American employee would also be paid substantially less per hour than a non-African-American (38 cents) or Latino employee (52 cents) (Table 2).

### Assignments

18.    Complainant worked in the soil room for the length of his employment.

19.    Work in the soil room involves physically handling dirty linens which often contain blood, blood-borne pathogens, fecal matter, used hypodermic needles and other potentially infectious material. Many employees are injured by needle sticks and must receive long-term medical attention for potential infection. Soiled laundry is then hand sorted into carts for loading into the tunnel. The work is regarded as unskilled and does not  not require heavy lifting.. The soil room had the highest rate of turnover in the plant.

20.    John Fitzgerald, Plant Manager and Brad Minetree made the assignment decisions in 1999. Mike Ashley, African-American team leader of the soil from 1995 - 2000, who had oversee authority of the production workers in the soil room, also had hiring authority over the soil room. He told everybody he knew to come down and get a job. He was available when people came in to fill out applications and he often conducted brief interviews on the spot. Ashley did not want Latinos back in the soil room because he they did not speak English. He thought that would detract from the cohesiveness of the group he supervised.

21.    With respect to departmental assignments, the data obtained during the investigation showed a racial pattern in the assignment of employees to the two major departments at the Respondent's facility. During the 15 month period, the majority of African-Americans were assigned to, and worked in, the soil room while the majority of Latinos were assigned to, and worked in, the flat work department. (Figures 3-5). Throughout this period, the *majority* of the employees in the flat work department were Latino and the *vast majority* of employees in the soil room were African-American. The results of the *Chi-Square* test and other measures show that this association between race and assignment is statistically significant at the .01 level.

22.    Logistic regression procedures were performed to determine which, if any, variables were statistically significant predictors of the Respondent's decision to assign employees to flat work vs. the soil room. Employee race was dummy coded in the same manner as before. The results (*See* Table 9 of Attachment 2) show that all three race variables (Race1, Race2 and Race3), in addition to employee sex and distance from home to work, were statistically significant (.01 level or less) predictors of departmental assignment In contrast, the employee's length of service, prior laundry experience, and rehire status were not statistically significant. Employee sex was the strongest predictor of assignment, followed by employee race, and distance from the employee's home to work. Moreover, race remained a strong, statistically significant predictor of assignment even after the effects of sex and distance were accounted for.

## CONCLUSION

Reliance on word of mouth recruiting, discriminatory statements made by the Respondent's agents, and payment of wages based on race, without regard for distance traveled to work or prior relevant work experience as proffered, demonstrate that the Respondent had a pattern and practice of discriminating against African-American workers in paying them a lower starting wage rate and in assigning them to work in the soil room, the area in which the greatest risk of injury and disease could occur. Respondent practices were intentionally discriminatory and/or had an adverse impact on African Americans. Respondent's own conduct demonstrated that Respondent eventually equalized the wages of all workers, African-American and Latino, thus maintenance of a practice of paying unequal wages based on race was never necessary to the operation of the Respondent's business. Nor does the ability to communicate effectively in English explain or justify the observed result with regard to assignments. The investigation established that English speaking and non-English speaking employees worked effectively side-by-side in the flat work department. Therefore, the ability to communicate in English is not required for the job.

7

## FINDING OF PROBABLE CAUSE

Therefore there is probable cause to believe that the Respondent has discriminated against the Complainant on the basis of his race in wage compensation and in job assignment in violation of Article 49B of the Annotated Code of Maryland. Pursuant to COMAR 14.03.01.7A, you will be contacted by a Commission conciliator to enter into the conciliation process. Should this fail, the case will be certified for public hearing.

Investigator

## CERTIFICATION OF SERVICE

The Written Finding was issued on the __21st__ day of __February__ 2001 and served on all parties of the complaint on said date.

FOR THE MARYLAND COMMISSION ON HUMAN RELATIONS

8

·BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

| | | |
|---|---|---|
| · **IN THE MATTER OF:** | * | |
| | | **Respondent's representative:** |
| Rudolph Curtis | | |
| 2111 Booth Street | * | Jeanne M. Phelan |
| Baltimore, Maryland 21223 | | Attorney at Law |
| | | Whiteford, Taylor & Preston, L.L.P. |
| **COMPLAINANT** | * | 7 St. Paul Street |
| | | Baltimore, Maryland  21202-1626 |
| vs. | | |
| | * | |
| Up-To-Date Laundry, Inc. | | Case No.: 9912-0534 |
| 1221 DeSoto Road | | EEOC No.: 12FA00220 |
| Baltimore, Maryland 21223 | * | |
| | | |
| **RESPONDENT** | | |
| | • | |

\*    \*    \*    \*    \*    \*        \*    \*    \*    \*    \*    \*

## AMENDED WRITTEN FINDING

The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure, COMAR 14.03.01.06(A). All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

In his complaint filed on December 17, 1999, the Complainant alleges that the Respondent discriminated against him by disciplining and terminating him in retaliation for filing a complaint against the Respondent, Maryland Commission on Human Relations charge number 9911-0386, in violation of Article 49B of the Annotated Code of Maryland. He states that on November 24, 1999, Nancy Stair called him into her office to talk about the complaint he had just filed against her. She told him that she felt that the accusations he made against her were false and she wanted to know how he could say that she is prejudiced. A little over one week later, Keith Springs and Nancy Stair told him that he was terminated, but did not give him an explanation for his firing.

1

## SUMMARY OF THE RESPONDENT'S POSITION

Respondent representative states that Nancy Stair did talk with the Complainant after Respondent received the charge of discrimination. She told the Complainant that she was quite surprised and asked him why he felt it was necessary to file a charge of discrimination. Complainant did not respond to her question. However, this was unrelated to the cause of Complainant's termination. On December 2, 1999, Elijah Sewell approached him as he was out of his work area to ask him what he was doing there. Representative states that Complainant replied, "What the fuck does it look like I'm doing? I'm working like you should be fucking doing". Sewell told him to return to his area, to which the Complainant retorted, "I'm working here in the motherfucking dry fold and you'd better get out of my face before I fuck you up". The supervisor on duty sent the Complainant home and the Plant Manager, John Fitzgerald terminated him for insubordination.

Respondent representative adds that Complainant was originally hired in 1995, left in April 1997, rehired in June 1997 and then terminated by Brad Minetree on February 13, 1998, for insubordination. Respondent re-hired the Complainant a second time on June 3, 1999.

## SUMMARY OF THE INVESTIGATION

1.    Charge number 9911-0386 was served on the Respondent on November 23, 1999. Nancy Stair called the Complainant into her office on November 24, 1999 to ask him why he filed a complaint of discrimination against her. Ms. Stair asked the Complainant if he really thought she was prejudiced. She asked how could he do something like that to them, in view of how good they had been to him and the money they have lent to him during his employment. During this conversation, in defense of paying the Latino workers more because she felt they are better workers, Stair remarked "Mexicans don't ask for money. Blacks are alcoholics and drug abusers. What else is there to think?" Her tone was angry during this conversation. on December 2, 1999, Stair told him to punch out and Springs advised him that he was terminated.

2.    Complainant admits that he left Respondent's employ on two prior occasions and returned to work for the Respondent for the last time on or around June 5, 1999. The first time he left, he left to work for a job in a restaurant that paid him more money and that did not conflict with his day job as a teacher's assistant. He recalls that Nancy Stair came to him to ask him to return to work for them and he agreed. He does not remember why he separated from the Respondent's employ the second time.

2

3.  Complainant got into a fight with Elijah Sewell, possibly in May 1998. He recalls that he was locked up for fighting some guys who were trying to talk to his girlfriend. He fought Sewell on the job because Sewell told people at work that some young boys were trying to talk to his girlfriend. Sewell was a lead worker in the washer/tunnel/dryer area at the time. Prior to this incident, Sewell and the Complainant were friends.   When the Complainant was released from jail, he returned to work for the Respondent.

4.    During another stint with the Respondent, Complainant walked off the job because Brad Minetree told him to "Get his ass back on line". He admitted that made him want to explode and so he left. Complainant recalled that Mr. Minetree had told him to accompany a truck driver to pick up some sailor uniforms from a boat that was in town. When they returned, Mr. Minetree denied that he told the Complainant to help the driver, rather he told him to return to his proper work area.. When he left, Mike Ashley, soil room team leader, visited the Complainant at his home and encouraged him to return. After approximately only one hour, the Complainant returned to work with Mr. Ashley.

5.     On the day that the Complainant was terminated, Mr. Sewell approached the Complainant who was working with female laborers in dry work and told him to "Get your ass in the back [soil room]". Complainant told Sewell to stop disrespecting him in front of the ladies and told him to "get the fuck out of my face and go do some work".

6.    Complainant admits to having made profane remarks to Elijah Sewell, but he denies that he threatened Mr. Sewell.

7.    Mr. Sewell did not supervise Mr. Curtis at the time of his termination. Lead worker Sewell supervised the flat work (dry work) area. Mr. Curtis worked in the soil room which was supervised by Keith Springs, lead worker.

