210 WEST PENNSYLVANIA AVENUE
TOWSON, MARYLAND 21204-4515
TELEPHONE 410 832-2000
FAX 410 832-2015

30 COLUMBIA CORPORATE CENTER
10440 LITTLE PATUXENT PARKWAY
COLUMBIA, MARYLAND 21044
TELEPHONE 410 884-0700
FAX 410 884-0719

JOSEPH K. POKEMPNER
DIRECT NUMBER
410 347-8739
jpokempner@wtplaw.com

# WHITEFORD, TAYLOR & PRESTON
L.L.P.

SEVEN SAINT PAUL STREET
BALTIMORE, MARYLAND 21202-1626

410 347-8700
FAX 410 752-7092
www.wtplaw.com

1025 CONNECTICUT AVENUE, NW
WASHINGTON, D.C. 20036-5405
TELEPHONE 202 659-6800
FAX 202 331-0573

1317 KING STREET
ALEXANDRIA, VIRGINIA 22314-2928
TELEPHONE 703 836-5742
FAX 703 836-0265

September 16, 1999

**Hand Delivered**
Patrick M. Devine, Esq.
National Labor Relations Board
Region 5
103 S. Gay Street, 8th Floor
Baltimore, MD 21202-4061

      Re:   Up-To-Date Laundry, Inc.
               NLRB Case No. 5-CA-28407

Dear Mr. Devine:

      Pursuant to your request, we are setting forth the Employer's response to the Union's allegations described in your letter of August 12, 1999.[1]

1.    <u>Disciplined employees by the following acts</u>:

    a.    <u>Reduced the number of hours worked of those employees believed to be Union supporters</u>.

**Response**:   In an earlier discussion, you stated that you could not give us the names of any of the current employees allegedly involved in this allegation or any of the other allegations involved in this case. While recognizing the Board's practices and their historical antecedents, not advising the Company as to whom the Company is alleged to have subjected to illegal conduct is inconsistent with fundamental notions of fairness. How, for example, can a witness' memory be probed and his/her credibility enhanced by questions limited to "Did you ever interrogate an employee?", "Did you ever tell an employee not to sign a Union card?", etc.

---

[1] For clarity, we have underlined the Union's allegations. Our responses are underlined only for emphasis or where otherwise appropriate.

Patrick M. Devine, Esq.
September 16, 1999
Page 2

That having been said, we note with regard to this particular allegation that at page 6 of your letter of August 12, you set forth the names of four individuals alleged to have had their hours "significantly reduced" after the Employer learned of their Union activities. We will address the particular facts related to the four individuals named. <u>None of the four named, nor any unnamed employee, ever had his/her hours reduced because of their Union activities or for any other reason.</u> Rather, each of these individuals, on his/her own, quit or failed to report to work and, in effect, abandoned his/her job. Any alleged reduction in work was brought about as a result of the individual employee's own actions. In other words, the work was there, but the employees just didn't continue to work for their own reasons.

- <u>Darius Henson</u> voluntarily abandoned his job in late June 1999. He simply stopped coming to work even though work was available. He was not terminated by the Employer, nor forced to quit due to a reduction in hours. His time cards reveal that for the week of 5/23/99 – 5/29/99, he worked 36 hours. For the week of 5/30/99 – 6/5/99, he worked 30¼ hours. For the week of 6/6/99 – 6/12/99, he worked 31 hours. For the week of 6/13/99 – 6/19/99, he worked 32½ hours. For the week of 6/20/99 – 6/26/99, he worked only 21 hours. His time card for his last week worked (6/20/99 – 6/26/99) shows the entry "no show" "no work" for the last three days that week[2] and he never returned. Mr. Henson's time card for 6/27/99 – 7/3/99 contains only the entry "gone" and "heard he quit – got another job." (See Exhibit A.) It is the Company's position that Mr. Henson was not forced to resign due to his hours being reduced. Rather, Mr. Henson <u>voluntarily abandoned</u> his job and was removed from the rolls as a result of his failure to report to work. The drop in his hours was not caused by the Employer, but was the result of his own failure to work. The work was there for him; he simply failed to show up.

