UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| MELVIN NEWSOME, et al.<br><br>      Plaintiffs,<br><br>      v.<br><br>UP-TO-DATE LAUNDRY, INC., et al.<br><br>      Defendants. | Civil Action No. S01-2257 (WDQ) |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

The five named plaintiffs, like other African-American employees at Up-To-Date Laundry (UTD), were paid less than Latino workers, worked fewer hours (including overtime) than Latinos, and were assigned to the dirtiest, most dangerous jobs -- those in the Soil Room.  In addition, the plaintiffs and the other black employees endured an unremitting barrage of hostile invective, replete with odious racial epithets.

The named plaintiffs have filed a motion for class certification, seeking to be the representatives of a class of all African Americans employed by UTD as hourly workers in Departments 100 through 500 since August 1, 1998.  Defendants' opposition says nothing to contradict plaintiffs' central claim – that UTD deliberately maintained wage rates based on race.  Nor do defendants deny that blacks were subjected to a hostile work environment.  This case is especially well suited for class treatment, and plaintiffs' motion for class certification should be granted.

### I.  PLAINTIFFS SATISFY RULE 23

Plaintiffs allege that defendants engaged in a pattern-or-practice of intentional racial discrimination.  To prevail, plaintiffs must show that discrimination was

defendants' "standard operating procedure," as opposed to a few sporadic acts of bias. Teamsters v. United States, 431 U.S. 324, 336 (1977). And the customary way for private parties to prove that intentional discrimination was a company's "standard operating procedure" is within the confines of a class action under F.R.Civ.P. 23. See Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 760 (4th Cir. 1998) ("the Teamsters decision implicitly endorsed the application of pattern-or-practice principles and rules of proof to class action lawsuits brought by private parties").[1]

A. Rule 23(a)

Defendants begin their opposition by setting forth the standards for class certification under Rule 23. In particular, Rule 23(a) requires plaintiffs to show (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. They must also show that the case fits within one of the three categories of class actions set forth in Rule 23(b). Plaintiffs easily satisfy these criteria.

Defendants appear to concede that plaintiffs meet the first and fourth requirements of 23(a) – numerosity and adequacy of representation. That is, defendants do not argue that a class of at least 500 employees is too small; nor do they contest the

---

[1] Defendants' reliance on Watson v. Ft. Worth Bank and Trust, 487 U.S. 977 (1988), is misplaced, because Watson involved disparate impact, and the elements of proof are not the same for pattern-or-practice and disparate impact cases: "where the inquiry in a pattern-or-practice disparate treatment claim is focused on determining the existence of discriminatory intent, disparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group." Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147, 160 (2d Cir. 2001). Plaintiffs are not challenging "facially neutral" practices that happen to fall more harshly on African Americans. Instead, plaintiffs attack intentionally discriminatory policies and practices -- including paying black employees less than Latinos, giving blacks less overtime, assigning blacks to the dirtiest and most dangerous jobs, and subjecting black workers to harassment based on race -- in a company in which discrimination is the "standard operating procedure."

qualifications of counsel or assert any conflict between the interests of the named plaintiffs and the class. Rather, defendants' arguments under Rule 23(a) appear to focus on commonality and typicality. These contentions are off the mark.

Defendants correctly identify the practices that plaintiffs complain about. Black workers have been (1) paid less than Latinos, (2) given fewer hours of work than Latinos, including overtime, (3) assigned to the dirtiest and most dangerous jobs (in the Soil Room), and (4) subjected to a racially hostile environment [Defendants' Opposition to Class Certification (Opposition) at 7]. The named plaintiffs have experienced each of these practices. That is, all five have received lower pay than Latinos, fewer hours (including overtime), and have been subjected to an environment in which racial harassment was the norm. Four of the five have been assigned to the Soil Room (Veronica Johnson being the only exception). See Plaintiffs' Opposition to Summary Judgment at 3-15.

