UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| MELVIN NEWSOME, et al.<br><br>    Plaintiffs,<br><br>    v.<br><br>UP-TO-DATE LAUNDRY, INC., et al.<br><br>    Defendants. | Civil Action No. S01-2257 (WDQ) |

**JOINT MEMORANDUM SUPPORTING
FINAL APPROVAL OF CONSENT DECREE**

The parties jointly request, pursuant to Paragraph 29 of the Consent Decree herein, that the Court give final approval to the Decree. Paragraph 29 provides that "counsel for both parties shall recommend that the Court grant final approval to this Consent Decree as fair, adequate and reasonable." This Joint Memorandum is submitted with this provision in mind.

A Fairness Hearing is scheduled for November 22, 2004, and the parties request that final approval be given by December 31, 2004, if the Court deems it appropriate. It is crucial that any final approval be given by that date (see Paragraphs 17 and 18).

**BACKGROUND**

**A.  History of the Litigation**

The five named plaintiffs are African Americans who were hourly employees of defendant Up-To-Date Laundry, Inc. (UTDL). In August 2001, they sued UTDL and its two top officers under 42 U.S.C. § 1981, claiming that the company has engaged in a pattern or practice of intentional racial discrimination against its black employees. In particular, plaintiffs claimed that the company (1) paid black workers less than Latino

employees, (2) gave blacks disproportionately fewer hours than Latinos, including overtime, (3) assigned blacks to the dirtiest and most dangerous jobs in the plant, and (4) subjected black workers to a hostile work environment based on race. Defendants denied these allegations.

On January 23, 2004, following completion of most discovery, the Court granted plaintiffs' motion for class certification as to issues of class-wide liability and injunctive relief, and conditionally granted certification as to issues of individual and class-wide monetary relief, with the named plaintiffs serving as class representatives. The Court then referred the case to Magistrate Judge Gauvey for a settlement conference. The conference occurred on March 31, 2004, lasted for 12 hours and in the end resulted in an agreement in principle. The parties then negotiated the specific terms of a Consent Decree, which they presented to the Court for preliminary approval on June 10, 2004. The Court preliminarily approved the Decree on July 6 and scheduled a Fairness Hearing for November 22, 2004.

### B. The Results of Notice to the Class[1]

Consistent with Paragraph 28 of the Decree, the parties submitted a Class Notice, including Claim Forms and Opt-Out Forms, for the Court's approval, which was given on July 6, 2004. Plaintiffs had retained a firm that specializes in administering class-wide settlements, Settlement Services, Inc. of Tallahassee, Florida; following the Court's approval of the Class Notice, the firm mailed copies of the Notice and the Consent Decree itself to 1,483 individuals identified as probable class members. Of these, 644 packages were returned by the Postal Service an undeliverable. Settlement Services then

---

[1] The information in this Section is supported by Paragraphs 29-32 in the attached Declaration of Douglas Huron.

2

conducted a trace and remailed the Notice package, which was received by 340 of the persons who did not receive it in the initial mailing. Plaintiffs also published the Notice in the Baltimore Sun on Sunday, August 1 and Sunday, August 8, 2004, and in the Baltimore Afro-American in its issues of July 24-30 and July 31-August 6, 2004.

Settlement Services established a toll-free phone number and responded to about 100 calls. The firm received 332 Claim Forms that were timely and 13 that were apparently untimely (with October 4, 2004 being the deadline, consistent with Paragraph 28 of the Consent Decree). The firm also received four timely and two untimely Opt-Out Forms, one of which was later withdrawn. In addition, 12 timely opt-outs were later withdrawn.

In addition, class counsel have been actively involved in dealing with individuals about the Class Notice. For example, counsel received approximately 40 phone calls from class members who had questions; answering these questions involved repeated phone contact, and some required follow-up correspondence. Among other things, counsel phoned and sent correspondence to 18 individuals who submitted Opt-Out Forms, 13 of whom also submitted Claim Forms at the same time. Fourteen of these 18 class members stated that they submitted the Opt-Out Form in error, and they returned written confirmation that they wished to remain in the class and to submit Claim Forms. Counsel also corresponded with the other four individuals regarding their Opt-Out Forms. One of these individuals is not a class member (she is white).

In addition, counsel corresponded with ten claimants for whom there were inconsistent social security numbers. All ten responded in writing to clarify and confirm their correct social security numbers.