8.     Springs and Stair terminated Mr. Curtis. Stair did not typically terminate employees but John Fitzgerald, Plant Manager whose responsibility was to terminate employees, was not present for the termination and was not notified of the incident until they had already fired Curtis.

9.     In the relevant time period, Michelle Milligan, worker in the flat area, and Keith Springs, lead worker in the soil and dryer area during the evening shift, were romantic partners and lived together. Ms. Milligan was also close to Nancy Stair. They went shopping together and got their hair and nails done together. Stair and Milligan were close friends.

10.    Elijah Sewell has a supervisory style employees throughout the plant describe as coarse, belligerent, confrontational and sometimes abusive.

11.    A member of Respondent supervisory staff has endured similar language from a subordinate, but waited for the worker to calm down, to address the problem with them. That worker was not terminated and had not filed a charge of discrimination nor protested any protected activity.

## CONCLUSION

Sewell and Curtis had a longstanding friendship that eventually turned sour. By his own admission, Complainant used profane language at Sewell but he denied threatening him. They have hurled similar words at each other in the past but the Complainant continued to work there. Other workers as well have directed profanity at management, but have been retained. Sewell was not his supervisor and information available to the investigation supports a deduction that it is not unlikely that Springs knew about Complainant's charge. Moreover, only one week had lapsed from Complainant's conversation with Ms. Stair and his termination.    Even then Respondent's termination protocol was not followed. Therefore there is sufficient evidence to conclude that Respondent's actions were a pretext for retaliating against the Complainant for participating in activity protected by Article 49B of the Annotated Code of Maryland.

## FINDING OF PROBABLE CAUSE

Therefore there is probable cause to believe that the Respondent has discriminated against the Complainant on the basis of retaliation for having filed a prior charge of discrimination against the Respondent, in violation of Article 49B of the Annotated Code of Maryland. Pursuant to COMAR 14.03.01.7A, you will be contacted by a Commission conciliator to enter into the conciliation process. Should this fail, the case will be certified for public hearing.

_____
Investigator, Systemic Unit

4

## CERTIFICATION OF SERVICE

The Written Finding was issued on the _____ day of _____ 2001 and
served on all parties of the complaint by regular mail on said date.

FOR THE MARYLAND COMMISSION
ON HUMAN RELATIONS

BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

| | |
|---|---|
| **IN THE MATTER OF:** | * |
| | **Respondent's representative:** |
| Herbert Lee Datcher | |
| 1925 South Payson Street | *    Jeanne M. Phelan |
| Baltimore, Maryland 21217 | Attorney at Law |
| | Whiteford, Taylor & Preston, L.L.P. |
| **COMPLAINANT** | *    7 St. Paul Street |
| | Baltimore, Maryland 21202-1626 |
| vs. | |
| | * |
| Up-To-Date Laundry, Inc. | Case No.: 9910-0370 |
| 1221 DeSoto Road | EEOC No.: 12FA00102 |
| Baltimore, Maryland 21223 | * |
| | |
| **RESPONDENT** | |
| | • |

\*   \*   \*   \*   \*   \*     \*   \*   \*   \*   \*   \*

## WRITTEN FINDING

The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure, COMAR 14.03.01.06(A). All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

The Complainant alleges that the Respondent discriminated against him on the basis of his race, African-American, by paying him at a lower wage than it paid non-African-American workers doing the same work in violation of Article 49B of the Annotated Code of Maryland.

The Complainant stated that he was hired by the Respondent on October 24, 1997. At the time of his hire, he claimed to have earned $5.15/hour with no prior relevant experience. He was assigned to the box pull and the tunnel areas. At the time he signed his complaint in October 1999, he alleged that his wages were $6.00/hour.

1

SUMMARY OF THE RESPONDENT'S POSITION

Wages

Respondent representative stated that their records reflect that the Complainant was hired on October 27, 1997, received a raise to $5.85/hour in 1998, and again to $6.00 on April 11, 1999.

Respondent denies that it discriminated on the basis of race with respect to wage rates. However, Respondent acknowledged that wage rates varied to some degree but did so in response to external wage pressures and difficulties Respondent had recruiting reliable employees. Their operations expanded in 1999 calling for more jobs. One of Respondent supervisors, who is Latino, pointed out that there was a large pool of available labor in the Maryland suburbs of Washington, D.C. Once she located available applicants, many of them were unwilling to travel to Baltimore for starting wage rate of $5.15/hour and they demanded more money. In order to make the job attractive to these applicants, Respondent offered and paid them a starting wage of $6.00/hour. Brad Minetree stated that he could not attract a higher caliber employee at $5.15/hour so he raised the starting wage to $6.00/hour. Many of the applicants had acquaintances and relatives who were also available and they demanded the same starting wage.

Brad Minetree and Nancy Stair both asserted that work experience upon hiring and the department to which an employee was assigned, influenced employees' starting wages. They concurred that in 1999, prior work experience affected laborers' wages in departments 100, 200 and 300 as much as $.35/hour. Work on the dryers (department 500) and in the wash room, a.k.a. wash alley, a.k.a. the tunnel(department 400) required greater skill and ability. Assignments in these areas call for inputting data and carrying heavy blocks of wet laundry from one place to another.

SUMMARY OF THE INVESTIGATION

1.    Up-To-Date Laundry, Inc. ("Up-To-Date") is a corporation located in Baltimore, Maryland that contracts with various businesses, including Johns Hopkins Hospital, St. Joseph's Hospital, , Bayview Hospital, Union Memorial Hospital, Washington Hospital Center, Georgetown University, Franklin Square Hospital, George Washington, and hospitals located in Harford County, Arlington, Va., and Fallston, Md. to wash, dry and press customers' laundry, including lab coats, hospital gowns, scrubs, towels, sheets and other linens, toweling and clothing items used in hospitals.

2

2.      Up-To-Date Laundry is a family business in operation since 1946 and owned, since 1994 by Nancy Stair, the secretary and chief executive officer. Stair's sons, Brad and David Minetree are the president and vice president of the Company, respectively. David Minetree is also the company's trucking supervisor.

3.  The Respondent's workforce is composed predominantly of African-Americans and employees of Spanish-speaking, Central American origin (hereinafter, "Latino"). During the 15 month period beginning January 1, 1999 and ending March 31, 2000, the Respondent employed approximately 1,179 persons as laborers, of whom 52.9% were African American, 43.2% were (non-black) Latino, 3.5% were White, and .4% were of other race or ethnic origins. (See Attachment 1, Figure 1). At the beginning of 1999, a substantial majority of persons employed as laborers were African-American. (Figure 2). During the year the number of Latino employees steadily increased to the point that by the fourth quarter they held a majority of the positions.

4.      During the investigation, data were collected from personnel, payroll and scheduling records obtained from the Respondent on the race, sex, and ethnic origin of employees, their home addresses, prior work experience, dates of employment, departmental assignments, schedules, hours worked, and compensation. The data were analyzed using the Statistical Package for the Social Sciences ("SPSS"), a leading computer software designed for descriptive and inferential statistical analysis.

### Wages

5.      Complainant was hired on October 27, 1997 into the flat work department. He pulled sheets at a starting pay rate of $5.15/hour. He performed various functions within the flat work department i.e. on the blanket machine and other dry work. Complainant was transferred to the dryers in September 1998 while his salary increased to $5.50/hour. By September 19, 1998, the end of a pay period, his wage increased to $5.60/hour. On November 2, 1998, Respondent raised his wages to $5.85/hour because Complainant refused insurance. His salary remained unchanged until April 17, 1999 when it went up again to $6.00/hour. This was considered a merit increase or "dryer man increase". Complainant was taken off of the dryers on May 17, 1999. Respondent transferred him to the soil room but his salary remained the same.

6.      Maria "Lulu" Espinosa, one of the Respondent's supervisors who had hiring and firing authority, admitted that most of the Latino people hired by the Respondent did not have relevant prior experience. Ms. Espinosa is the Latino supervisor to whom Latino workers were referred when in search of work. She was a conduit for a large labor pool, of predominantly Central American immigrants, living in the Washington, D.C. suburbs. She

3

participated in hiring for her own shift by giving out job applications and reading them in Spanish, when necessary, to the applicants.

7.    As the plant experienced rapid growth in 1999, Brad Minetree told Lulu Espinosa that he needed employees.

8.    Nancy Stair admitted to this investigator and to another employee of the Commission, that "Latinos are better workers than blacks"and that "Latinos deserve better pay". Stair admitted that she said this to other employers in the industry. Several former employees heard Nancy or Brad say this at work.

9.    At the plant, Brad Minetree referred to the black workers as "niggers" when they were not present. Brad and Dave Minetree were heard at the work site calling the African-American employees "dumb niggers," "stupid niggers," "fucking niggers," "black niggers" and used racially derogatory phrases like " get your black ass over here"and "get your black ass away from there." Dave Minetree admitted that he used the term "nigger-rig-it" publicly when he meant something had been "screwed up". The term "nigger" was commonly used by the Minetrees in front of and behind the backs of its African-American employees.