- <u>Andre Wheatfall</u> voluntarily abandoned his job in early July by his own choice. He was suspended for three days on July 2, 1999, for failing to report to work. He was due to report back to work on July 6, 1999. However, on that day, he did not report for work. He simply came in for his check and quit. There was work for him to perform on July 6, 1999, but he nevertheless quit his job. Wheatfall's time cards reveal the following for the period prior thereto. Thus, for the week of 5/2/99 – 5/8/99, he worked 36¼ hours. For the week of 5/9/99 – 5/15/99, he worked 8¼ hours. For the week of 5/16/99 – 5/22/99, he worked 34½ hours. For the week of 5/23/99 – 5/29/99, he worked 29¼ hours. For the week 5/30/99 – 6/5/99, he worked 16½ hours. For the week of 6/6/99 – 6/12/99, he worked 26½ hours. For the week of 6/13/99 – 6/19/99, he worked 44¼ hours. That must have "exhausted" him, because for the week of 6/13/99 – 6/19/99, he work only Sunday and Wednesday for 14½ hours. The following week (6/27/99 – 7/3/99) he worked only Monday and Wednesday for 16½ hours, and was suspended for three days. (See Exhibit B.) As noted above, he was supposed to return to work from suspension on

---

[2] The time cards read from bottom (Sunday) to top (Saturday).

because nothing in the laundry moves until the soiled incoming linen, sheets, towels, uniforms, etc. are sorted. If that operation is short employees, others must be temporarily transferred to that work[6] until it is caught up. Almost all employees are so assigned as needed. In certain situations, if an employee, for health or other reasons, is unable to work on this function, he/she need only let that be known to management, and an effort is made to excuse such person if backed by legitimate reason (not including just not liking to do this work). Under no circumstances were alleged Union supporters assigned to the sorting area as punishment for or in retaliation for alleged Union activity; nor where they so assigned disproportionately.

    c.    <u>Reassigned employees after seeing them talking to employees believed to be Union supporters. These employees were then called into the office and warned not to speak to the Union organizers or supporters.</u>

**Response:** The Board has declined to furnish the Employer with the names of the employees involved in this allegation. The Employer denies the allegation. As discussed with you, the Employer, on occasion, did observe groups of employees, on the work floor during work time, talking and neglecting their work. Without any reference to the nature or content of the talk, the Employer would break up such groups, directing that the employees return to their work. No employees were called into the Employer's office and warned not to speak to the Union organizers. Brad Minetree, the President of the Company and a Section 2(11) supervisor, stated that Herbert Datcher was seen on several occasions outside of his normal work area, talking to groups of 4-5 employees on the work floor, while the employees (including Datcher) were on their working time. On each occasion, Minetree warned Datcher not to interfere with employees while they were working and to get back to work.

    d.    <u>Isolated employees believed to be Union supporters by placing them in the separating area and preventing them from walking across the workroom floor.</u>

**Response:** Again the Board has declined to furnish the Employer with the names of the employees involved in this allegation, and the Employer denies the allegation. According to Brad Minetree, the aforementioned Herbert Datcher was frequently outside of his work area, roaming the plant, and talking with groups of 4-5 employees, while all were on working time and had work to perform. Several employees even complained to the Company that Datcher was interfering with their work. Datcher was called into the office and told by Minetree to stop interfering with employees while they were working.

---

[6] Sometimes employees are not sent to the usual separating area, but instead soiled garments are brought to another area where the temporarily assigned employees do the sorting.

Patrick M. Devine, Esq.
September 16, 1999
Page 12

      (8)    <u>not to sign or accept anything from the Union</u>.

**Response:** The Employer's witnesses deny the allegation. The Employer's witnesses did tell employees during the course of the campaign that they had a legal right not to sign a card as well as having the legal right to have nothing to do with the Union, including not accepting Union literature if it was their desire not to.

      (9)    <u>that if the Company wins the June 1999 election, the Company would fire all the blacks and replace them with Hispanics</u>.

**Response:** The Employer's witnesses denied making any such ridiculous statement. To the contrary, it was the Union and only the Union that tried to inject racial considerations into the campaign, as set forth in the Company's "Objections to Conduct affecting the Results of the Election."

      (10)    <u>that employees would get vaccines and gloves (better working conditions) within 2 weeks if the Company won the June 1999 election</u>.

**Response:** John Fitzgerald explained that employees are given gloves as a normal part of work, especially in the soil/sort area. In regard to vaccinations, he explained that employees regularly assigned to the soil/sort room receive the Hepatitis "B" vaccine series as part of the job, although not immediately upon hire. He denied promising employees vaccines and gloves within two weeks if the Company won the June 1999 election.

    c.    <u>Lulu told employees not to sign Union authorization cards</u>.

**Response:** Lulu told employees, in response to employee questions, that they did not have to sign a card if they did not want to. She also told an employee that, if it were her (Lulu), she would not sign.[11]

    d.    <u>Promised employees better working conditions including, but not limited to, better hours, (including reassignment to morning shift after the Employer announced that the afternoon shift might be eliminated), better equipment, and less onerous assignments (including being taken off the employee-dreaded separation room work)</u>.

**Response:** The Employer did tell employees early-on that it hoped to have only one shift. That was one reason for moving to a larger plant. However, an increased volume of business has made that impossible. It also told employees that it hoped one day to have

---

[11] Even if the allegation were true, it would not constitute an illegal act unless tied to a promise or threat.