The similarity in treatment between the named plaintiffs and the class satisfies both the commonality and typicality requirements of Rule 23(a) which, as the Supreme Court has noted, "tend to merge." General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 158 n.13 (1982). Defendants concede that the class representatives and the class do not have to be "identically situated" [Opposition at 4, quoting American Finance System, Inc. v. Harlow, 65 F.R.D. 94, 107 (D. Md. 1974)]. That is, it is sufficient if the claims of the class representatives are "reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). See also Hartman v. Duffy, 19 F.3d 1459, 1472 (D.C. Cir. 1994). In the present case, there is no question that the claims of the five named

plaintiffs are "reasonably co-extensive with those of absent class members." That is enough.

Defendants try to argue that the named plaintiffs lack commonality and typicality because their unfair treatment – particularly in the areas of overtime and job assignment – arose from UTD's violations of labor law, rather than from racial discrimination. Defendants made the same misbegotten argument in their motion for partial summary judgment, and the same response is warranted. Defendants have in the past denied engaging in activities violating the National Labor Relations Act; now, when it is deemed expedient, they trumpet their unlawful anti-union practices. A jury could fairly conclude that defendants lied in the past, and that they are lying now. Further, plaintiffs are not required to prove that discrimination was the sole cause of their travails, only that it was a motivating factor. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). They can easily show that here, especially where the union organizing effort was directed at the same type of discrimination that plaintiffs are challenging.

Finally – and conclusively – defendants' argument addresses the merits. That is, they do not dispute that the plaintiffs were denied overtime or assigned to the Soil Room; they just say that discrimination was not the reason. But now is not the time to deal with the merits. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974) (district court lacks authority "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999) ("a motion for class certification is not an occasion for examination of the merits of the case"); Deloach v. Philip Morris Cos., Inc.,

4

206 F.R.D. 551, (M.D.N.C. 2002)(in antitrust case, plaintiffs "are not required to prove the existence of the conspiracy at this [class certification] stage").

Defendants' other arguments on the merits are similarly premature – and wrong as well. For example, defendants cannot dispute the accuracy of the analyses performed by plaintiffs' statistical expert, Dr. Charles Mann, which show statistically significant differences between African Americans and Latinos with respect to base pay, overtime and assignment to the Soil Room. In particular, Dr. Mann found that blacks averaged between 70 cents and a dollar less, per hour, than Latinos; that Latinos averaged over twice as much overtime as blacks; and that the Soil Room was over 90 percent black in a plant where blacks made up less than half the employees. See Plaintiffs' Memorandum in Support of Class Certification (Class Memo) at 6-8.

Unable to contest Dr. Mann's findings on the merits, defendants quibble that he has not considered every variable, such as interest in working overtime, saying it was "defendants' impression that black employees were more likely to turn down opportunities" for overtime work [Opposition at 13].[2] Putting aside the problem that mere "impressions" cannot overcome refined statistical analysis, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." Adams v. Indiana Bell Telephone Co., 231 F.3d 414, 423 (7th Cir. 2000), quoting Bazemore v. Friday, 478 U.S. 385, 400 (1986). See Maitland v. Univ. of Minnesota, 155 F.3d 1013, 1017 (8th Cir. 1998)("it is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results").

---

[2] This "impression" is not believable on the merits. It is also additional evidence of defendants' willingness to perpetuate racial stereotypes, even in pleadings.

5

In sum, plaintiffs satisfy the commonality and typicality requirements of Rule 23(a), and defendants do not challenge numerosity or adequacy of representation, which plaintiffs also meet. Many of defendants' arguments go to the merits and are therefore premature, but they are wrong anyway. Plaintiffs satisfy Rule 23(a).

B. Rule 23(b)

1. The Class Should Be Certified under 23(b)(2)

In addition to meeting Rule 23(a)'s criteria, plaintiffs have also shown that the class can be certified under Rule 23(b)(2), because defendants have acted "on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The practices identified by plaintiffs – race-based disparities in pay, hours and job assignment, as well as omnipresent racial harassment – are certainly "appropriate [for] final injunctive relief." Indeed, the Supreme Court has said that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of 23(b)(2) class actions. Anchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997).