3

Thirteen class members submitted untimely Claim Forms, and one additional individual submitted an untimely Opt-Out Form that has not yet been withdrawn. Counsel are waiting to hear back from the latter, so that the parties can make a determination about whether to ask the Court to include those who filed untimely forms.

Finally, counsel have been in close communication with Settlement Services (the settlement administrator) concerning Claim Forms, Opt-Out Forms, claimants, calculation of awards and damages, and documentation issues. The earnings records for a small number of the claimants are incomplete, and the parties are seeking to determine the most expeditious way to acquire this additional information, so that the amounts due each claimant can be accurately computed.

### C. The Lack of Objection to the Consent Decree

The Notice specified that October 4, 2004 was also the deadline for filing objections to the Decree with the Clerk of the Court. No objections were filed. Three individuals have indicated an interest in being heard at the Fairness Hearing.

### THE TERMS OF THE DECREE

### A. General

The Consent Decree is comprised of a preamble, which outlines the history of the litigation, and 29 numbered paragraphs. Paragraphs 1-6 set forth general principles, including the Court's jurisdiction (¶ 1), the basic fairness of the Decree (¶¶ 2-3), the non-adjudicative nature of the Decree and a prohibition on its use against Defendants in other proceedings (¶ 4), the complete resolution by the Decree of all claims that were made or could have been made in this action (¶ 5), and confirmation that the Decree represents the parties' full agreement (¶ 6).

Paragraph 7 unconditionally certifies the class under Rules 23(b)(2) and (b)(3) as "all African Americans employed by UTDL as hourly workers in non-management positions in Departments 100 through 500 and 1001 at any time from August 1, 1998 through January 23, 2004." This is the definition that was included in the Class Notice. It embraces the time period beginning in August 1998 – three years before the filing of this action in August 2001 – and ending on the date when the Court initially certified the class in January 2004.

Paragraph 8 contains six definitions, including defining "Court approval" as the date on which the Court's final approval of the Consent Decree is entered on the docket, and "effective date" as the date of Court approval or, if there is an appeal, the date of final disposition of the appeal.

### B. Injunctive Relief

Section III (¶¶ 9-16) sets forth the provisions of the Decree dealing with injunctive relief. Paragraph 9 specifies that these provisions will be in effect for three years from the effective date. Paragraph 10 broadly enjoins Defendants from engaging in the types of practices about which the Plaintiffs complained, saying that Defendants and their agents "shall not (1) discriminate against African-American employees based on race, including but not limited to the payment of base wages, assignment of overtime work, and assignment to the Soil Room, (2) engage in harassment or other demeaning or offensive conduct based on race, including but not limited to the use of racial slurs, epithets or stereotypes, or (3) retaliate against African-American employees for opposing discrimination and/or harassment."

Paragraphs 11, 12 and 15 deal specifically with racial harassment. Paragraph 11 requires UTDL to adopt and enforce a written policy designed to prevent racial harassment and to punish it when it occurs. The policy, which is to apply to both management and non-management personnel and is to be distributed to all current employees and new hires, must include a prohibition of all forms of racial harassment; a schedule of disciplinary action; an effective procedure both to report and to investigate allegations of racial harassment; and the designation of a management official (other than Nancy Stair or Brad and David Minetree) to receive, investigate and resolve such allegations. Paragraph 12 requires annual training for all employees on the subject of racial harassment. Paragraph 15 requires Defendants to submit the policy on racial harassment to class counsel within 60 days of the effective date of the Consent Decree, and to provide records so that class counsel can confirm that the annual training has occurred.

Paragraphs 13 and 14 concern reports and records. Paragraph 13 obliges UTDL to provide to class counsel copies of all legally required reports on equal employment opportunity, such as EEO-1 reports. Paragraph 14 requires the company to maintain all materials developed to comply with the Decree.

Finally, Paragraph 16 gives class counsel the right to investigate and attempt to resolve any complaint by an African-American employee who alleges a violation of the injunction set forth in Paragraph 10, and Defendants are to provide any documents reasonably requested during such an investigation. This provision is not intended to permit black employees to bypass internal complaint or grievance procedures; nor does

the provision limit whatever other rights black employees may have to assert violations of EEO law.