10.    Brad Minetree did not publicly direct ethnic epithets at or about the Latino employees.

11.    With respect to wages, the data showed a consistent disparity between the hourly wages paid to African-American employees and those paid to both Latino and White employees. (Figure 8). The median wage rate for African-Americans who worked at any time during 1999 was $5.15 per hour. For Latinos who worked during the same period the rate was $6.00 and for Whites it was $5.35. For African-Americans, the mean (average) wage rate was $5.29 per hour, while for Latinos and Whites, the means were $5.91 and $5.42, respectively. These wage disparities were evident in each quarter and for both incumbent and newly hired employees. (Figures 6-7). On a month-by-month basis, newly hired African-Americans as a group were consistently paid at a lower hourly rate than their Latino counterparts throughout 1999. (Due to their much smaller numbers, Whites' wages could not be reliably considered on a monthly basis). The overall disparity did not lessen until the first quarter of 2000.

12.    Cross-tabulation procedures were performed on the wage data. The results show that African-Americans as a group were paid at a lower hourly rate than Latinos regardless of prior laundry work experience (Figure 9), rehire status (Figure 10), departmental assignment (Figure 13), distance from home to work (in miles) (Figure 14), and length of service. (Figures 11 and 12).

4

13.    Multiple regression procedures were performed to determine whether any or all of the above variables, including employee race, were statistically significant predictors of hourly wage. The race variable was "dummy coded" to capture the effect of a change in employee race from (a) non-African-American to African-American (Race1), (b) Latino to African-American (Race2), and (c) White to African-American (Race3). The results are summarized in Tables 1-4 of Attachment 2.

14.    The results show that regardless of which coding scheme is used, employee race was a strong, statistically significant predictor of the Respondent's hourly wage rates, including the starting wage rates of employees hired in 1999 (Table 1), the average wage rates for all employees during 1999 (Table 2), and the average wage rates for employees who worked during both 1999 and the first quarter of 2000 (Table 3). Race1 and Race2 were also significant predictors of the average wage rates by quarter. The results were almost always significant at less than .001, meaning that the probability of such a result occurring by chance alone was less than 1 in 1,000. The direction of the race co-efficient was consistently negative, indicating that the effect was a net *decrease* in wages for African-American employees. In terms of dollars and cents, for a newly hired employee, a change in race from non-African-American to African-American meant a loss of 64 cents per hour, or $26 per 40 hour week; from Latino to African-American, a loss of 67 cents per hour, or $27 per week, and from White to African-American, a loss of 17 cents per hour, or $7 per week. (Table 1).

15.    The results show that with one exception, non-racial variables were either statistically insignificant or became insignificant when included in the same equation with employee race. The only variable that remained a statistically significant predictor of wage rates *after* the effects of employee race were accounted for was the distance from the employee's home to work. (*See* Tables 1-4). However, Race1 and Race2 were both stronger predictors than distance from home to work and largely negated its effect, reducing the standardized beta coefficient (a measure of the strength of the relationship) of distance from home to work to less than half of its original size. Controlling for the effects of distance, a newly hired African-American employee would still be paid, per hour, 44 cents less than a non-African-American, 57 cents less than a Latino employee, and 11 cents less than a White employee. (Table 1). An incumbent African-American employee would also be paid substantially less per hour than a non-African-American (38 cents) or Latino employee (52 cents) (Table 2).

## CONCLUSION

Discriminatory statements made by the Respondent's agents, and payment of wages based on race, without regard for distance traveled to work or prior relevant work experience as proffered, demonstrate that the Respondent had a pattern and practice of discriminating

against African-American workers in paying them a lower starting wage rate.. Respondent practices were intentionally discriminatory and/or had an adverse impact on African Americans. Respondent's own conduct demonstrated that Respondent eventually equalized the wages of all workers, African-American and Latino, thus maintenance of a practice of paying unequal wages based on race was never necessary to the operation of the Respondent's business.

## FINDING OF PROBABLE CAUSE

Therefore there is Probable Cause to believe that the Complainant has been discriminated against on the basis of his race in wage compensation in violation of Article 49B of the Annotated Code of Maryland.

Investigator. Systemic Unit

## CERTIFICATION OF SERVICE

The Written Finding was issued on the _____ day of FEBRUARY 2001 and served on all parties of the complaint on said date.

FOR THE MARYLAND COMMISSION ON
HUMAN RELATIONS

6

BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

**IN THE MATTER OF:**                    *

**Respondent's representative:**

Veronica Johnson
1527 Lester Morton Court, #1            *      Jeanne M. Phelan
Baltimore, Maryland 21205                      Attorney at Law
                                               Whiteford, Taylor & Preston, L.L.P.
   **COMPLAINANT**              *      7 St. Paul Street
                                               Baltimore, Maryland  21202-1626

     vs.
                                        *

Up-To-Date Laundry, Inc.                       Case No.: 9910-0373
1221 DeSoto Road                               EEOC No.: 12FA00105
Baltimore, Maryland 21223               *

   **RESPONDENT**
                                        •

*    *    *    *    *    *         *    *    *    *    *    *

## WRITTEN FINDING

The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure, COMAR 14.03.01.06(A). All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

The Complainant alleged that the Respondent discriminated against her on the basis of her race, African-American, by paying her at a lower wage than it paid her Latino co-workers doing the same work and with less to no experience. She also alleged that the Respondent treated the full time Latino workers more favorably by scheduling them Monday through Friday with weekends off. She alleged that in contrast, Respondent required the full time African-Americans workers to work on the weekends.

The Complainant stated that he was hired by the Respondent on October 23, 1994 and that she brought with her six years of experience. She claimed that the Respondent hired her to work at the minimum wage at the time. She was assigned to handle pads in dry work. At the time the Complainant signed this charge, her most recent rate of pay was $5.75/hour.

1

## SUMMARY OF THE RESPONDENT'S POSITION

Respondent representative stated that their records confirm the Complainant's date of hire and rate of wages, however they deny her allegations of discrimination.

### Wages

Respondent denies that it discriminated on the basis of race with respect to wage rates. However, Respondent acknowledged that wage rates varied to some degree but did so in response to external wage pressures and difficulties Respondent had recruiting reliable employees. Their operations expanded in 1999 calling for more jobs. One of Respondent supervisors, who is Latino, pointed out that there was a large pool of available labor in the Maryland suburbs of Washington, D.C. Once she located available applicants, many of them were unwilling to travel to Baltimore for starting wage rate of $5.15/hour and they demanded more money. In order to make the job attractive to these applicants, Respondent offered and paid them a starting wage of $6.00/hour. Brad Minetree stated that he could not attract a higher caliber employee at $5.15/hour so he raised the starting wage to $6.00/hour. Many of the applicants had acquaintances and relatives who were also available and they demanded the same starting wage.

Brad Minetree and Nancy Stair both asserted that work experience upon hiring and the department to which an employee was assigned, influenced employees' starting wages. They concurred that in 1999, prior work experience affected laborers' wages in departments 100, 200 and 300 as much as $.35/hour. Work on the dryers (department 500) and in the wash room, a.k.a. wash alley, a.k.a. the tunnel(department 400) required greater skill and ability. Assignments in these areas call for inputting data and carrying heavy blocks of wet laundry from one place to another.

### Scheduling

Respondent denies that race was a factor in scheduling. In the first half of 1999, there were no written schedules. As it happened, senior employees tended to work the schedules that they always had worked and the newer employees were given schedules to meet the production demands. During the latter half of 1999, Respondent instituted written scheduling to correct past inefficiencies that resulted in excessive overtime. It assigned weekend work equitably without regard for race. Respondent operated its facility seven days a week and many had to work at least one day of the weekend.

## SUMMARY OF THE INVESTIGATION

1.     Up-To-Date Laundry, Inc. ("Up-To-Date") is a corporation located in Baltimore, Maryland that contracts with various businesses, including Johns Hopkins Hospital, St. Joseph's Hospital, , Bayview Hospital, Union Memorial Hospital, Washington Hospital Center, Georgetown University, Franklin Square Hospital, George Washington, and hospitals located in Harford County, Arlington, Va., and Fallston, Md. to wash, dry and press customers' laundry, including lab coats, hospital gowns, scrubs, towels, sheets and other linens, toweling and clothing items used in hospitals.

2.     Up-To-Date Laundry is a family business in operation since 1946 and owned, since 1994 by Nancy Stair, the secretary and chief executive officer. Stair's sons, Brad and David Minetree are the president and vice president of the Company, respectively. David Minetree is also the company's trucking supervisor.

3.     The Respondent's workforce is composed predominantly of African-Americans and employees of Spanish-speaking, Central American origin (hereinafter, "Latino"). During the 15 month period beginning January 1, 1999 and ending March 31, 2000, the Respondent employed approximately 1,179 persons as laborers, of whom 52.9% were African American, 43.2% were (non-black) Latino, 3.5% were White, and .4% were of other race or ethnic origins. (*See* Attachment 1, Figure 1). At the beginning of 1999, a substantial majority of persons employed as laborers were African-American. (Figure 2). During the year the number of Latino employees steadily increased to the point that by the fourth quarter they held a majority of the positions.