Patrick M. Devine, Esq.
September 16, 1999
Page 25

There were 59 votes cast for the Union, 84 votes cast against the Union, with 47 challenges. Challenges are determinative. Each side filed Objections to the election. The "challenges" and "objections" are still pending.

To say that the Union conducted an extensive, intensive, high-powered, and pervasive campaign to organize the Employer's employees would be a gross understatement. From the start of the Union's campaign and lasting through to the vote, anywhere from 6-10 paid organizers were camped in front of the Employers place of business, trampling on the newly planted grass; hurling pieces of fertilizer at management officials' cars; booing, hissing and hurling vile language at the Employer's female CEO and her two sons; and carrying on in a most uncivilized manner requiring, on several occasions, the intervention of the local police. In addition, Union organizers concentrated on outright intimidation of Company officials by following then in their cars directly to their homes and making it clear that they knew where the Company officials lived. The Union distributed several dozen leaflets, appeared on local radio talk shows, and conducted what turned out to be a rather disappointing "mass" rally outside the Employer's plant on June 15, 1999. It was clear that in conducting its drive to organize the local laundry industry, Up-To-Date, the largest of the group, was #1 on the list, and the Union spared no expense and manpower in attempting to achieve a victory. Unfortunately, much of the Union's campaign sunk to the gutter in personal vituperation directed at Ms. Stair and her family, and the playing of the "race card" accusing the Employer of treating its employees like slaves. One Union leaflet highlighted the following quote from a guest speaker at one of the Union's rallies: "We Didn't Get Out Of Slavery Because We Were Looking For Someone Else To Free Us. Now [Up-To-Date Workers] Must Stand Up Because It's The Right Thing To Do." Against this "siege" background, the Employer, with its limited staff and resources, did what it could to exercise its legal rights to inform its employees of its position and counter the never ending personal attacks. Did the Employer conduct its own vigorous campaign and urge employees to reject the Union? Yes it did. Did it violate the law by terminating the 25 employees listed in your letter of August 12, 1999, and committing the numerous alleged violations of Section 8(a)(1) of the Act, requiring the issuance of a 10(j) injunction and a Gissel bargaining order? No it did not.

Here, an examination of the record reveals that a majority of the alleged 8(3)'s voluntarily quit or abandoned their jobs as discussed above, while the few who were actually terminated were terminated for cause, unrelated to alleged Union activity. As to the group of ten employees who claimed they were fired for not having the proper papers only after the Employer became aware of their Union activity, a totally valid, legal, and non-discriminatory explanation was presented as to why nine of them could no longer be employed and why the Employer checked the work authorization status of its employees.

As we discussed with you, the turnover at the Company is horrendous. Nancy Stair, in fact, showed you stacks of nearly blank time cards showing employee after employee who simply disappears, abandoning their job, never returning. This has long been the situation at the Company, and we all realize that working in a laundry is not the most

Patrick M. Devine, Esq.
September 16, 1999
Page 28

hearing on the merits, the Court concluded that the Board had only a fair chance of prevailing on the merits of the underlying charges and that while both parties were able to show some harm, the Board had failed to meet its burden that the balance of hardships favored interim relief. Accordingly, "the Court . . . concluded that extraordinary relief is not 'just and proper' under the facts of this case and that a final Board order will adequately remedy the alleged wrongdoing, if any. The Petition for Section 10(j) injunction is hereby DENIED. (emphasis added).

The above Hyatt Regency Saipan case is similar in many ways to the Up-To-Date case now before your office. Not only was there an election in which the Union was rejected on the basis of unchallenged ballots, but the final results were tied up as a result of challenges and the Objections of both parties. In addition, while the Employer in Up-To-Date is alleged by the Union to have illegally "terminated" 25 employees, the Union in Hyatt Regency Saipan charged the Employer with illegally terminating 35 employees, plus illegally threatening, intimidating, spying, soliciting grievances, etc. In recognizing that the issuance of a Section 10(j) injunction "is still an extraordinary remedy and a narrow exception to the general rule that labor injunctions are prohibited," the Court, even in view of the allegation that 35 employees, in effect, were terminated prior to the election, nevertheless decided that the Board's traditional procedures "will adequately remedy the alleged wrongdoing." (emphasis added)

We submit that your office should follow the Court's reasoning in the Hyatt Regency Saipan case, consider the quality (i.e., validity) of, rather than the sheer quantity of, the Union's spurious allegations, and hold that the Union's request for 10(j) injunctive relief is inappropriate.

\*   \*   \*   \*   \*

Counsel requests the opportunity to meet with the Regional Director and the appropriate members of his staff to discuss this important matter.

Very truly yours,

Larry M. Wolf

Joseph K. Pokempner

JKP:DD
Enclosure

cc: Louis J. D'Amico, Regional Director (exhibits not included)
Steven Shuster, Esq., Assistant to the Regional Director (exhibits not included)
Eileen Conway, Esq. (exhibits not included)