Here again, defendants' objections go largely to the merits. For example, they argue that injunctive relief is not appropriate, saying that plaintiffs' proof focuses on 1999 and the collective bargaining agreement signed with UNITE in June 2001 has remedied the problems. Putting prematurity aside, there are two problems with this argument. First, defendants have not offered any evidence concerning the impact of the contract with UNITE on UTD's discriminatory practices. Second, plaintiffs have adduced substantial evidence that the problems identified in 1999 have continued to the present.

Many of the UTD officials cited in Plaintiffs' Class Memo were employed at UTD **after 1999**. Linda Marr, for instance, was hired to establish a Human Resources department and worked for the company from April 2001 until August of that year. Nancy Stair told Marr that Latinos deserved better pay than blacks because they were better workers [Marr deposition attached to Class Memo at 103-04], and Marr observed the discriminatory assignment of blacks to the Soil Room [id. at 125-26 (attached to Plaintiffs' Opposition to Summary Judgment)]. In addition, Marr heard Brad Minetree refer to black employees as "niggers," "dumb niggers," "stupid niggers" and "fucking niggers" [id. at 42], and Minetree "laughed off" Marr's counseling about his persistent discriminatory comments [id. at 44, 82]. Marr observed all this in the spring and summer of 2001, on the eve of this lawsuit.[3]

Maria Espinosa worked at UTD from August 1997 until April 2001. When she told Brad Minetree that he should pay Latinos and blacks equally, he refused and said that blacks are lazy [Espinosa declaration attached to Class Memo at 2]. And Espinosa heard both Brad and David Minetree refer to black employees as "niggers," as well as using other racist terms [Espinosa at 3].

Michael Kennedy was the Plant Manager at UTD from late 1999 until August 2000, and Thomas Hendrickson is the Plant Manager **today**. Both Kennedy and Hendrickson have heard Nancy Stair and the Minetree brothers repeatedly use the term "nigger" at the workplace, including on the plant floor [Kennedy declaration attached to Class Memo, ¶7; Hendrickson deposition attached to Class Memo at 88]. Kennedy also confirmed that David Minetree kept a gun in his credenza at work [Kennedy, ¶ 9].

---

[3] Plaintiff Joseph Lloyd also testified about discriminatory treatment to which he was subjected well into 2001 [Lloyd deposition attached to Class Memo at 112, 115-17].

7

In short, the record does not reflect any cessation of defendants' discriminatory practices.  Injunctive relief is needed to remedy this class-wide bias, so this case is suitable for certification under Rule 23(b)(2).

Defendants also say that claims of hostile work environment are rarely certified as class actions.  This is simply wrong.  In recent years, many cases alleging a hostile environment based on race or sex have been certified for class treatment.  See, e.g., Toney v. Rosewood Care Center, Inc. of Joliet, 1999 WL 199249 at *10 (N.D. Ill. 1999) (certifying a subclass of "[t]hose current and former African-American employees . . . who were subject to a racially-hostile work environment"); Jefferson v. Windy City Maintenance, Inc., 1998 WL 474115 at *2 (N.D. Ill. 1998) (certifying class of black workers who among other things alleged that the employer "created a hostile work environment for African American employees"); EEOC v. Mitsubishi Motor Manufacturing of America, Inc., 990 F.Supp. 1059, 1070 (C.D. Ill. 1998) ("[t]his Court does not need to make a great leap of faith to state the obvious: Title VII authorizes a pattern-or-practice action for sexual harassment"); Bremiller v. Cleveland Psychiatric Inst., 195 F.R.D. 1, 25 (N.D. Ohio 2000) ("[t]he existence of a company's policy of exposing women to a sexually hostile work environment is the basis for pattern or practice liability"); EEOC v. Dial Corp., 156 F.Supp.2d 926 (N.D. Ill. 2001) (rejecting argument that "sexual harassment claims, by nature, are not suited to class treatment"); Warnell v. Ford Motor Co., 189 F.R.D. 383, 386-87 (N.D. Ill. 1999) ("Ford argues in effect that no sexual harassment case can be maintained as a class action. This is a bold and striking claim, but one quite without merit"); Jenson v. Evelth Taconite Co., 824 F.Supp. 847, 886 (D. Minn. 1993) (court analyzed class allegation of hostile work

environment and "conclude[d] that a reasonable woman would find that the working environment . . . altered the terms and conditions of her employment and was abusive").