### C. <u>Monetary Relief</u>

Section IV of the Consent Decree (¶¶ 17-22) relates to monetary relief. Under Paragraph 17, Defendants agree to pay a settlement sum of $1,830,000 in six installments, beginning 30 days after Court approval and ending on December 31, 2008, provided that Court approval occurs on or before December 31, 2004. UTDL's agreement to the settlement sum was predicated upon its ability to carry back losses attributable to the settlement to calendar years 2002 and 2003, and Court approval prior to December 31, 2004 is necessary to ensure that can be done. For this reason, Paragraph 18 permits either party to withdraw from the Consent Decree if Court approval does not occur by December 31, 2004, in which case the Decree becomes null and void. Assuming that Court approval occurs by December 31, 2004, payment of the settlement sum operates to resolve all claims for monetary damages that were raised in this case, except for monetary remedies under ¶ 24(c) (which authorizes the Court, upon finding a violation of the Decree, to award such relief as will fully remedy the violation, which may include attorneys' fees).

Paragraph 19 is keyed to the Sealed Supplement to the Decree. Only four individuals submitted timely Opt-Out Forms, and two of these were whites to whom the Class Notice was erroneously sent, so ¶ 1 of the Sealed Supplement does not come into play. It is too early to say with certainty whether ¶¶ 2-4 will be viable, but based on conversations with the individuals involved, it does not seem likely.

Paragraphs 20 and 21 are intended to give some measure of protection to the plaintiff class in the event that Defendants declare bankruptcy. At this juncture, there is no reason to believe that bankruptcy is a realistic possibility.

Finally, Paragraph 22 incorporates the schedule and formula set forth in Exhibit 1 for making payments to class members. Class counsel will make final determinations of the amount due each class member from among those who have submitted timely Claim Forms, and Defendants will have no responsibility or obligation concerning these payments. Before making monetary determinations, class counsel will consult with Settlement Services (the settlement administrator), one of whose tasks is to compute the amount of money owed each class member under the formula.

### D. The Distribution Formula

The formula provides that a total of three distributions will be made to class members following the first, third and sixth installments paid by Defendants (Ex. 1, ¶ 1). To be eligible for a monetary payment, an individual must be a member of the class and must submit a valid Claim Form (¶ 2).

There are two types of monetary payments – back pay and damages – and each is based on plaintiffs' claims in this case. In particular, plaintiffs alleged that African-American employees of UTDL were paid at a lower level than their Latino counterparts. The evidence marshaled by plaintiffs showed this disparity to be about one dollar per hour and to be most pronounced in the period August 1, 1998 through December 31, 1999. See Newsome v. Up-To-Date Laundry, Inc., 219 F.R.D. 356, 360-62 (D. Md. 2004); see also Plaintiffs' Memorandum in Support of Class Certification at 4-7. For these reasons, Paragraph 3 of the Distribution Formula provides that all eligible

individuals will receive one dollar for each hour worked in the period August 1, 1998 through December 31, 1999, subject to legally required withholding.

Paragraph 4 provides that after back pay has been determined, and certain other amounts (specified in ¶¶ 5 and 6) have been set aside, the remaining amount comprises a Damages Fund. This Fund is intended to compensate eligible individuals for the harm they suffered by being subjected to an allegedly hostile work environment. See Newsome, supra; see also Plaintiffs' Memorandum in Support of Class Certification at 9-10, 14-18.

A hostile work environment is one in which harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). Working with this definition, it was determined to compensate eligible individuals based on the length of their service in the allegedly hostile environment, with two caveats: (1) a person who had not worked at UTDL for at least one month (160 hours) during the class period would not be eligible to participate in the Damages Fund, since the hostile environment could not reasonably be seen as pervasive for such an individual, and (2) in the judgment of plaintiffs, the alleged racial harassment abated considerably after UTDL signed a collective bargaining agreement with UNITE in June 2001. For this reason, service in the period August 1, 1998 through June 30, 2001 was accorded more weight than service in the period after UNITE organized UTDL (July 1, 2001 through January 23, 2004).

Paragraphs 5 and 6 of the Distribution Formula contain provisions that are common to consent decrees in EEO cases. First, each of the five class representatives is given a premium of $12,500 for their services in representing the class, as detailed in

9

Paragraphs 25-28 of the attached Declaration of Douglas Huron. Courts regularly approve such premiums for class representatives, especially when they are as modest as these. See, e.g., In Re Southern Ohio Correctional Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997) (citing cases). Such awards are justified when the class representatives expend considerable time and effort on the case beyond that of the other class members, especially by actively reviewing the case and advising counsel. Id. at 273. The class representatives here meet this standard. See also Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001); In re Lease Oil Antitrust Lit., 186 F.R.D. 403, 449 (S.D. Tex. 1999).