4.     During the investigation, data were collected from personnel, payroll and scheduling records obtained from the Respondent on the race, sex, and ethnic origin of employees, their home addresses, prior work experience, dates of employment, departmental assignments, schedules, hours worked, and compensation. The data were analyzed using the Statistical Package for the Social Sciences ("SPSS"), a leading computer software designed for descriptive and inferential statistical analysis.

### Wages

5.     Complainant applied for work on September 27, 1994, and started work in October 1994 at $4.75/hour. She applied for "folder, feeder, wrapper - anything" and responded "folding" and "presser" to the application's questions about special qualifications and "office machines that you can operate", respectively. The Complainant listed her most recent employer was Nu-Dy Diaper Service. She wrote that she worked there for six years, from 1988 to 1994, and her duties were feeding, wrapping and folding. The Complainant

3

stayed in flat work and continued to receive merit pay increases up to the point of her
resignation on August 29, 1999. At that point she was making $5.75/hour.

6.    Maria "Lulu" Espinosa, one of the Respondent's supervisors who had hiring and
firing authority, admitted that most of the Latino people hired by the Respondent did not
have relevant prior experience. Ms. Espinosa is the Latino supervisor to whom Latino
workers were referred when in search of work. She was a conduit for a large labor pool, of
predominantly Central American immigrants, living in the Washington, D.C. suburbs. She
participated in hiring for her own shift by giving out job applications, reading them in
Spanish, when necessary, to the applicants and interviewing.

7.    As the plant experienced rapid growth in 1999, Brad Minetree told Lulu Espinosa that
he needed employees.

8.    Nancy Stair admitted to this investigator and to another employee of the Commission,
that "Latinos are better workers than blacks"and that "Latinos deserve better pay". Stair
admitted that she said this to other employers in the industry. Several former employees
heard Nancy or Brad say this at work.

9.    At the plant, Brad Minetree referred to the black workers as "niggers" when they
were not present. Brad and Dave Minetree were heard at the work site calling the African-
American employees "dumb niggers," "stupid niggers," "fucking niggers," "black niggers"
and used racially derogatory phrases like " get your black ass over here"and "get your black
ass away from there." Dave Minetree admitted that he used the term "nigger-rig-it" publicly
when he meant something had been "screwed up". The term "nigger" was commonly used
by the Minetrees in front of and behind the backs of its African-American employees.

10.    Brad Minetree did not publicly direct ethnic epithets at or about the Latino employees

11.    With respect to wages, the data showed a consistent disparity between the hourly
wages paid to African-American employees and those paid to both Latino and White
employees. (Figure 8). The median wage rate for African-Americans who worked at any
time during 1999 was $5.15 per hour. For Latinos who worked during the same period the
rate was $6.00 and for Whites it was $5.25. For African-Americans, the mean (average)
wage rate was $5.29 per hour, while for Latinos and Whites, the means were $5.91 and
$5.42, respectively. These wage disparities were evident in each quarter and for both
incumbent and newly hired employees. (Figures 6-7). On a month-by-month basis, newly
hired African-Americans as a group were consistently paid at a lower hourly rate than their
Latino counterparts throughout 1999. (Due to their much smaller numbers, Whites' wages

could not be reliably considered on a monthly basis). The overall disparity did not lessen until the first quarter of 2000.

12.     Cross-tabulation procedures were performed on the wage data. The results show that African-Americans as a group were paid at a lower hourly rate than Latinos regardless of prior laundry work experience (Figure 9), rehire status (Figure 10), departmental assignment (Figure 13), distance from home to work (in miles) (Figure 14), and length of service. (Figures 11 and 12).

13.     Multiple regression procedures were performed to determine whether any or all of the above variables, including employee race, were statistically significant predictors of hourly wage. The race variable was "dummy coded" to capture the effect of a change in employee race from (a) non-African-American to African-American (Race1), (b) Latino to African-American (Race2), and (c) White to African-American (Race3). The results are summarized in Tables 1-4 of Attachment 2.

14.     The results show that regardless of which coding scheme is used, employee race was a strong, statistically significant predictor of the Respondent's hourly wage rates, including the starting wage rates of employees hired in 1999 (Table 1), the average wage rates for all employees during 1999 (Table 2), and the average wage rates for employees who worked during both 1999 and the first quarter of 2000 (Table 3). Race1 and Race2 were also significant predictors of the average wage rates by quarter. The results were almost always significant at less than .001, meaning that the probability of such a result occurring by chance alone was less than 1 in 1,000. The direction of the race co-efficient was consistently negative, indicating that the effect was a net *decrease* in wages for African-American employees. In terms of dollars and cents, for a newly hired employee, a change in race from non-African-American to African-American meant a loss of 64 cents per hour, or $26 per 40 hour week; from Latino to African-American, a loss of 67 cents per hour, or $27 per week, and from White to African-American, a loss of 17 cents per hour, or $7 per week. (Table 1).

15.     The results show that with one exception, non-racial variables were either statistically insignificant or became insignificant when included in the same equation with employee race. The only variable that remained a statistically significant predictor of wage rates *after* the effects of employee race were accounted for was the distance from the employee's home to work. (*See* Tables 1-4). However, Race1 and Race2 were both stronger predictors than distance from home to work and largely negated its effect, reducing the standardized beta coefficient (a measure of the strength of the relationship) of distance from home to work to less than half of its original size. Controlling for the effects of distance, a newly hired African-American employee would still be paid, per hour, 44 cents less than a non-African-

5

American, 57 cents less than a Latino employee, and 11 cents less than a White employee. (Table 1). An incumbent African-American employee would also be paid substantially less per hour than a non-African-American (38 cents) or Latino employee (52 cents) (Table 2).

### Scheduling

16.    Brad Minetree and John Fitzgerald were responsible for scheduling.  Everyone got at least one day  a week off in 1999 but not necessarily on the weekend.

17.    As part of the investigation, data were obtained from the Respondent on the number of times employees worked or were off on weekends during a five month period beginning August 8, 1999 and ending December 31, 1999.  The data show that African-American employees, as a group, were more likely to work on Saturdays or Sundays than their Latino counterparts. (*See* Attachment 1, Figures 17-18). Per employee, African-Americans worked an average of 6.97 weekend days while Latinos worked an average of only 4.65, a difference that is statistically significant at the .01 level. The median numbers of days were 7.00 and 3.00, respectively. Moreover, these racial differences were evident in both major departments (flat work and soil room) and for both recently hired and longer term employees. (Figures 19-20).

18.    Multiple regression procedures were performed to determine which variables, if any, were statistically significant predictors of the frequency of weekend work.  The results are summarized in Table 9 of Attachment 2. Both Race1 and Race2 were statistically significant, though modest, predictors, of an employee's weekend work.  Besides employee race, only length of service (as of December 31, 1999) and the distance from home to work, were statistically significant.  However, when included in the same equation with race, the distance variable became insignificant and length of service lost most of its predictive power.  Employee race was the best predictor of whether an employee worked on a Saturday or Sunday or did not work on those days.

### CONCLUSION

Discriminatory statements made by the Respondent's agents, and payment of wages based on race, without regard for distance traveled to work or prior relevant work experience as proffered, demonstrate that the Respondent had a pattern and practice of discriminating against African-American workers in paying them a lower starting wage rate. Respondent's own conduct demonstrated that Respondent eventually equalized the wages of all workers, African-American and Latino, thus maintenance of a practice of paying unequal wages based on race was never necessary to the operation of the Respondent's business. Statistically significant  evidence further established a causal link between race and

6

scheduling work on weekends. Respondent practices were intentionally discriminatory and/or had an adverse impact on African Americans.

## FINDING OF PROBABLE CAUSE

Therefore there is probable cause to believe that the Respondent has discriminated against the Complainant on the basis of her race in wage compensation and in scheduling weekend days in violation of Article 49B of the Annotated Code of Maryland. Pursuant to COMAR 14.03.01.7A, you will be contacted by a Commission conciliator to enter into the conciliation process. Should this fail, the case will be certified for public hearing.

_____
Investigator

## CERTIFICATION OF SERVICE

The Written Finding was issued on the ___21st___ day of ___FEBRUARY___
2001 and served on all parties of the complaint by regular mail on said date.

_____
FOR THE MARYLAND COMMISSION ON
HUMAN RELATIONS

7

BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

**IN THE MATTER OF:**                          *

                                       **Respondent's representative:**

Joseph Lloyd

4127 Norfolk Avenue                          *         Jeanne M. Phelan

Baltimore, Maryland 21216                              Attorney at Law

                                       Whiteford, Taylor & Preston, L.L.P.

     **COMPLAINANT**                       *         7 St. Paul Street

                                       Baltimore, Maryland   21202-1626

        vs.