Contrary to defendants' suggestion, the court in Mitsubishi explained that a class claim of hostile environment does not turn on the subjective perceptions of each class member:

> the landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of unwelcome sexual harassment which is severe and pervasive. The existence of a company's policy of tolerating sexual harassment is the basis for pattern or practice liability.

990 F.Supp. at 1074 (footnotes omitted).

At UTD, the "landscape of the total work environment" is permeated with racist abuse. And the company not only has a "policy of tolerating . . . harassment"; top officials actively foster mistreatment of African-American employees. In these circumstances, injunctive relief is required, and class certification under Rule 23(b)(2) is appropriate.[4]

2. The Proposed Class Is Manageable

Plaintiffs' proposal is the most efficient way to manage litigation challenging defendants' conduct. Defendants try to contest this by raising the specter of problems associated with awards of compensatory damages, which they say must be tailored to each claimant. This is a red herring, because plaintiffs' approach would not deal with

---

[4] Contrary to defendants' assertion, racist statements made outside the presence of a particular plaintiff are relevant to a claim of racial harassment. See Schwapp v. Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("[t]he mere fact that [plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim"); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110-11 (3d Cir. 1999) (evidence of a supervisor's harassment of other women was "extremely probative" of plaintiff's hostile work environment claim, even though the plaintiff had not witnessed the harassment of others, because such proof was relevant to defendant's motive).

compensatory damages at this point.  Instead, plaintiffs have followed the lead of Judge Chasanow and have proposed a bifurcation in which "the issues of liability and class-wide relief would be tried first, with the individual relief, if any, to be determined later." Hewlett v. Premier Salons International, Inc., 185 F.R.D. 211, 219 (D. Md. 1997).  Given this bifurcation, (b)(2) certification would be limited to the issues of liability and class-wide relief, including declaratory and injunctive relief and punitive damages, exactly as in Hewlett.  Id. at 222.

Defendants criticize bifurcation, but it often represents an effective way to manage class actions, and the U.S. District Court for the District of Columbia has recently joined Hewlett in adopting it.  McReynolds v. Sodexho Marriott Services, Inc., 208 F.R.D. 428, 449 (D.D.C. 2002).

Other courts have approved similar approaches to class certification.  For example, in Robinson v. Metro-North Commuter Railroad Co., n.1 supra, the Second Circuit reversed a denial of class certification and directed the district court to "consider whether the [entire] pattern-or-practice disparate treatment claim is appropriate for (b)(2) certification. . . .  If the court determines that (b)(2) certification of the pattern-or-practice claim is inappropriate, it shall bifurcate the claim, see Fed.R.Civ.P. 42(b), and certify the liability stage of the claim for (b)(2) class treatment, see Fed.R.Civ.P. 23(c)(4)(A)."  267 F.3d at 154.  The court explained why bifurcation, in particular, would be efficient:

> litigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy.  For example, if the class should succeed and, even assuming that the remedial stage is ultimately resolved on a non-class basis, the issues and evidence relevant to these individual adjudications would be substantially narrowed.

Id. at 168.

The Court has ample authority to manage this class action by bifurcating the proceedings and certifying the proposed class for purposes of liability and class-wide relief under Rule 23(b)(2), reserving for later determination issues of relief for individuals.[5] Alternatively, as plaintiffs noted in their Class Memo, the Court could bifurcate and certify under 23(b)(3), although "[w]here a class is capable of certification under both (b)(2) and (b)(3), the preferred method is to certify under (b)(2)." Hewlett, 185 F.R.D. at 219.

## II. DEFENDANTS' REMAINING POINTS ARE ALSO MISGUIDED

Defendants did not append any documentary material to their opposition, although they occasionally refer to their motion for partial summary judgment. For the most part, though, defendants attempt to dispute facts without citing any record support at all. See, e.g., Opposition at 10 ("various individuals set pay rates"); id. at 12 ("the most common reasons for employees working fewer hours"); id. at 13 ("it was defendants' impression"). Such bare assertions should be disregarded. In any event, while the merits are not to be assessed at the class certification stage, defendants largely concede the validity of many of plaintiffs' claims. In particular, they do not seriously dispute that black employees were paid less than Latinos, or that UTD's highest level officials personally engaged in racist diatribes.