As noted, plaintiffs have retained Settlement Services as settlement administrator, and Paragraph 5 of the Distribution Formula provides that a total of $100,000 be set aside to defray the costs of administration and monitoring ($50,000 from each of the first two installments paid by Defendants under Paragraph 17 of the Consent Decree). To the extent that the full $100,000 is not needed to defray these costs, the unused balance will be distributed to eligible individuals in accordance with this formula. The same will be true of interest that accrues.

Paragraph 6 provides for payment to class counsel of $525,000 in attorneys' fees and $85,000 in expenses, or a total of $610,000, with a portion of this amount to be paid from each of the six installments paid by Defendants. That is, counsel are not being paid ahead of the class members.

The attached Declaration of Douglas Huron summarizes the work that counsel performed (see Paragraphs 24, 30-32), and it is also itemized on an accompanying printout. As the printout reflects, Philip Simon performed the lion's share of the legal

work on this case for plaintiffs, from the initial investigation and interviews of potential class members; through filing of this suit, discovery and class certification; to playing the lead role in settlement discussions. Mr. Simon is not able to participate actively now, because on August 1, 2004 he began a two-year leave of absence in Geneva. He has, however, continued to advise other class counsel concerning this case.

Counsels' actual expenses are about $88,000, and fees at counsels' current rates, see Missouri v. Jenkins, 491 U.S. 274, 282 (1989) ("[i]n setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value"), are over $590,000 through October 31, 2004 (see charts attached to Declaration of Douglas Huron and Paragraphs 33-34). More work remains to be done. Plaintiffs originally retained counsel on a one-third contingency basis, and the fee here is under 30 percent of the settlement sum. Counsels' fees have been fully disclosed in the Distribution Formula, and no objection to them has been voiced.

Finally, Paragraph 7 of the Distribution Formula provides that any remainder under $7,500 will not be distributed but will instead be donated to the NAACP Legal Defense and Education Fund, Inc.

### E.  The Remaining Provisions

As discussed above, Section IV of the Consent Decree embraces Paragraphs 17-22 and Exhibit 1 (the Distribution Formula). Following these, Paragraph 23 provides that the Court is to retain jurisdiction over the Injunctive Provisions set forth in Section III for three years (which may be extended upon a showing of good cause), and the Court is to

retain jurisdiction over the Monetary Relief in Section IV until Defendants have made all required payments.

Paragraph 24 sets forth the procedure for seeking relief for alleged violations of the Consent Decree. Only class counsel may seek relief from the Court, and counsel must first attempt for at least 30 days to reach a negotiated resolution. But if a motion is ultimately filed and the moving party prevails, the Court is to award such relief as will fully remedy the violation, which may include an award of attorneys' fees.

Paragraph 25 provides for the extinguishing of any and all claims by class members against Defendants arising on or before January 23, 2004 and based on racial discrimination, including claims before the Maryland Commission on Human Relations, except for those class members who have opted out.

Paragraphs 26-29 set forth the procedures for securing Court approval of the Consent Decree, many of which have already been discussed. Paragraph 29 expressly provides the Decree is not severable; if it is not approved in its entirety, it will be null and void. This is simply a restatement of the familiar legal principle that a District Court reviewing a consent decree has authority only to approve or disapprove the decree in its entirety; piecemeal approval or disapproval is not permitted. Brooks v. Georgia State Bd. of Elections, 59 F.3d 1114, 1119-20 (11th Cir. 1995) (citing Evans v. Jeff D., 475 U.S. 717, 726-27 (1986)); In re Warner Communications Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986) ("it is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms").

**STANDARD OF REVIEW**

Public policy favors settlement of litigation, and this policy is particularly significant in cases such as this, because of the "strong preference" of Congress for "encouraging voluntary settlement of employment discrimination claims." Carson v. American Brands, 450 U.S. 79, 88 n.14 (1981); Flinn v. FMC Corp., 528 F.2d 1169, 1174 (4th Cir. 1975), cert. denied, 424 U.S. 967 (1976).

Under Rule 23(e), F.R.Civ.P., "[a] class action shall not be dismissed or compromised without the approval of the court." In assessing the proposed settlement of a class action, the District Court's overriding obligation is to "evaluate the fairness of the settlement to the class as a whole." Thomas v. Albright, 139 F.3d 227, 233 (D.C. Cir.), cert. denied, 525 U.S. 1033 (1998). In particular,

> before entering a consent decree the court must satisfy itself that the agreement "is fair, adequate, and reasonable" and "is not illegal, a product of collusion, or against the public interest." * * * In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case. See Flinn, [supra], 528 F.2d at 1172-73. While this assessment does not require the court to conduct "a trial or a rehearsal of the trial," the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision." Id. * * * In particular, the "court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement."