                         *

Up-To-Date Laundry, Inc.                                Case No.: 9910-0366

1221 DeSoto Road                                        EEOC No.: 12FA00098

Baltimore, Maryland 21223                    *


     **RESPONDENT**

                           •

*      *      *      *      *      *        *      *      *      *      *      *

## AMENDED WRITTEN FINDING

       The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure, COMAR 14.03.01.06(A).  All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

       On his complaint filed on September 21, 1999, the Complainant alleges that the Respondent discriminated against him on the basis of his race, African-American, by paying him at a lower starting wage than it paid non-African-American workers  in violation of Article 49B of the Annotated Code of Maryland.  The Complainant also alleges that on several occasions in 1998, Brad and Dave Minetree sexually harassed him.  Specifically, he alleges that when he was bending over, a necessary movement he makes to do his job, Dave came behind him, pressed his body against the Complainant's and began "humping" him. Dave did this to him several times before the Complainant elbowed Dave in the stomach. Although Dave never humped him again, he and Brad began tweaking his nipples and saying, "Other guys have titties, where are yours?"  They continued this behavior for several more days and then it just stopped.

1

Further, Complainant alleges that he witnessed Dave Minetree approach a female co-worker while she was working at the dryers. He had her pinned up against the dryer, humping on her. Complainant saw her trying to push Minetree off of her. He wanted to but did not say anything. By sexually harassing its employees, he alleges that Respondent has created a hostile work environment.

## SUMMARY OF THE RESPONDENT'S POSITION

### Wages

Respondent denies that it discriminated on the basis of race with respect to wage rates. However, Respondent acknowledged that wage rates varied to some degree but did so in response to external wage pressures and difficulties Respondent had recruiting reliable employees. Their operations expanded in 1999 calling for more jobs. One of Respondent supervisors, who is Latino, pointed out that there was a large pool of available labor in the Maryland suburbs of Washington, D.C. Once she located available applicants, many of them were unwilling to travel to Baltimore for starting wage rate of $5.15/hour and they demanded more money. In order to make the job attractive to these applicants, Respondent offered and paid them a starting wage of $6.00/hour. Brad Minetree stated that he could not attract a higher caliber employee at $5.15/hour so he raised the starting wage to $6.00/hour

Many of the applicants had acquaintances and relatives who were also available and demanded the same starting wage.

Brad Minetree and Nancy Stair both asserted that work experience upon hiring and the department to which an employee was assigned, influenced employees' starting wages. They concurred that in 1999, prior work experience affected laborers' wages in departments 100, 200 and 300 as much as $.35/hour. Work on the dryers (department 500) and in the wash room, a.k.a. wash alley, a.k.a. the tunnel(department 400) required greater skill and ability. Assignments in these areas call for inputting data and carrying heavy blocks of wet laundry from one place to another.

### Sexual Harassment

Respondent representative proffers that Complainant's allegations regarding sexual harassment are time barred as they occurred around August and or September 1998. The representative further asserts that even if the allegations are not time barred, because the Complainant is a male complaining of the same type of conduct that the female employees are complaining about, allegations of harassment can not be based on sex.

2

## SUMMARY OF THE INVESTIGATION

1.     Up-To-Date Laundry, Inc. ("Up-To-Date") is a corporation located in Baltimore, Maryland that contracts with various businesses, including Johns Hopkins Hospital, St. Joseph's Hospital, , Bayview Hospital, Union Memorial Hospital, Washington Hospital Center, Georgetown University, Franklin Square Hospital, George Washington, and hospitals located in Harford County, Arlington, Va., and Fallston, Md. to wash, dry and press customers' laundry, including lab coats, hospital gowns, scrubs, towels, sheets and other linens, toweling and clothing items used in hospitals.

2.     Up-To-Date Laundry is a family business in operation since 1946 and owned, since 1994 by Nancy Stair, the secretary and chief executive officer. Stair's sons, Brad and David Minetree are the president and vice president of the Company, respectively. David Minetree is also the company's trucking supervisor.

3.     The Respondent's workforce is composed predominantly of African-Americans and employees of Spanish-speaking, Central American origin (hereinafter, "Latino"). During the 15 month period beginning January 1, 1999 and ending March 31, 2000, the Respondent employed approximately 1,179 persons as laborers, of whom 52.9% were African American, 43.2% were (non-black) Latino, 3.5% were White, and .4% were of other race or ethnic origins. (*See* Attachment 1, Figure 1). At the beginning of 1999, a substantial majority of persons employed as laborers were African-American. (Figure 2). During the year the number of Latino employees steadily increased to the point that by the fourth quarter they held a majority of the positions.

4.     During the investigation, data was collected from personnel, payroll and scheduling records obtained from the Respondent on the race, sex, and ethnic origin of employees, their home addresses, prior work experience, dates of employment, departmental assignments, schedules, hours worked, and compensation. The data were analyzed using the Statistical Package for the Social Sciences ("SPSS"), a well-known computer software used for descriptive and inferential statistical analysis.

### Wages

5.     The Complainant was hired by the Respondent in May 1997 at the starting wage of $5.00/hour with no previous pertinent experience. He worked all the areas in the plant but was originally assigned to the soil room. He left the Respondent's employ in June 1999 making $6.00/hour.

3

6.    From 1997 through 1999, Brad and Dave Minetree were heard by black workers at the work site calling the African-American employees "damn niggers", "dumb niggers", "stupid niggers", "fucking niggers", "no educated niggers", "black niggers", "ugly black bitch" and "black motherfuckers".

7.    Dave Minetree admitted using racially derogatory phrases at work like " get your black ass over here" and "get your black ass away from there." He also admitted that he used the term "nigger-rig-it" publicly when he meant something had been "screwed up".

8.    At the plant, some Latino workers heard Brad Minetree refer to the black workers as "niggers" when they were not present.

9.    The term "nigger" was commonly used by the Minetrees in front of and behind the backs of its African-American employees.

10.    Neither Brad or Dave Minetree or Nancy Stair publicly directed ethnic epithets at or about the Latino employees.

11.    Nancy Stair admitted to this investigator and to another employee of the Commission, that "Latinos are better workers", "Blacks just try to get more money but don't want to do any work" and that "Latinos deserve better pay". Stair admitted that she said this to other employers in the industry. Several former employees heard Ms. Stair or Brad Minetree say this at work. Ms. Stair was heard reacting to charges filed against Up-To-Date, Inc. saying "Blacks just try to get more and more money, but don't want to do the work and give you a lot of lip".

12.    Employees observed that management frequently sat with Latinos at lunch and not the black employees.

13.    Maria "Lulu" Espinosa, one of the Respondent's supervisors who had hiring and firing authority, admitted that most of the Latino people hired by the Respondent did not have relevant prior experience. Ms. Espinosa is the Latino supervisor to whom Latino workers were referred when in search of work. She was a conduit for a large labor pool, of predominantly Central American immigrants, living in the Washington, D.C. suburbs. She participated in hiring for her own shift by giving out job applications, reading them in Spanish, when necessary, to the applicants and interviewing.

14.    As the plant experienced rapid growth in 1999, Brad Minetree told Ms. Espinosa that he needed employees.

4

15.     With respect to wages, the data showed a consistent disparity between the hourly wages paid to African-American employees and those paid to both Latino and White employees. (Figure 8). The median wage rate for African-Americans who worked at any time during 1999 was $5.15 per hour. For Latinos who worked during the same period the rate was $6.00 and for Whites it was $5.25. For African-Americans, the mean (average) wage rate was $5.29 per hour, while for Latinos and Whites, the means were $5.91 and $5.42, respectively. These wage disparities were evident in each quarter and for both incumbent and newly hired employees. (Figures 6-7). On a month-by-month basis, newly hired African-Americans as a group were consistently paid at a lower hourly rate than their Latino counterparts throughout 1999. (Due to their much smaller numbers, Whites' wages could not be reliably considered on a monthly basis). The overall disparity did not lessen until the first quarter of 2000.

16.     Cross-tabulation procedures were performed on the wage data. The results show that African-Americans as a group were paid at a lower hourly rate than Latinos regardless of prior laundry work experience (Figure 9), rehire status (Figure 10), departmental assignment (Figure 13), distance from home to work (in miles) (Figure 14), and length of service. (Figures 11 and 12).

17.     Multiple regression procedures were performed to determine whether any or all of the above variables, including employee race, were statistically significant predictors of hourly wage. The race variable was "dummy coded" to capture the effect of a change in employee race from (a) non-African-American to African-American (Race1), (b) Latino to African-American (Race2), and (c) White to African-American (Race3). The results are summarized in Tables 1-4 of Attachment 2.

18.     The results show that regardless of which coding scheme is used, employee race was a strong, statistically significant predictor of the Respondent's hourly wage rates, including the starting wage rates of employees hired in 1999 (Table 1), the average wage rates for all employees during 1999 (Table 2), and the average wage rates for employees who worked during both 1999 and the first quarter of 2000 (Table 3). Race1 and Race2 were also significant predictors of the average wage rates by quarter. The results were almost always significant at less than .001, meaning that the probability of such a result occurring by chance alone was less than 1 in 1,000. The direction of the race co-efficient was consistently negative, indicating that the effect was a net *decrease* in wages for African-American employees. In terms of dollars and cents, for a newly hired employee, a change in race from non-African-American to African-American meant a loss of 64 cents per hour, or $26 per 40 hour week; from Latino to African-American, a loss of 67 cents per hour, or $27 per week, and from White to African-American, a loss of 17 cents per hour, or $7 per week. (Table 1).