At times, however, defendants seek to deflect the force of plaintiffs' proof by calling it hearsay. It is not. Much of the evidence in this case comes out of the mouths of

---

[5] Even in the case on which defendants principally rely, Allison v. Citgo Petroleum Corp., 151 F.3d 402, 434 (5th Cir. 1998), the court emphasized that it was "not called upon to decide whether the district court would have abused its discretion if it had elected to bifurcate liability issues that are common to the class and to certify for class determination those discrete liability issues."

11

the two individual defendants – CEO Nancy Stair and President Brad Minetree – as well as former Vice President David Minetree.  Such statements, as reported by present and former company employees, are classic admissions under F.R.Evid. 801(d)(2)(A) and (D).[6]  In addition, Stair and the Minetrees have openly admitted making several racist remarks, and they have not submitted affidavits denying **any** of the comments that others heard them make.  In light of these admissions of racism, it is plain that plaintiffs' motion is based on much more than "their personal experiences" [see Opposition at 8].

Of course, questions about whether a statement should be treated as an admission, or as hearsay, arise only when a statement is offered to prove the truth of the matter asserted.  In the present case, however, many of the statements of Nancy Stair and Brad and David Minetree are offered simply to show that they were actually made, in furtherance of plaintiffs' allegations concerning a hostile work environment.  For example, plaintiffs' proof that defendants repeatedly used the epithet "nigger" is not offered to prove the truth about anything – other than defendants' demeaning treatment of African Americans.  Testimony about such disparaging comments is admissible under Rule 402 -- without more -- simply because it is relevant.[7]

---

[6] Defendants are just wrong in asserting (without citation) that statements do not qualify as admissions under Rule 801(d)(2), simply because the people reporting them are no longer with UTD.  That is irrelevant.  Rather, the rule requires only that the **person making the quoted statement** either be a party (as with Stair and Brad Minetree) or be employed by the party at the time the statement was made (as with David Minetree).

[7] The findings of the Maryland Commission on Human Rights are admissible under Rule 803(8), which exempts public records from the ban on hearsay.  Under the rule, defendants bear the burden of showing that the MCHR report is untrustworthy, and they have not produced any evidence to support such a claim. See, e.g., Distaff, Inc. v. Springfield Contracting Corp., 984 F.2d 108 (4th Cir. 1993); Gross v. King David Bistro, Inc., 84 F.Supp.2d 675 (D. Md. 2000).

Finally, contrary to defendants' frivolous suggestion, plaintiffs' motion is timely. Neither the Federal nor the Local Rules contain a deadline for filing a motion for class certification. The Scheduling Order in this case, however, set a general motions deadline, and plaintiffs complied with it. Nothing more is required.[8]

## CONCLUSION

There is no serious dispute that defendants have engaged in discrimination against African Americans as a class. They will not reform on their own.

Plaintiffs ask that this case be bifurcated into (a) issues affecting black employees on a class-wide basis, including liability, declaratory and injunctive relief, and punitive damages, and (b) issues of relief peculiar to individuals, with the class-wide issues to be tried first. Plaintiffs also request that they be designated as representatives of a Rule 23(b)(2) class -- consisting of all African Americans employed by UTD as hourly workers in Departments 100 through 500 since August 1, 1998 -- to litigate the class-wide issues.

---

[8] The original motions deadline of March 4, 2002 was extended several times upon joint motion of the parties, principally to permit an opportunity for settlement discussions. Unfortunately, those talks did not bear fruit, and ultimately the Court set a motions deadline of June 26, 2003. Plaintiffs filed their motion on June 26.

A proposed order is attached to plaintiffs' Class Memo.

                              /s/
                        Philip J. Simon 12893
                        Richard A. Salzman
                        Douglas B. Huron
                        Betty Grdina 15647
                        HELLER, HURON, CHERTKOF
                        LERNER, SIMON & SALZMAN
                        1730 M Street, NW
                        Suite 412
                        Washington, DC  20036
                        (202) 293-8090

                        Attorneys for plaintiffs