United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999) (some citations omitted).

The Consent Decree here satisfies these criteria. Among other things, the parties reached agreement only after nearly three years of hard fought litigation, including extensive discovery – and after the Court acted on plaintiffs' motion for class certification (in which plaintiffs laid out their case on the merits) and after Magistrate Judge Gauvey lent her good offices. There was no collusion here.

In addition, "counsel who negotiated the settlement," <u>United States v. North Carolina</u>, <u>supra</u>, are quite experienced in EEO law, as is evident from the attached Declaration of Douglas Huron (see Paragraphs 2-21). See also <u>Newsome</u>, 219 F.R.D. at 362 ("the expertise of plaintiffs' counsel is undisputed").

Finally, the Consent Decree addresses the concerns identified by plaintiffs. Most broadly, Paragraph 10 enjoins Defendants from "(1) discriminat[ing] against African-American employees based on race, including but not limited to the payment of base wages, assignment of overtime work, and assignment to the Soil Room, (2) engag[ing] in harassment or other demeaning or offensive conduct based on race, including but not limited to the use of racial slurs, epithets or stereotypes, or (3) retaliat[ing] against African-American employees for opposing discrimination and/or harassment."

Paragraphs 11, 12 and 15 focus on racial harassment, requiring Defendants to adopt and implement a meaningful policy against such harassment, to give all UTDL employees annual training concerning the anti-harassment policy, and to cooperate with class counsel to permit effective monitoring of this effort.

Paragraphs 17 and 22, and Exhibit 1 (the Distribution Formula) provide monetary relief to class members in the form both of back pay, in which they receive 100 cents on the dollar for each dollar of alleged underpayment, and damages for having to endure an allegedly hostile work environment, with the most damages going to those workers who were exposed to the environment for the longest periods.

The Consent Decree also provides for effective monitoring by class counsel, who have unfettered discretion under Paragraph 16 to investigate a complaint of a violation, again with the required cooperation of Defendants. And if it proves impossible to resolve

14

the complaint informally, counsel have the authority under Paragraph 24 to raise the matter with the Court, which is empowered to grant full relief, including attorneys' fees, to remedy a violation.

The Consent Decree negotiated by the parties was the product of arms length bargaining.  It addresses the problems uncovered in discovery, and no class member has objected to it.  In these circumstances, it is evident that "the agreement 'is fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.' " United States v. North Carolina, supra.  The parties request that the Court give final approval to the Decree.

## SPECIAL CONSIDERATIONS

As noted above, 13 class members submitted untimely Claim Forms, and one person submitted an untimely Opt-Out Form; class counsel are seeking to contact this individual.  Especially if he changes his mind and instead wishes to submit a Claim Form (as has happened with others), the parties may request that the Court treat the 14 untimely Claim Forms as valid.

Pasquale Hernandez, who is of Italian origin, submitted a Claim Form that acknowledged that he is not African American.  Mr. Hernandez wishes to be included in the class and is one of the three individuals who have notified the Clerk of a desire to speak at the Fairness Hearing.  Apparently Mr. Hernandez has a swarthy complexion, and he has filed an administrative complaint alleging that UTDL treated him as if he were African American.  The parties agree that Mr. Hernandez should be permitted to participate as a class member under the Consent Decree and are attaching a proposed order permitting this.

## CONCLUSION

A review of the history of this litigation, and of the terms of the Consent Decree, shows the Decree to be fair, adequate and reasonable. The Court should give final approval to the Decree, and the parties request that such approval be given before December 31, 2004.

| | |
|---|---|
| /s/ | /s/ |
| Jeanne M. Phelan | Richard A. Salzman |
| WHITEFORD, TAYLOR & PRESTON, LLP | Douglas B. Huron |
| Seven Saint Paul Street, Suite 1300 | Betty Grdina |
| Baltimore, MD 21202 | Tammany M. Kramer |
| 410-347-8738 | HELLER, HURON, CHERTKOF LERNER, SIMON & SALZMAN |
| | 1730 M Street, NW, Suite 412 |
| | Washington, DC 20036 |
| | 202-293-8090 |
| Counsel for Defendants | Counsel for Plaintiffs |