5

19.    The results show that with one exception, non-racial variables were either statistically insignificant or became insignificant when included in the same equation with employee race. The only variable that remained a statistically significant predictor of wage rates *after* the effects of employee race were accounted for was the distance from the employee's home to work. (*See* Tables 1-4). However, Race1 and Race2 were both stronger predictors than distance from home to work and largely negated its effect, reducing the standardized beta coefficient (a measure of the strength of the relationship) of distance from home to work to less than half of its original size. Controlling for the effects of distance, a newly hired African-American employee would still be paid, per hour, 44 cents less than a non-African-American, 57 cents less than a Latino employee, and 11 cents less than a White employee. (Table 1). An incumbent African-American employee would also be paid substantially less per hour than a non-African-American (38 cents) or Latino employee (52 cents) (Table 2).

### Sexual Harassment

20.    The Complainant admits that the incidents in which Dave Minetree, Respondent Vice President, "humped" him and Dave and Brad Minetree, President, "tweaked his breasts", occurred while they were still at the Frederick Avenue plant, in August or September 1998. He further acknowledges that the incident he witnessed involving Dave Minetree and a co-worker occurred in December 1998 or January 1999.

21.    In September 1995, Respondent published its current policy on sexual harassment in its "Employee Handbook"and it states:

> "It is our firm policy to prohibit sexual harassment of any employee by another employee or a supervisor...While it is not easy to define precisely what sexual harassment is, it certainly includes unwelcome sexual advances, requests for sexual favors and /or verbal or physical conduct of a sexual nature including but not limited to drawings, pictures, jokes, teasing, uninvited touching or other sexually related comments..

> Sexual harassment will not be tolerated. Violations of this policy may result in disciplinary action, up to and including discharge. There will be no adverse action taken against employees who report violations of this policy or participate in the investigation of such violations.

> Any employee who feels that (s)he is a victim of sexual harassment should report the act in accordance with the following procedure. All complaints will be promptly and thoroughly investigated.

6

1. Any employee who believes that (s)he is a victim of sexual harassment, should report the act immediately to the **human resources manager**. If you prefer not to discuss the matter with the human resource manager, **you may directly report to any other member of management.**

2. The company will investigate every reported incident immediately. Any employee, supervisor or agent of the company who has been found to have sexually harassed another employee may be subject to appropriate disciplinary action, up to and including immediate discharge.

3. The company will conduct all investigations in a discreet manner. The company recognizes that every investigation requires a determination based on all the facts in the matter. We also recognize the serious impact a false accusation can have. We trust that all employees will continue to act responsibly.

4. The reporting employee and any employee participating in any investigation under this policy has the company's assurance that no reprisals will be taken as a result of a sexual harassment complaint. Rather, it is our policy to encourage discussion of the matter so as to help protect others from being subjected to similar inappropriate behavior.

22.   The Employee Handbook, which is written in English, is not distributed to individual employees, but available for perusal from time to time in the employee lunchroom and at the scale.

23.   Respondent staff did not include a human resources manager. Stair, Brad Minetree and the plant manager directly handled all personnel matters. Plant Manager, John Fitzgerald reported directly to Brad Minetree.

24.   In 1998, Mike Ashley, team leader for the soil room day shift, admitted that he witnessed Dave Minetree "hump" Mr. Lloyd on two occasions.

25.   Co-complainants', principals' and witnesses' testimony overwhelmingly supported the existence of sexually inappropriate behavior in the workplace pioneered by both Brad and Dave Minetree and directed towards women workers. Common behaviors repeatedly mentioned were touching, kissing, hugging, arms around the shoulders, feeling legs, feeling thighs, slapping the buttocks, putting hands down female workers shirts, grabbing breasts, pretending to have sex with bent over female employees from the rear, asking female employees out on dates or to go home with them, insinuating sex and urging women to have

7

sex with them, and to accept money. In addition to the Minetrees, Shakti Soni, and Elijah Sewell, both supervisors made sexual innuendoes and in some instances overt sexual comments to the female workers.

26.    Dave Minetree admitted that he has put his hands on the buttocks of women who have been there for about seven years. He said that "you know who you can do it to and which ones you can't". "If someone told me 'No', I wouldn't do it anymore". He admitted that has touched seven female employees in the form of hugging and kissing. He admitted that he may have kissed one female employee on the cheek but that he has seen his brother Brad Minetree, kiss people.

27.    Brad Minetree admitted that he had sexual relationships with three former employees, but that they were all consenting. He denies having had a sexual relationship with any employee since 1998. Brad admitted that since then, he kissed one of the Latino workers and asked her out, but that was all he did. He saw Dave Minetree kiss "one of the Spanish girls" hands.

28.    In the fall of 1998, Nancy Stair learned of one of Brad's relationships from some of her employees. The woman in this relationship admitted to having had a sexual relationship with Brad. They would go to his apartment, and have sex as much as three times a week and he would give her money to help her pay her bills.

29.    This woman came into Nancy Stair's office and told her about her relationship with Brad. Ms. Stair admitted that she started watching her closely after that. Ms. Stair said that she approached Brad and said, "If you did this, your grandfather and I would not approve".

30.    Within a short period of time of learning about it, Ms. Stair asked her to quit as she did not need those rumors going around in her business. When the worker refused to quit, Ms. Stair terminated her.

31.    In response to having been asked if she knew about the other sexual relationships Brad had with more female employees, she opined that Brad was a man and could do what he wants.

32.    Fitzgerald also attested to having seen Nancy Stair and a Latino tunnel worker, kiss. They were dating and that she made him a supervisor.

33.    Brad Minetree "constantly" put his hands on shoulders of the female workers. Fitzgerald would tell Marie "Lulu" Espinosa, plant supervisor, who often acted as liaison and interpreter for the Latino employees, to tell the girls that Brad Minetree wanted to see

them in his office. Fitzgerald knew of one incident that occurred around September 1999.

34.    A female Latino dry fold worker who worked on the blanket machine, was at Brad's house. He knew this because when her husband came to pick her up from work, she wasn't there. Ms. Espinosa came to him and asked him what she should do. She told Fitzgerald that the workers' husband was waiting for her , but the dry fold worker was at Brad's house, that she had been there overnight.

35.    Fitzgerald remembered that Dave Minetree used to say that Brad [Minetree] dated the help. Dave would tell people that they have big breasts or big butts.

36.    Dave Minetree touched the upper thigh and waist of a Latino female worker and asked her what kind of underwear she was wearing, "tangas" ( meaning bikinis) or dental floss.

37.    Mike Ashley, who began his employment with the Respondent in July 1993 and left in the spring of 2000, was the team leader for the workers of the 1st shift of the soil room. Frequently over the years, he saw Brad Minetree openly feel women's private body parts, and whisper in their ears. He knew of several sexual relationships Brad Minetree had with female workers there, some of which Brad Minetree admitted to and some he did not. The workers confided in Mr. Ashley and complained to him about Brad Minetree putting his hands on them. Ashley said that when the women told Brad Minetree to stop, he did, only to start again some time later.

38.    Mr. Ashley admitted that he would scold these women and ask them why they let him disrespect them like that. He went to Brad Minetree and asked him why he was going around doing that.

39.    A Latino former employee who worked for the Respondent between February 1998 until September 1999, saw Brad Minetree touch the legs, chests and backs of female workers. He remembered seeing this behavior for the first time after about four months of working there. The last time he witnessed this type of behavior was about two days before he left Respondent's employ.

40.    Brad and/or Dave Minetree touched the breast of, kissed and made sexual comments to two Latino women who worked for the Respondent in the spring of 1999.

41.    In September 2000, Maria Espinosa admitted that she knew Brad Minetree was presently living with one of the female Latino workers with whom he has a sexual relationship. The worker was working on the blanket machine in September 2000.

42.    In early 1999, Brad Minetree asked Ms. Espinosa to approach six Latina workers to tell them that he wanted to have sex with them. Ms. Espinosa admitted that she translated Mr. Minetrees's messages to the women as he requested.

43.    Ms. Espinosa admitted that Brad Minetree started to sexually harass her when she began work there in 1997. He touched her buttocks and asked her if she would like to "fuck". She told him that if he did, she would slap him. He also brushed her thighs while she and her husband were sitting in a truck in full view of her husband. In December 1998, he touched her legs and her buttocks in the presence of her husband. As recently as in the spring of 2000, Brad Minetree asked Ms. Espinosa if she were cold, to which she replied, "Why?" He said, "Look at your titties."

44.    From May 1999 through May 2000, Dave Minetree kissed female workers as they walked past him moving large carts from one place in the plant to another. He told Ms. Espinosa that he would give her $10,000 to have his baby.

45.    Dave Minetree frequently came behind the African-American women, wrapped his arms around them, lifted them up off the floor, and began to hump them.

46.    In or around the spring and summer of 1999, a black female worker was having a relationship with Brad Minetree.

## CONCLUSION

Discriminatory statements and payment of wages based on race, without regard for distance traveled to work or prior relevant work experience as proffered, demonstrate that the Respondent had a pattern and practice of discriminating against African-American workers in paying them a lower starting wage rate. Respondent practices were intentionally discriminatory and/or had an adverse impact on African Americans. Respondent's own conduct demonstrated that Respondent eventually equalized the wages of all workers, African-American and Latino, thus maintenance of a practice of paying unequal wages based on race was never necessary to the operation of the Respondent's business.

Other than his complaint, no further evidence exists to support a finding that the Minetrees' harassing handling of Mr. Lloyd was based on his gender. The vast amount of evidence collected indicates that the Minetrees directed their sexually harassing behavior at women. Nor is there evidence of alleged sexually harassing behavior that Mr. Lloyd either experienced or witnessed that occurred within six months of the date that he filed his charge of discrimination.

10

## FINDING OF PROBABLE CAUSE

Therefore there is probable cause to believe that the Respondent has discriminated against the Complainant on the basis of his race, in violation of Article 49B of the Annotated Code of Maryland. Pursuant to COMAR 14.03.01.7A, you will be contacted by a Commission conciliator to enter into the conciliation process. Should this fail, the case will be certified for public hearing.

Investigator, Systemic Unit

## FINDING OF NO PROBABLE CAUSE

Therefore there is No Probable Cause to believe that the Complainant has been discriminated against on the basis of his sex in violation of Article 49B of the Annotated Code of Maryland.

Under the Commission's Rules of Procedure, COMAR 14.03.01.06C, the Complainant may apply for reconsideration of the No Probable Cause finding within fifteen (15) days from the date upon which these Findings were mailed or delivered. The application should be in writing and **shall state specifically the grounds upon which the application is based**. A request for reconsideration shall be directed to J. Neil Bell, Deputy Director, Maryland Commission Human Relations, Six Saint Paul Street, Baltimore, Maryland 21202. If the request for reconsideration is granted, the Deputy Director shall notify the parties and remit the matter to the investigative staff for further appropriate action.

Investigator, Systemic Unit

11

## CERTIFICATION OF SERVICE

The Written Finding was issued on the _____ day of _____ 2001 and served on all parties of the complaint by regular mail on said date.

_____
FOR THE MARYLAND COMMISSION ON HUMAN RELATIONS

12

BEFORE THE MARYLAND COMMISSION ON HUMAN RELATIONS

**IN THE MATTER OF:**                                    *

                                                         **Respondent's representative:**

Melvin Newsome
1532 Penrose Avenue, #7                                  *     Jeanne M. Phelan
Baltimore, Maryland 21223                                      Attorney at Law
                                                               Whiteford, Taylor & Preston, L.L.P.
     **COMPLAINANT**                                     *     7 St. Paul Street
                                                               Baltimore, Maryland   21202-1626
               vs.
                                                         *
Up-To-Date Laundry, Inc.                                       Case No.: 9910-0374
1221 DeSoto Road                                               EEOC No.: 12FA00106
Baltimore, Maryland 21223                                *

     **RESPONDENT**
                                                    •
*     *     *     *     *     *          *     *     *     *     *     *

## AMENDED WRITTEN FINDING

The above-captioned case has been investigated pursuant to Article 49B, Section 10(A) and the Commission's Rules of Procedure, COMAR 14.03.01.06(A). All procedural requirements have been met.

## SUMMARY OF THE COMPLAINANT'S POSITION

The Complainant alleged that the Respondent discriminated against him on the basis of his race, African-American, by paying him at a lower wage than it paid Latino workers doing the same work, in violation of Article 49B of the Annotated Code of Maryland. On the same basis he also alleged that Latino workers were given more hours to work, i.e. regular and overtime, that even though he requested more hours, he was denied the opportunity to do so. Finally, the Complainant alleged that he has heard Brad Minetree Respondent President, make racially insulting remarks, calling Complainant's co-workers "dumb niggers" and "fucking niggers".

The Complainant stated that he was hired by the Respondent in September 1998 and assigned to the box pulling area. At the time of his hire, he alleged that he earned $5.15/hour. He stated that in May 1999, he began working in the sorting area (soil room)

1

and he received a pay increase to $5.50/hour. Because the workers in the soil room generally completed their work before any other department, Complainant asked to work more hours on the floor. Respondent denied his request but allowed Latinos who arrived for work at 12 PM to work on the floor until closing.

## SUMMARY OF THE RESPONDENT'S POSITION

### Wages

Respondent representative stated that Respondent records confirm the Complainant's assertions regarding his starting wage and date of hire. Respondent also acknowledged that it paid some of the Complainant's Latino co-workers $6.00/hour. However, Respondent denied that it discriminated on the basis of race with respect to wage rates. Respondent acknowledged that wage rates varied to some degree but did so in response to external wage pressures and difficulties Respondent had recruiting reliable employees. Their operations expanded in 1999 calling for more jobs. One of Respondent supervisors, who is Latino, pointed out that there was a large pool of available labor in the Maryland suburbs of Washington, D.C. Once she located available applicants, many of them were unwilling to travel to Baltimore for starting wage rate of $5.15/hour and they demanded more money. In order to make the job attractive to these applicants, Respondent offered and paid them a starting wage of $6.00/hour. Brad Minetree stated that he could not attract a higher caliber employee at $5.15/hour so he raised the starting wage to $6.00/hour. Many of the applicants had acquaintances and relatives who were also available and they demanded the same starting wage.

Brad Minetree and Nancy Stair both asserted that work experience upon hiring and the department to which an employee was assigned, influenced employees' starting wages. They concurred that in 1999, prior work experience affected laborers' wages in departments 100, 200 and 300 as much as $.35/hour. Work on the dryers (department 500) and in the wash room, a.k.a. wash alley, a.k.a. the tunnel(department 400) required greater skill and ability. Assignments in these areas call for inputting data and carrying heavy blocks of wet laundry from one place to another.

### Overtime

Respondent representative stated that the Complainant failed to work his scheduled hours because he was frequently absent. Moreover, Respondent representative stated that Respondent on several occasions in 1999 actually offered more hours to the Complainant,

2

but he told the Respondent that he was not available .

Respondent denied that it discriminated on the basis of race with respect to the distribution of overtime. Their policy was to only offer overtime hours when work in an area was backlogged. Overtime was first offered to employees in the backlogged area, then if there were not enough volunteers, the opportunity was opened up to workers from other departments. Respondent representative stated that in most cases, when overtime was offered, all volunteers were permitted to work. In the rare cases where there were more volunteers than work, Respondent selected workers who had helped out in emergency situations in the past.

Respondent noted that it had observed that many African-American employees declined overtime offers while it was rare for a Latino employee to decline the opportunity.

Respondent policy indicates that the overtime rate of pay of one and one-half the employee's regular rate of pay was paid once the employee had actually worked 40 regular hours in the work week

**Racial Harassment**

Respondent representative stated that Respondent denied having made racially oriented remarks including but not limited to those alleged to have been made by Brad Minetree.

## SUMMARY OF THE INVESTIGATION

1.    Up-To-Date Laundry, Inc. ("Up-To-Date") is a corporation located in Baltimore, Maryland that contracts with various businesses, including Johns Hopkins Hospital, St. Joseph's Hospital, , Bayview Hospital, Union Memorial Hospital, Washington Hospital Center, Georgetown University, Franklin Square Hospital, George Washington, and hospitals located in Harford County, Arlington, Va., and Fallston, Md. to wash, dry and press customers' laundry, including lab coats, hospital gowns, scrubs, towels, sheets and other linens, toweling and clothing items used in hospitals.

2.    Up-To-Date Laundry is a family business in operation since 1946 and owned, since 1994 by Nancy Stair, the secretary and chief executive officer. Stair's sons, Brad and David Minetree are the president and vice president of the Company, respectively. David Minetree is also the company's trucking supervisor.

3

3.    The Respondent's workforce is composed predominantly of African-Americans and employees of Spanish-speaking, Central American origin (hereinafter, "Latino"). During the 15 month period beginning January 1, 1999 and ending March 31, 2000, the Respondent employed approximately 1,179 persons as laborers, of whom 52.9% were African American, 43.2% were (non-black) Latino, 3.5% were White, and .4% were of other race or ethnic origins. (*See* Attachment 1, Figure 1). At the beginning of 1999, a substantial majority of persons employed as laborers were African-American. (Figure 2). During the year the number of Latino employees steadily increased to the point that by the fourth quarter they held a majority of the positions.

4.    During the investigation, data were collected from personnel, payroll and scheduling records obtained from the Respondent on the race, sex, and ethnic origin of employees, their home addresses, prior work experience, dates of employment, departmental assignments, schedules, hours worked, and compensation. The data were analyzed using the Statistical Package for the Social Sciences ("SPSS"), a leading computer software designed for descriptive and inferential statistical analysis.

### Wages and Racial Harassment

5.    Complainant applied for any available opening job opening with Respondent on September 28, 1998. He did not list any prior relevant experience. Respondent hired him on the same date with a starting wage of $5.15/hour and assigned him to the flat work department. A review of the Complainant's personnel records indicated that he transferred to the soil room in May 1999 with an accompanying wage increase to $5.50/hour. He resigned in mid-August 1999 because, as he said in an interview, he needed more work hours.

6.    Maria "Lulu" Espinosa, one of the Respondent's supervisors who had hiring and firing authority, admitted that most of the Latino people hired by the Respondent did not have relevant prior experience. Ms. Espinosa is the Latino supervisor to whom Latino workers were referred when in search of work. She was a conduit for a large labor pool, of predominantly Central American immigrants, living in the Washington, D.C. suburbs. She participated in hiring for her own shift by giving out job applications and reading them to in Spanish, when necessary, to the applicants.

8.    As the plant experienced rapid growth in 1999, Brad Minetree told Ms. Espinosa that he needed employees.

9.    Nancy Stair stated to this investigator and to another employee of the Commission, that "Latinos are better workers than blacks"and that "Latinos deserve better pay." Stair

4

admitted that she said this to other employers in the industry. Several former employees heard Stair or Brad Minetree say this at work.

10.    At the plant, Brad Minetree referred to the black workers as "niggers" when they were not present. Brad and Dave Minetree were heard at the work site calling the African-American employees "dumb niggers," "stupid niggers," "fucking niggers," "black niggers" and used racially derogatory phrases like " get your black ass over here"and "get your black ass away from there." Dave Minetree admitted that he used the term "nigger-rig-it" publicly when he meant something had been "screwed up". The term "nigger" was commonly used by the Minetrees in front of and behind the backs of its African-American employees.

11.    Brad Minetree did not publicly direct ethnic epithets at or about the Latino employees.

12.    With respect to wages, the data obtained from Respondent showed a consistent disparity between the hourly wages paid to African-American employees and those paid to both Latino and White employees. (Figure 8). The median wage rate for African-Americans who worked at any time during 1999 was $5.15 per hour. For Latinos who worked during the same period the rate was $6.00 and for Whites it was $5.25. For African-Americans, the mean (average) wage rate was $5.29 per hour, while for Latinos and Whites, the means were $5.91 and $5.42, respectively. These wage disparities were evident in each quarter and for both incumbent and newly hired employees. (Figures 6-7). On a month-by-month basis, newly hired African-Americans as a group were consistently paid at a lower hourly rate than their Latino counterparts throughout 1999. (Due to their much smaller numbers, Whites' wages could not be reliably considered on a monthly basis). The overall disparity did not lessen until the first quarter of 2000.

13.    Cross-tabulation procedures were performed on the wage data. The results show that African-Americans as a group were paid at a lower hourly rate than Latinos regardless of prior laundry work experience (Figure 9), rehire status (Figure 10), departmental assignment (Figure 13), distance from home to work (in miles) (Figure 14), and length of service. (Figures 11 and 12).

14.    Multiple regression procedures were performed to determine whether any or all of the above variables, including employee race, were statistically significant predictors of hourly wage. The race variable was "dummy coded" to capture the effect of a change in employee race from (a) non-African-American to African-American (Race1), (b) Latino to African-American (Race2), and (c) White to African-American (Race3). The results are summarized in Tables 1-4 of Attachment 2.

5

15.    The results show that regardless of which variable definition is used, employee race was a strong, statistically significant predictor of the Respondent's hourly wage rates, including the starting wage rates of employees hired in 1999 (Table 1), the average wage rates for all employees during 1999 (Table 2), and the average wage rates for employees who worked during both 1999 and the first quarter of 2000 (Table 3). Race1 and Race2 were also significant predictors of the average wage rates by quarter. The results were almost always significant at less than .001, meaning that the probability of such a result occurring by chance alone was less than 1 in 1,000. The direction of the race co-efficient was consistently negative, indicating that the effect was a net *decrease* in wages for African-American employees. In terms of dollars and cents, for a newly hired employee, a change in race from non-African-American to African-American meant a loss of 64 cents per hour, or $26 per 40 hour week; from Latino to African-American, a loss of 67 cents per hour, or $27 per week, and from White to African-American, a loss of 17 cents per hour, or $7 per week. (Table 1).

16.    The results show that with one exception, non-racial variables were either statistically insignificant or became insignificant when included in the same equation with employee race. The only variable that remained a statistically significant predictor of wage rates *after* the effects of employee race were accounted for was the distance from the employee's home to work. (*See* Tables 1-4). However, Race1 and Race2 were both stronger predictors than distance from home to work and largely negated its effect. reducing the standardized beta coefficient (a measure of the strength of the relationship) of distance from home to work to less than half of its original size. Controlling for the effects of distance. a newly hired African-American employee would still be paid, per hour, 44 cents less than a non-African-American, 57 cents less than a Latino employee. and 11 cents less than a White employee. (Table 1). An incumbent African-American employee would also be paid substantially less per hour than a non-African-American (38 cents) or Latino employee (52 cents) (Table 2).

### Overtime

17.    In 1998 , the Complainant worked no more than 35.75 hours in any one pay week and no overtime. In the first quarter of 1999, Complainant worked two 40 hour weeks, and 24.75 hours of accumulated overtime within these pay periods. He earned no more than 37.25 hours /week and no more overtime for the remainder of his term of employment.

18.    Employees who worked 40 hours within one pay period were eligible for overtime hours at time and a half pay. Evidence obtained indicated that overtime hours were available if work stacked up in one department. When this happened, Brad Minetree directly approached specific employees to get help. He often went to the employees who had agreed to work it in the past. John Fitzgerald had supervisors John Thomas, who is black, and

Maria Espinosa go around and tell workers that they needed the help and overtime was available. Mr. Fitzgerald often stood by the time clock to alert workers who were about to punch out that he needed people to work overtime.

19.    The data on overtime hours and compensation show that Latino employees, on average, tended to work more overtime hours than their African-American counterparts. (Figures 15-18). For employees who worked at least 280 hours (twelve 40-hour weeks) in a given quarter, the differences in mean overtime hours for African-American and non-African-American employees were statistically significant (.05 or less) in every quarter except the 4th quarter of 1999.

20.    Multiple regression procedures were performed to determine which variables, if any, were statistically significant predictors of an employee's overtime hours. The results for each quarter of 1999 are summarized in Tables 7 through 10. While Race1 and Race2, considered individually, were significant predictors in the first three quarters, they lost their significance once other variables were added to the equations. Accordingly, despite racial differences in the mean numbers of overtime hours. the employee's race *was not a statistically significant predictor* of the amount of overtime work he or she was given during 1999.

## CONCLUSION

Discriminatory statements made by the Respondent's agents, and payment of wages based on race, without regard for distance traveled to work or prior relevant work experience as proffered, demonstrate that the Respondent had a pattern and practice of discriminating against African-American workers in paying them a lower starting wage rate. Respondent's own conduct demonstrated that Respondent eventually equalized the wages of all workers, African-American and Latino, thus maintenance of a practice of paying unequal wages based on race was never necessary to the operation of the Respondent's business. Derogatory racial comments made by Respondent agents to and about African Americans compounding other evidence of racially disparate employment practices, garner further support for a finding that Respondent's practices were intentionally discriminatory and/or had an adverse impact on African Americans. However, there is no statistically significant evidence to establish race as a predictor in Respondent's agents' distribution of overtime hours.

7

## FINDING OF PROBABLE CAUSE

Therefore there is probable cause to believe that the Respondent has discriminated against the Complainant on the basis of race, in wage compensation, and by racially harassing its African-American employees in violation of Article 49B of the Annotated Code of Maryland. Pursuant to COMAR 14.03.01.7A, you will be contacted by a Commission conciliator to enter into the conciliation process. Should this fail, the case will be certified for public hearing

_____
Investigator, Systemic Unit

## FINDING OF NO PROBABLE CAUSE

Therefore there is No Probable Cause to believe that the Complainant has been discriminated against on the basis of his race in the distribution of overtime hours in violation of Article 49B of the Annotated Code of Maryland.

Under the Commission's Rules of Procedure, COMAR 14.03.01.06C, the Complainant may apply for reconsideration of the No Probable Cause finding within fifteen (15) days from the date upon which these Findings were mailed or delivered. The application should be in writing and **shall state specifically the grounds upon which the application is based**. A request for reconsideration shall be directed to J. Neil Bell, Deputy Director, Maryland Commission Human Relations, Six Saint Paul Street, Baltimore, Maryland 21202. If the request for reconsideration is granted, the Deputy Director shall notify the parties and remit the matter to the investigative staff for further appropriate action.

_____
Investigator, Systemic Unit

8